| | |
|---|---|
| DISTRICT COURT, DENVER COUNTY, COLORADO<br>1437 Bannock Street<br>Denver, CO 80202<br>303-606-2300 | DATE FILED: December 14, 2020 10:16 AM<br>FILING ID: 88C2DD8C89AF4<br>CASE NUMBER: 2020CV34229 |
| **ANDREW ROWELL**<br><br>*Plaintiff,*<br><br>vs.<br><br>**THE NORTHWESTERN MUTUAL LIFE INS. CO.**<br><br>*Defendant.* | ▲ COURT USE ONLY ▲ |
| *Attorney for Plaintiffs:*<br>Shawn E. McDermott, #21965<br>Timothy M. Garvey, #42668<br>MCDERMOTT LAW, LLC<br>4600 S. Ulster Street, Suite 800<br>Denver, CO 80237<br>(303) 964-1800<br>(303) 964-1900 (Fax)<br>shawn@mcdermottlaw.net<br>tim@mcdermottlaw.net | Case Number: Div. |
| **COMPLAINT AND JURY DEMAND** | |

Plaintiff, Andrew Rowell ("Andy" or "Mr. Rowell"), for his Complaint and Jury Demand against The Northwestern Mutual Life Ins. Co. ("Northwestern"), states and alleges as follows:

### STATEMENT OF THE CASE

1.      When Mr. Rowell's wife, Sarah Rowell, died, he submitted to Northwestern a claim for life insurance benefits under the policy Northwestern sold to Mrs. Rowell, which named Mr. Rowell as her sole beneficiary. (A true and correct copy of the life insurance policy is attached as **Exhibit 1.**) However, Northwestern—in violation of the policy terms and Colorado law—repeatedly rejected Mr. Rowell's claim, forcing him to file this Complaint and Jury Demand, in which he now seeks to recover $400,000.00 in life insurance benefits, plus extra-contractual damages stemming from Northwestern's knowingly unreasonable breach of its contractual and legal obligations to him.

EXHIBIT A

## JURISDICTION, VENUE & PARTIES

2.      Mr. Rowell is an individual who resides and is domiciled at 5502 County Road V, Wiggins, Colorado, 80654, and at all times relevant is and was a resident, domiciliary, and citizen of the State of Colorado.

3.      Northwestern is, upon information and belief, a mutual insurance company, authorized to conduct the business of insurance in the State of Colorado.

4.      As a mutual insurance company conducting business in the State of Colorado, Northwestern has members and shareholders residing in the State of Colorado, including Mr. Rowell.

5.      Northwestern's principal address in the State of Colorado is 1560 Broadway, Denver, Colorado, 80202.

6.      Jurisdiction is proper in this Court under C.R.S. § 13-1-124(1), because the causes of action asserted arise from the transaction of business in the State of Colorado and relate to a contract of insurance on a person and risk residing within the State of Colorado at the time of contracting.

7.      Venue is proper in this Court under C.R.C.P. 98(c)(1), because the Defendant was served in Denver County.

8.      This Court has subject matter jurisdiction over the issues asserted herein.

## GENERAL ALLEGATIONS

### The Insurance Policy at Issue

9.      Effective January 6, 2019, Northwestern issued to Sarah C Rowell ("Sarah" or "Mrs. Rowell") a 20 Year Level Term Life Insurance Policy (No. 22 805 974) (the "Policy"). Exhibit 1 at pdf pp. 1, 4.

10.      Under the Policy, Northwestern—in exchange for Mrs. Rowell's premium payments—promised to pay her beneficiary $400,000.00 upon her death while the Policy was in force. Exhibit 1 at pdf pp. 1, 4.

11.      The Policy was issued to Mrs. Rowell in the State of Colorado on January 6, 2019. Exhibit 1 at pdf p. 4.

12.      Mrs. Rowell designated Andrew M Rowell (her spouse and the Plaintiff herein) as her beneficiary under the Policy. Exhibit 1 at 3 pdf p. 4.

13.      The Policy was in force with all premiums paid as of April 24, 2019.

### The Event Triggering Northwestern's Duties Under the Policy

14.      In the early morning hours of April 24, 2019, Sarah Rowell (Andy's wife and the mother of their two children) was found on the floor of her bedroom with a gunshot wound to the head and their infant child in the bed. No suicide note was found.

EXHIBIT A

15.     At the time of her death, Sarah was 31 years old, 5 feet and 5 inches tall, and weighed 107 pounds.

16.     A post-mortem sample of Sarah's urine revealed a blood alcohol content ("BAC") of 246 mg/dL, while a post-mortem sample of her vitreous fluid revealed a BAC of 220 mg/dL, and a post-mortem sample of her blood revealed a BAC of .177 grams of ethyl alcohol per 100 mL. *See* NMS Labs, Supplemental Report, May 15, 2020 (attached as **Exhibit 2**); Letter from Sarah Urfer, M.S., Chief Forensic Toxicologist, Chematox, to Timothy Garvey, McDermott Law, Aug. 25, 2020 (attached as **Exhibit 3**).

17.     According to the National Institutes of Health, Sarah's alcohol intoxication at these levels would have left her with "severe impairment" to the point that her judgment and decision making would have been "dangerously impaired." *See* National Institute on Alcohol Abuse and Alcoholism, "Understanding the Dangers of Alcohol Overdose" (attached as **Exhibit 4**) *available at* https://www.niaaa.nih.gov/publications/brochures-and-fact-sheets/understanding-dangers-of-alcohol-overdose.

18.     Additionally, Sarah's alcohol intoxication was magnified by other intoxicants in her system, as post-mortem drug screens were positive for oxycodone, oxymorphone, and THC-COOH at the time of her death. *See* Exhibits 2–3.

19.     The prescription warning label for oxycodone states, "[c]oncomitant use of opioids with benzodiazepines or other central nervous system (CNS) depressants, including alcohol, may result in profound sedation, respiratory depression, coma, and death." Highlight of Prescribing Information for Oxycodone Hydrochloride Oral Solution (attached as **Exhibit 5**).

20.     Studies show that cannabinoids (such as THC-COOH) may produce a range of psychotic symptoms, including "suspiciousness, paranoid and grandiose delusions, conceptual disorganization, fragmented thinking, and perceptual alterations … depersonalization, derealization, alterations in sensory perceptions, and feelings of unreality." Radhakrishnan, Rajiv, et al, *Gone to pot— a review of the association between cannabis and psychosis.* May 2014; 5: 54 *available at* https://www.frontiersin.org/articles/10.3389/fpsyt.2014.00054/full. And, these effects can be further heightened when cannabinoids are ingested orally via edibles—which is how Ms. Rowell would have likely ingested it—as opposed to simply being smoked.

21.     The Centers for Disease Control warns, "[u]sing alcohol and marijuana at the same time is likely to result in greater impairment than when using either one alone." Centers for Disease Control and Prevention, *What are the effects of mixing marijuana with alcohol, tobacco, or prescription drugs? available at* www.cdc.gov/marijuana/faqs/mixing-marijuana-with-alcohol-tobacco-drugs.html.

22.     The combination of alcohol, marijuana, and oxycodone/oxymorphone in Sarah's system made it so she could not have formed the intent needed to commit suicide, because this combination of intoxicants is "likely to impair a person's ability to knowingly and intelligently perform actions with total comprehension of the ramifications of these actions including the act of self destruction," and Sarah would have been "substantially impaired at the time of her death while under the influence of these drugs as described thus impairing her ability to form the intent to commit an act of self-destruction." Exhibit 3 at 4.

EXHIBIT A

23.     Due to the combination of impairing intoxicants in her system when she died, Sarah was too impaired to possess the *mens rea* needed to intentionally kill herself. That is, Sarah's level of severe intoxication from multiple substances rendered her unable to understand the physical nature and consequences of the act that eventually took her life.

24.     Because Sarah was too impaired to understand the physical nature and consequences of the act that eventually took her life, she could not have (and did not) intentionally kill herself; there was simply no "suicide" in the context of a claim for life insurance benefits.

### Northwestern's Rejections of Mr. Rowell's Claims for Benefits

25.     After Sarah's death, Mr. Rowell submitted a claim for benefits under the Policy.

26.     By letter dated July 23, 2019, Northwestern rejected Mr. Rowell's claim for benefits, asserting that because "Sarah's death by suicide occur[ed] within one year of the Date of Issue," the Policy only required Northwestern to pay Mr. Rowell the premiums paid on the Policy, plus interest. In doing so, Northwestern cited the Policy provision that states, "If the insured dies by suicide within one year from the Date of Issue, the amount payable by the Company will be limited to the premiums paid." Letter from Sheila Hauerwas, Northwestern Mutual, to Andrew M. Rowell, July 23, 2019 (attached as **Exhibit 6**).

27.     To declare Sarah's death a suicide, Northwestern relied solely on the fact that the death certificate and Medical Examiner's report listed her manner of death as a "suicide." Exhibit 6.

28.     After Northwestern rejected his claim for benefits, Mr. Rowell repeatedly requested a copy of the insurance company claim file to ensure Northwestern had all the information it needed to make the right decision and so that he could contest any misinformation its decision may have relied on.

29.     Northwestern repeatedly refused to provide Mr. Rowell with the claim, claiming that it was proprietary.

30.     By letter dated August 26, 2020, Mr. Rowell, through counsel, timely submitted to Northwestern an internal appeal of its rejection of his claim for benefits. Letter from Timothy M. Garvey, McDermott law, to Sheila Hauerwas, Northwestern Mutual, Aug. 26, 2020 (attached as **Exhibit 7**).[1] However, Mr. Rowell's ability to provide as much information as possible to contest Northwestern's decision was prejudiced by Northwestern's refusal to provide him with the claim file.

31.     In his appeal letter dated August 26, 2020, Mr. Rowell provided evidence of Mrs. Rowell's severe intoxication at the time of her death, which demonstrated that she was too intoxicated to commit an act of self-destruction with the intent to kill herself. Exhibit 7.

32.     In his appeal letter dated August 26, 2020, Mr. Rowell provided evidence that when rejecting his claim Northwestern ignored Mrs. Rowell's severe intoxication, which caused its decision to violate Colorado law. Exhibit 7.

---

[1] For the sake of brevity, we are including the appeal letter without the exhibits referenced therein.

EXHIBIT A

33.     In his appeal letter dated August 26, 2020, Mr. Rowell provided evidence that Northwestern conducted an inadequate investigation into the cause of Mrs. Rowell's death and whether it met the legal definition of a "suicide" in the context of a suicide exclusion under Colorado law. Exhibit 7.

34.     In his appeal letter dated August 26, 2020, Mr. Rowell provided evidence showing that Northwestern's rejection of his claim impermissibly relied on suspicions, rather than facts. Exhibit 7.

35.     In his appeal letter dated August 26, 2020, Mr. Rowell provided substantial evidence demonstrating that his wife's death did not satisfy the definition of a "suicide" under Colorado law within the context of a suicide exclusion in a life insurance policy.

36.     In his appeal letter dated August 26, 2020, Mr. Rowell provided substantial information on Colorado law that required Northwestern to pay the claim.

37.     By letter dated October 15, 2020, Northwestern upheld its claim decision, once again relying on suspicion and speculation, rather than facts. Letter from Sheila Hauerwas, Northwestern, to Timothy Garvey, McDermott Law, Oct. 15, 2020 (attached as **Exhibit 8**).

### Northwestern's Knowledge of Its Duties Under Colorado Law

38.     When Northwestern refused to provide Mr. Rowell with the claim file, it knew:

a.   The claim file was not proprietary;

b.   Colorado law required it to maintain a claim file and mandated its contents (3 CCR 702-1 Reg. 1-1-7);

c.   It was preventing itself from making the correct decision on appeal by withholding information from Mr. Rowell;

d.   It was ensuring that its decision would rest on less than all the available information; and

e.   It would likely require Mr. Rowell to institute litigation to recover amounts due under the Policy (in violation of C.R.S. § 10-3-1104(1)(h)).

39.     When Northwestern denied Mr. Rowell's claim and when it upheld that decision after an internal appeal, Northwestern knew that under Colorado law the word "suicide" as used in a life insurance policy exclusion "is limited to acts of intentional self-destruction; it is the deliberate termination of one's existence." Exhibit 7 (quoting *Renfandt v. N.Y. Life Ins. Co.*, 2018 CO 49 at ¶ 6).

40.     When Northwestern denied Mr. Rowell's claim and when it upheld that decision after an internal appeal, it knew that under Colorado law a suicide exclusion in a life insurance policy "excludes coverage only if the insured, whether sane or insane at the time, committed an act of self-destruction with the intent to kill himself." Exhibit 7 (quoting *Renfandt*, 2018 CO 49 at ¶ 7).

41.     When Northwestern denied Mr. Rowell's claim and when it upheld that decision after an internal appeal, Northwestern knew that under Colorado law if the insured's intoxication renders

the insured unable to "understand the physical nature and consequences of the act, then he did not intentionally kill himself. In that event, there is simply no 'suicide.'" Exhibit 7 (quoting *Renfandt*, 2018 CO 49 at ¶ 52 n.7).

42.     When Northwestern denied Mr. Rowell's claim and when it upheld that decision after an internal appeal, Northwestern knew that under Colorado law it was required to fully investigate the claim before denying it.  Exhibit 7 (citing, *inter alia*, *Brodeur v. American Home Assur. Co.*, 169 P.3d 139, 147 n.7 (Colo. 2007) ("bad faith can occur in the unreasonable refusal to investigate a claim or to gather facts.")).

43.     When Northwestern denied Mr. Rowell's claim and when it upheld that decision after an internal appeal, Northwestern knew that under Colorado law implicit in the duty to investigate is the requirement that the investigation be adequate and fair, which means the insurer must diligently search for evidence supporting the insured's claim and not merely seeking evidence upholding its own interests. Exhibit 7 (citing, *inter alia*, Steven Plitt et al., 4 Couch on Ins. § 207:25 (3d ed. 2015)).

44.     When Northwestern denied Mr. Rowell's claim and when it upheld that decision after an internal appeal, Northwestern knew that under Colorado law the purpose of a suicide exclusion is to "protect insurers from a 'risk' that lies wholly in the control of the insured." Exhibit 7 (citing *Renfandt*, 2018 CO 49 at ¶ 51).

45.     When Northwestern denied Mr. Rowell's claim and when it upheld that decision after an internal appeal, Northwestern knew that under Colorado law to apply a suicide exclusion "to an individual who lacks suicidal intent is inconsistent with the purpose of such provisions." Exhibit 7 (citing *Renfandt*, 2018 CO 49 at ¶ 51).

46.     When Northwestern denied Mr. Rowell's claim and when it upheld that decision after an internal appeal, Northwestern knew that Mrs. Rowell's severe intoxication at the time of her death made her unable to understand the physical nature and consequences of the act that presumably took her life.

47.     When Northwestern denied Mr. Rowell's claim and when it upheld that decision after an internal appeal, it knew that under Colorado law Mrs. Rowell's death could not be considered a "suicide," because she was unable to form the necessary intent to kill herself.

48.     When Northwestern denied Mr. Rowell's claim and when it upheld that decision after an internal appeal, Northwestern knew there was no evidence that Mrs. Rowell intended to defraud Northwestern by taking her own life soon after obtaining the Policy; rather, it knew that Mr. Rowell had to convince her to get a life insurance policy in the first place and that their insurance agent had actually recommended taking out a larger policy. Exhibit 7.

## CLAIMS FOR RELIEF

49.     In light of the allegations above, Sarah Rowell did not commit "suicide" as the Colorado Supreme Court has interpreted that word within the context of a life insurance policy, because she was unable to understand the physical nature and consequences of her actions due to her severe intoxication. And, based on the facts and circumstances alleged herein, as well as others to be

uncovered during discovery and presented at trial, Northwestern breached its legal and contractual obligations by denying Mr. Rowell's claim for benefits based upon the Policy's suicide limitation.

50.     Because Mr. Rowell has otherwise satisfied all other conditions for receiving benefits under the Policy, he asserts the following claims for relief.

<div align="center">

FIRST CLAIM FOR RELIEF
(BREACH OF CONTRACT)

</div>

51.     Mr. Rowell realleges each and every allegation of above and below as if fully set forth herein.

52.     The Policy constitutes a contract of insurance.

53.     Plaintiff is entitled to received life insurance benefits under the Policy, because Mrs. Rowell's death was not a "suicide" as the Colorado Supreme Court has interpreted that word in the context of a life insurance policy limitation.

54.     Through the acts and omissions described herein, as well as those yet to be uncovered through discovery, Northwestern breached the contract of insurance.

55.     Northwestern's breach of the insurance contract has caused Plaintiff to suffer injuries, damages, and losses in amount to be proven at trial.

<div align="center">

SECOND CLAIM FOR RELIEF
(BAD FAITH BREACH OF AN INSURANCE CONTRACT)

</div>

56.     Mr. Rowell realleges each and every allegation of above and below as if fully set forth herein.

57.     Northwestern agreed to be bound by the terms of the Policy and Colorado law.

58.     Mr. and Mrs. Rowell performed all obligations under the Policy.

59.     Northwestern was obligated to deal with Mr. Rowell in good faith when considering his claim for benefits.

60.     Through the acts and omissions described herein, as well as those yet to be uncovered through discovery, Northwestern breached the duties of good faith and fair dealing that it owed (and continues to owe) to Mr. Rowell.

61.     Through the acts and omissions described herein, as well as those yet to be uncovered through discovery, Northwestern knew its acts and omissions in considering Mr. Rowell's claim for benefits were unreasonable, or it recklessly disregarded the reasonableness of its acts and omissions.

62.     As a proximate result of Northwestern's acts and omissions, Plaintiff has suffered compensable economic and non-economic harms and losses in amounts to be proven at trial, including without limitation:

EXHIBIT A

a.  The contract benefits;

b.  Being forced to institute litigation to recover benefits owed under the Policy;

c.  Incurring additional attorneys' fees and litigation costs;

d.  Enduring the emotional trauma of being unnecessarily thrust into a lawsuit over his deceased wife's life insurance proceeds;

e.  Inconvenience, emotional stress, mental suffering, anguish, anxiety, annoyance, humiliation, and loss of the enjoyment of life;

f.  The adverse effect on his financial well-being from the denial of benefits; and

g.  Other harms and losses.

**WHEREFORE**, Plaintiff Andrew Rowell asks that judgment be entered in his favor and against the Defendant as follows:

1.  For compensatory economic, noneconomic, special, and exemplary damages in amounts to be proven at trial;

2.  For interest (statutory and moratory) as provided by law;

3.  For attorneys' fees and other costs of suit, expert witness fees and prejudgment interest, pre-filing interest, and post judgment interest permitted by law, contract, or otherwise; and

4.  For such other and further relief as the Court deems just and proper.

## PLAINTIFF DEMANDS A TRIAL BY JURY

DATED this 14th day of December 2020,

*s/ Timothy Garvey*
Shawn E. McDermott
Timothy M. Garvey
McDERMOTT LAW, LLC
4600 S. Ulster St., Suite 800
Denver, CO 80237
(303) 964-1800
(303) 964-1900
*shawn@mcdermottlaw.net*
*tim@mcdermottlaw.net*

*Counsel for Plaintiff*

EXHIBIT A

<u>Plaintiff's Address</u>:

5502 County Road V
Wiggins, CO 80654

EXHIBIT A

## Northwestern Mutual`

The Northwestern Mutual Life Insurance Company agrees to pay the benefits provided in this policy
(the "Policy"), subject to its terms and conditions.
Signed at Milwaukee, Wisconsin on the Date of Issue.

DATE FILED: December 14, 2020 10:16 AM
FILING ID: 6F8BBBE89AF4
CASE NUMBER: 2020CV34229

*John E. Schlifke*                    *Raymond A. Nainster*

Chief Executive Officer                    Secretary

### TERM LIFE POLICY

**Participating**

Insurance payable on death of Insured before Expiry Date.

Convertible on or before the Final Conversion Date.

Premiums are payable to the Expiry Date.

The Expiry Date and Final Conversion Date are shown on page 3.

**Right To Return Policy. Please read this Policy carefully.** The Policy may be returned by the Owner for any reason within ten days after it was received. The Policy may be returned to the Northwestern Mutual agent who sold it to you or to the Company at 720 East Wisconsin Avenue, Milwaukee, Wisconsin 53202 ("Home Office"), 414-271-1444. If returned, the Policy will be considered void from the beginning. Any premium paid will be refunded.

ICC12.TT.TERM.L20.(0513)

| | | | |
|---|---|---|---|
| **Insured** | Sarah C Rowell | **Age and Sex** | 31 Female |
| **Policy Date** | January 6, 2019 | **Policy Number** | 22 805 974 |
| **Plan** | 20 Year Level Term | **Amount** | $400,000 |

ICC12.TT.TERM.L20.(0513)

**EXHIBIT 1**

1

334

## Northwestern Mutual'

**It is recommended that you ...**

read your Policy.

notify your Northwestern Mutual agent or the Company at 720 East Wisconsin Avenue, Milwaukee, Wisconsin 53202, of an address change.

call your Northwestern Mutual agent for information--particularly on a suggestion to terminate or exchange this Policy for another policy or plan.

**Important Notice Concerning Statements in the Application for Your Insurance**

Please read the copy of the application attached in this Policy. Omissions or misstatements in the application could cause an otherwise valid claim to be denied. Carefully check the application and write to the Company at 720 East Wisconsin Avenue, Milwaukee, Wisconsin 53202, within ten days of delivery, if any information shown on it is not correct and complete, or if any past medical history or other information has been left out of the application. The application is part of the Policy and the Policy was issued on the basis that the answers to all questions and the information shown on the application are correct and complete.

**Election of Trustees**

The members of The Northwestern Mutual Life Insurance Company are its policyholders of insurance policies and deferred annuity contracts. The members exercise control through a Board of Trustees. Elections to the Board are held each year at the annual meeting of members. Members are entitled to vote in person or by proxy.

<div align="center">

**TERM LIFE POLICY**

**Participating**

Insurance payable on death of Insured before Expiry Date.

Convertible on or before the Final Conversion Date.

Premiums are payable to the Expiry Date.

The Expiry Date and Final Conversion Date are shown on page 3.

</div>

ICC12.TT.TERM.L20.(0513)

<div align="center">

**EXHIBIT 1**

2

</div>

355

EXHIBIT A

**This Policy is a legal contract between the Owner and
The Northwestern Mutual Life Insurance Company.**
**Read your Policy carefully.**

# TABLE OF CONTENTS

**POLICY SCHEDULE PAGES**

**SECTION 1. THE CONTRACT**
- Section 1.1 Life Insurance Benefit
- Section 1.2 Expiry of Policy
- Section 1.3 Entire Contract; Changes
- Section 1.4 Incontestability
- Section 1.5 Suicide
- Section 1.6 Dates
- Section 1.7 Misstatement
- Section 1.8 Payments by the Company
- Section 1.9 Conformity with Interstate Insurance Product Regulation Commission Standards

**SECTION 2. OWNERSHIP**
- Section 2.1 The Owner
- Section 2.2 Transfer of Ownership
- Section 2.3 Naming and Changing a Successor Owner
- Section 2.4 Collateral Assignment

**SECTION 3. PREMIUMS**
- Section 3.1 Amount of Premium
- Section 3.2 Premium Payment
- Section 3.3 Frequency
- Section 3.4 Grace Period
- Section 3.5 Premium Refund at Death

**SECTION 4. REINSTATEMENT**

**SECTION 5. DIVIDENDS**
- Section 5.1 Annual Dividends
- Section 5.2 Use of Dividends
- Section 5.3 Automatic Use of Dividend Accumulations For Premium Payment
- Section 5.4 Payment of Dividend Accumulations
- Section 5.5 Dividend at Death

**SECTION 6. CONVERSION TO PERMANENT INSURANCE**
- Section 6.1 Attained Age Conversion
- Section 6.2 Effective Date
- Section 6.3 Conversion of Waiver of Premium Benefit

**SECTION 7. BENEFICIARIES**
- Section 7.1 Definition of Beneficiaries
- Section 7.2 Naming and Changing of Beneficiaries of the Life Insurance Benefit
- Section 7.3 Succession in Interest of Beneficiaries of the Life Insurance Benefit
- Section 7.4 Trustee as Beneficiary
- Section 7.5 General

**SECTION 8. PAYMENT OF POLICY BENEFITS**
- Section 8.1 Payment of Proceeds
- Section 8.2 Income Plan Elections
- Section 8.3 Income Plan Offerings
- Section 8.4 Naming and Changing of Beneficiaries under Income Plans
- Section 8.5 Succession in Interest of Beneficiaries under Income Plans
- Section 8.6 Income Plan Rates

**ADDITIONAL BENEFITS (if any)**

**APPLICATION**

ICC12.TT.TERM.L20.(0513)

**EXHIBIT 1**                                                    **3**

335

EXHIBIT A

**POLICY SCHEDULE PAGES**
Date of Issue - January 6, 2019

This policy was issued in the State of Colorado.
The Colorado Division of Insurance phone number is: (303) 894-7499.

| Plan and Additional Benefits | Amount | Annual Premiums | Payable For |
|---|---|---|---|
| 20 Year Level Term | $400,000 | See Table | 20 Years |
| Waiver of Premium | | See Table | 20 Years |

An annual premium is payable January 6, 2019 and every January 6 after that.

The first annual premium is $█████

Final Conversion Date: January 6, 2029       Expiry Date: January 6, 2039

This Policy is issued in a Premier (Non-Tobacco) premium classification.

This policy is participating. Dividends are not guaranteed. It is not expected that any dividends will be payable on this policy.

Following the Table of Annual Premiums is information on how to determine the amount of the premium when paid more often than annually.

**TABLE OF ANNUAL PREMIUMS**

| For Policy Year Beginning January 6, | $400,000 20 Year Level Term Premium | Waiver of Premium Benefit | Total Premiums |
|---|---|---|---|
| 2019 | $ | $ | $ |
| 2020 | | | |
| 2021 | | | |
| 2022 | | | |
| 2023 | | | |
| 2024 | | | |
| 2025 | | | |
| 2026 | | | |
| 2027 | | | |
| 2028 | | | |
| 2029 | | | |
| 2030 | | | |
| 2031 | | | |
| 2032 | | | |
| 2033 | | | |

- Continued on Page 3-1 -

| | |
|---|---|
| **Direct Beneficiary** | Andrew M Rowell, spouse of the Insured |
| **Owner** | Sarah C Rowell, the Insured |

| | | | |
|---|---|---|---|
| **Insured** | Sarah C Rowell | **Age and Sex** | 31 Female |
| **Policy Date** | January 6, 2019 | **Policy Number** | 22 805 974 |
| **Plan** | 20 Year Level Term | **Amount** | $400,000 |

ICC12.TT.TERM.L20.(0513)               **EXHIBIT 1**               (REV0116)

3

336

EXHIBIT A

Policy Number: 22 805 974

**TABLE OF ANNUAL PREMIUMS**
- Continued from Page 3 -

| For Policy Year Beginning January 6, | $400,000 20 Year Level Term Premium | Waiver of Premium Benefit | Total Premiums |
|---|---|---|---|
| 2034 | | | |
| 2035 | | | |
| 2036 | | | |
| 2037 | | | |
| 2038 | | | |

The premium for the conversion benefit, which is a required component of all of the Company's term policies, is 7.2% of the premium above.

The total amount of premiums due per year when paid on frequencies other than annual is greater than the annual premium shown in the table above. Premiums paid on a basis other than annual are increased to reflect the time value of money and to cover the administrative costs of processing the additional premium payments. If premiums are paid more often than annually (See Section 3.3), the premium amount will be determined as follows:

| Premium Frequency | Multiply Annual Premium by: *** |
|---|---|
| Every 6 months | .5096 |
| Every 3 months | .2573 |
| Monthly | .0863 |

*** Depending upon the frequency premiums are paid and the premium payment method used, the Company may also charge an administrative fee, not to exceed $5 per payment, to cover the additional costs associated with the payment method.

ICC12.TT.TERM.L20.(0513)             **EXHIBIT 1**             (REV0116)

337

EXHIBIT A

Policy Number: 22 805 974

(This page is intentionally blank.)

ICC12.TT.TERM.L20.(0513)                    **EXHIBIT 1**                    (REV0116)

EXHIBIT A

# SECTION 1. THE CONTRACT

## 1.1 LIFE INSURANCE BENEFIT

The Northwestern Mutual Life Insurance Company ("Company") will pay the Life Insurance Benefit on the death of the Insured while this Policy is in force. Subject to the terms and conditions of the Policy, the payment of the Life Insurance Benefit will be:

- made after proof of the death of the Insured is received at the Home Office; and
- made to the Beneficiary or other payee under Section 7.

This payment of the Life Insurance Benefit will be made within 60 days after proof of death is received.

When all premiums due have been paid, the amount of the Life Insurance Benefit will be:

- the plan Amount shown on page 3; plus
- the amount of dividend accumulations, if any (Section 5.2); plus
- the amount of any premium refund (Section 3.5) and dividend, if any, at death (Section 5.5).

These amounts will be determined as of the Insured's date of death.

When the Insured dies during the grace period following the due date of any unpaid premium, the amount of the Life Insurance Benefit will be:

- the amount determined above assuming the overdue premium has been paid; less
- the amount of the unpaid premium.

## 1.2 EXPIRY OF POLICY

Unless terminated earlier (because a premium was not paid, conversion, or otherwise), this Policy will terminate on the Expiry Date shown on page 3.

## 1.3 ENTIRE CONTRACT; CHANGES

This Policy, together with the attached application and any application supplements, and any attached amendments, endorsements, riders and additional benefits are the entire contract. Statements in the application are representations and not warranties. This Policy may be changed by the Company to maintain compliance with applicable state and federal law or to assure continued qualification of the Policy under federal tax laws. The Owner may add any available benefits or riders to the Policy, or remove existing benefits or riders, subject to conditions and underwriting requirements set by the Company at the time of the request. A change in the terms of, or a waiver of the Company's rights under, the Policy is valid only if it is approved in writing by an officer of the Company. The Company may require that the Policy be sent to it for endorsement to show a change or waiver. No agent has the authority to change the Policy or waive the Company's rights thereunder.

## 1.4 INCONTESTABILITY

Except as stated below for a fraudulent misstatement, the Company will not contest this Policy after the Policy has been in force, during the lifetime of the Insured, for two years from the Date of Issue or for two years from the effective date of a reinstatement (Section 4). Except as stated below for a fraudulent misstatement, a change (including an increase in the amount of insurance) to the terms of the Policy after the Date of Issue, which occurred at the request of the Owner and was subject to the Company's insurability requirements, will be incontestable after the change has been in force, during the lifetime of the Insured, for two years from the effective date of the change. In issuing the insurance, the Company has relied on the application(s). While the insurance is contestable, the Company, on the basis of a material misstatement in the application(s), may rescind the insurance or deny a claim. After the applicable contestability period set forth above, the Company may rescind the insurance for a fraudulent misstatement to the extent allowed by the law of the state in which this Policy is delivered or issued for delivery.

## 1.5 SUICIDE

If the Insured dies by suicide within one year from the Date of Issue, the amount payable by the Company will be limited to the premiums paid.

**EXHIBIT 1**                                          7

339

EXHIBIT A

## 1.6 DATES

The contestable and suicide periods begin with the Date of Issue. Policy months, years, and anniversaries are computed from the Policy Date. Both dates applicable to the Policy as originally issued are shown on page 3. The Date of Issue will be later for any increase in the amount of insurance coverage placed into effect after the Policy is originally issued.

## 1.7 MISSTATEMENT

If the age or sex of the Insured has been misstated, the amount payable will be the amount which the premiums paid would have purchased at the correct age and sex.

## 1.8 PAYMENTS BY THE COMPANY

All payments by the Company under this Policy are payable in United States dollars at the Home Office.

## 1.9 CONFORMITY WITH INTERSTATE INSURANCE PRODUCT REGULATION COMMISSION STANDARDS

This Policy was approved under the authority of the Interstate Insurance Product Regulation Commission and issued under the Commission standards. Any provision of this Policy which, on the Date of Issue, is in conflict with the Commission standards for an Individual Term Life Insurance Policy, as in effect on the Date of Issue, is hereby amended to conform to those standards as of the Date of Issue.

# SECTION 2. OWNERSHIP

## 2.1 THE OWNER

The Owner is named on page 3. All Policy rights may be exercised by the Owner, the Owner's successor, or the Owner's transferee without the consent of any Beneficiary. If the Policy has more than one Owner, Policy rights must be exercised only by authorization of all Owners. After the death of the Insured, Policy rights may be exercised only as provided in Section 7.

## 2.2 TRANSFER OF OWNERSHIP

The Owner may transfer the ownership of this Policy by providing the Company with written proof of the transfer and supplying the information in a form that is acceptable to the Company, including supplying any required information about the new Owner. The Company will not be responsible to a subsequent Owner for any payment or other action taken by the Company until the above information, in a form acceptable to the Company, is received at the Home Office. The transfer will then take effect as of the date it was signed unless otherwise specified by the Owner. The Company may require that the Policy be sent to it for endorsement to show the transfer.

## 2.3 NAMING AND CHANGING A SUCCESSOR OWNER

If the Owner is not the Insured, the Owner may name or change a successor owner who will

become the new owner upon the Owner's death. Naming or changing a successor owner will be effective upon receipt at the Home Office of a written request that is acceptable to the Company, including supplying any required information about the successor owner. A successor owner succeeds to the interests of the Owner only if the Owner is not the Insured at the time of the Owner's death.

## 2.4 COLLATERAL ASSIGNMENT

The Owner may assign this Policy as collateral security. The Company is not responsible for the validity or effect of a collateral assignment. The Company will not be responsible to an assignee for any payment or other action taken by the Company before receipt of the assignment in writing at the Home Office. Unless otherwise specified by the Owner, the assignment will take effect on the date the assignment is signed by the Owner, subject to any payments made or actions taken prior to receipt of the assignment.

The interest of any Beneficiary will be subject to any collateral assignment made either before or after the Beneficiary is named.

A collateral assignee is not an Owner. A collateral assignment is not a transfer of ownership. Ownership can be transferred only by complying with Section 2.2 or Section 2.3.

EXHIBIT 1                                                           8

EXHIBIT A

# SECTION 3. PREMIUMS

## 3.1 AMOUNT OF PREMIUM

The annual premiums due for the plan Amount and the annual premiums due for any additional benefits are shown on page 3.

## 3.2 PREMIUM PAYMENT

All premiums after the first are payable at the Home Office or to a payment center designated by the Company. All payments must be made in United States dollars payable through a United States financial institution. A receipt signed by an officer of the Company will be furnished on request. A premium must be paid on or before its due date. The date when each premium is due and the number of years for which premiums are payable are described on page 3.

## 3.3 FREQUENCY

Premiums may be paid every 3, 6 or 12 months. The Company may offer other payment programs that permit the payment of premiums on other frequencies or provide additional features such as electronic funds transfer.

On request, the Company will provide:
- the amount of the premium due on any available frequency for any Policy year;
- the annual total of premiums due (including the amount of the administrative fee, if any) if paid on frequencies other than annual; and
- the amount by which that total differs from the annual premium. The total amount of premiums due per year when paid on frequencies other than annual is greater than the annual premium (see page 3). The Company also will provide an annual percentage rate calculation upon request.

A change in premium frequency will take effect when the Company accepts a premium on a new frequency.

## 3.4 GRACE PERIOD

A grace period of 31 days will be allowed to pay a premium that is not paid on its due date. The Policy will be in full force during this period. If the Insured dies during the grace period, any overdue premium will be paid from the Life Insurance Benefit of the Policy.

If the premium is not paid within the grace period, the Policy will terminate as of the due date.

## 3.5 PREMIUM REFUND AT DEATH

The Company will refund a portion of a premium paid for the period beyond the date of the Insured's death. The refund will be paid as part of the Life Insurance Benefit.

**EXHIBIT 1**                                          9

340

EXHIBIT A

# SECTION 4. REINSTATEMENT

If this Policy terminates as provided in Section 3.4, it may be reinstated within three years after the due date of the overdue premium. All unpaid premiums (and interest as required in this section) must be received by the Company while the Insured is alive and before the Expiry Date.

In addition, for the Policy to be reinstated more than 31 days after the end of the grace period:

- evidence of insurability must be given that is acceptable to the Company; and
- all unpaid premiums must be paid with interest from the due date of each premium. Interest is at an annual effective rate of 6%.

# SECTION 5. DIVIDENDS

## 5.1 ANNUAL DIVIDENDS

This Policy is eligible to share in the divisible surplus, if any, of the Company. This divisible surplus is determined each year. This Policy's share, if any, will be credited as a dividend on the Policy anniversary. Decisions concerning the amount and appropriate allocation of divisible surplus are within the sole discretion of the Company's Board of Trustees. There is no guaranteed method or formula for the determination or allocation of divisible surplus. The Company's approach is subject to change. There is no guarantee of a divisible surplus. Even if there is a divisible surplus, the payment of a dividend on this Policy is not guaranteed.

It is not expected that any dividends will be payable on this Policy.

## 5.2 USE OF DIVIDENDS

Annual dividends, if any, may be paid under one of the following options:
- **Cash.**
- **Dividend Accumulations.** Dividends will accumulate at interest. Interest is credited at an annual effective rate of 0.5%. The Company may set a higher rate.
- **Premium Payment.** Dividends will be used to reduce premiums. If the balance of a premium is not paid, the dividend will be credited to dividend accumulations.

If no direction is given for the use of dividends, they will be used to reduce premiums.

## 5.3 AUTOMATIC USE OF DIVIDEND ACCUMULATIONS FOR PREMIUM PAYMENT

Dividend accumulations, if any, will be used to pay an overdue premium on this Policy. If dividend accumulations are not large enough to pay the overdue premium, a premium will be paid for any other frequency permitted by this Policy for which dividend accumulations are large enough.

If dividend accumulations are not large enough to pay any premium and if the premium is unpaid at the end of the grace period, the Policy will terminate.

The Owner may revoke or reinstate this Automatic Use of Dividend Accumulations For Premium Payment provision upon receipt at the Home Office of a written request acceptable to the Company.

## 5.4 PAYMENT OF DIVIDEND ACCUMULATIONS

Dividend accumulations, if any, are part of the Life Insurance Benefit payable on the death of the Insured. While the Insured is living, dividend accumulations may be withdrawn by the Owner at any time. If the Policy terminates, any dividend accumulations will be paid to the Owner.

## 5.5 DIVIDEND AT DEATH

If a dividend is payable under Section 5.1, a dividend for the period from the beginning of the Policy year to the date of the Insured's death will be payable as part of the Life Insurance Benefit.

# SECTION 6. CONVERSION TO PERMANENT INSURANCE

## 6.1 ATTAINED AGE CONVERSION

The Owner may convert this entire Policy to a new policy that will be issued at the attained age of the Insured. This may be done on or before the Final Conversion Date shown on page 3. No new evidence of insurability will be required for conversions involving the same or lesser under-writing amount as the term insurance coverage converted. The underwriting amount, which may exceed the amount of term insurance coverage converted, is determined by the Company and represents the mortality risk of the new policy.

A portion of this Policy may be converted, subject to conditions set by the Company at the time of the conversion.

**Plan.** The new policy will be on a permanent single life insurance plan that the Company makes available for this purpose and which is being is-sued by the Company on the date of the conver-sion. If this Policy has an additional benefit, the additional benefit that is made a part of the new policy will contain the provisions of that benefit as it is being issued by the Company on the date of conversion.

**Amount.** The amount of the new policy will be the amount of term insurance coverage converted. The converted plan must meet minimum size re-quirements as of the date of the conversion.

**Premiums.** The premium for the new policy, including any additional benefits, will be deter-mined as of the date of conversion based on:

- the Company's premium rates then in effect;
- the plan and amount of the new policy and any additional benefits;
- the Insured's age on the Insured's birthday nearest the policy date of the new policy; and
- the underwriting classification of this Policy. However, if the underwriting classification of this Policy has been modified or eliminated for policies being issued at the time of con-version, the premium will be based on an appropriate underwriting classification, as de-termined by the Company.

If the new policy allows the payment of addi-tional premiums that have the effect of increasing

cash value, the Company may limit the amount of such premiums.

**Cost of Conversion.** The cost of conversion will be the first premium on the new policy less any dividend and premium credit on the amount con-verted.

**Provisions.** The new policy will contain any ex-clusion provision which is a part of this Policy. The new policy shall provide that the incontestability and suicide periods applicable to the coverage converted will begin from the Date of Issue of this Policy. If the new policy includes additional cov-erage, the incontestability and suicide periods for that additional coverage will begin on the new policy's Date of Issue.

## 6.2 EFFECTIVE DATE

The new policy will take effect on receipt at the Home Office of:

- a written request acceptable to the Com-pany; and
- payment of the cost of conversion.

The amount of term insurance coverage con-verted from this Policy will be surrendered when the new policy takes effect. The Company may require that this Policy be sent to it for endorse-ment to show the conversion.

## 6.3 CONVERSION OF WAIVER OF PREMIUM BENEFIT

If the Waiver of Premium Benefit is a part of this Policy at the time of conversion, the new policy may be issued with the Waiver of Premium Benefit only if the annual premium on the new policy is not greater than the annual premium for the same amount of coverage on the Company's Whole Life Paid Up at 90 plan (or, if that plan has been discontinued, the successor plan then being issued by the Company).

The Waiver of Premium Benefit on the new policy will apply to a disability that started while the converted term insurance coverage was in force.

**Exception.** The new policy may be issued with the Waiver of Premium Benefit only if it is available on the new policy (as determined in Section 6.1) at the time of conversion.

**EXHIBIT 1**

11

341

EXHIBIT A

# SECTION 7. BENEFICIARIES

## 7.1 DEFINITION OF BENEFICIARIES

The term "Beneficiaries" means direct beneficiaries, contingent beneficiaries, and further payees of the Life Insurance Benefit.

## 7.2 NAMING AND CHANGING OF BENEFICIARIES OF THE LIFE INSURANCE BENEFIT

**By Owner.** The Owner may name and change the Beneficiaries of the Life Insurance Benefit:

- while the Insured is living; or
- during the first 60 days after the death of the Insured, if the Insured at the time of his or her death was not the Owner. A change made during the 60 days cannot be revoked.

**Effective Date.** Naming or changing of Beneficiaries will be made on receipt at the Home Office of a written request in good order that is acceptable to the Company. The request will then take effect as of the date that it was signed unless otherwise specified by the Owner. The Company is not responsible for any payment or other action that is taken by it before the receipt of the request. The Company may require that the Policy be sent to it to be endorsed.

## 7.3 SUCCESSION IN INTEREST OF BENEFICIARIES OF THE LIFE INSURANCE BENEFIT

**At Least One Beneficiary Survives And Receives Payment.** If at least one of the Beneficiaries survives the Insured and receives payment of his or her share of the Life Insurance Benefit, then the Life Insurance Benefit will be paid as follows:

**Direct Beneficiaries.** The Life Insurance Benefit of this Policy will be paid in equal shares, unless otherwise designated by the Owner, to the direct beneficiaries who survive and receive payment. If a direct beneficiary dies before receiving all or part of the direct beneficiary's full share, then the unpaid portion will be paid in equal shares to the other direct beneficiaries who survive and receive payment.

**Contingent Beneficiaries.** If the direct beneficiaries do not survive and receive payment of the entire Life Insurance Benefit, then the unpaid portion will be paid in equal shares, unless otherwise designated by the Owner, to the contingent beneficiaries who survive and receive payment. If a contingent beneficiary dies

before receiving all or part of the contingent beneficiary's full share, then the unpaid portion will be paid in equal shares to the other contingent beneficiaries who survive and receive payment.

**Further Payees.** If the direct and contingent beneficiaries do not survive and receive payment of the entire Life Insurance Benefit, then the unpaid portion will be paid in one sum:

- in equal shares, unless otherwise designated by the Owner, to the further payees who survive and receive payment; or
- if no further payees survive and receive payment of the Life Insurance Benefit, then to the estate of the last to die of all of the Beneficiaries.

**No Beneficiaries Survive And Receive Payment.** If no Beneficiaries survive the Insured and receive payment of any portion of the Life Insurance Benefit, then the Life Insurance Benefit will be paid to the Owner or to the Owner's estate.

## 7.4 TRUSTEE AS BENEFICIARY

If a trustee is named as a beneficiary and no qualified trustee makes claim to the Life Insurance Benefit within one year after payment becomes due to the trustee, or if acceptable evidence is furnished to the Company within that year showing that no trustee can qualify to receive payment, payment will be made as though the trustee had not been named.

The Company will be fully discharged of liability for any action taken by the trustee and for all amounts paid to, or at the direction of, the trustee and will have no obligation as to the use of the amounts. In all dealings with the trustee, the Company will be fully protected against the claims of every other person. The Company will not be charged with notice of a change of trustee unless written evidence of the change is received at the Home Office.

## 7.5 GENERAL

**Transfer Of Ownership.** A transfer of ownership, in and of itself, will not change the interest of the Beneficiaries.

**Claims Of Creditors.** So far as allowed by law, no amount payable under this Policy will be subject to the claims of creditors of the Beneficiaries.

ICC12.TT.TERM.L20.(0513)                     10

**EXHIBIT 1**                     **12**

EXHIBIT A

# SECTION 8. PAYMENT OF POLICY BENEFITS

## 8.1 PAYMENT OF PROCEEDS

The Life Insurance Benefit will be paid, as designated, in cash or into an income plan as follows:

- in a manner designated by the Owner and accepted by the Company; or
- if the Owner has not designated an acceptable manner of payment, then in cash or in a manner designated by a direct or contingent beneficiary and accepted by the Company.

The Company will pay interest on the Life Insurance Benefit from the date of death of the Insured until the Life Insurance Benefit is paid in cash or into an income plan. Interest will be paid at an annual effective rate determined by the Company but the rate shall not be less than the rate applicable to this Policy for funds left on deposit, as of the date of death of the Insured. Additional interest will be paid at a rate of 10% annually beginning with the date that is 31 calendar days from the latest of items (a), (b) and (c) to the date the claim is paid, where:

(a) is the date that due proof of death is received by the Company;

(b) is the date the Company receives sufficient information to determine its liability, the extent of the liability, and the appropriate payee legally entitled to the proceeds; and

(c) is the date that legal impediments to payment of proceeds that depend on the action of parties other than the Company are resolved and sufficient evidence of the same is provided to the Company. Legal impediments to payment include, but are not limited to:

- the establishment of guardianships and conservatorships;
- the appointment and qualification of trustees, executors and administrators; and
- the submission of information required to satisfy a state and federal reporting requirements.

## 8.2 INCOME PLAN ELECTONS

**For Income Plans Elected By Owner.** The Owner may elect an income plan for each Beneficiary's share of the Life Insurance Benefit:

- while the Insured is living; or
- during the first 60 days after the death of the Insured, if the Insured at the time of his or her death was not the Owner. An election made during the 60 days cannot be revoked.

**For Income Plans Elected By Beneficiary.** Subject to the Owner's rights during the first 60 days after the death of the Insured, if no income plan has been selected by the Owner upon the death of the Insured, the Beneficiary may elect an income plan for the Life Insurance Benefit.

**Effective Date.** An income plan that is elected by the Owner will take effect on the date of the death of the Insured if the election is received at the Home Office while the Insured is living. In all other situations, an income plan that is elected will take effect on the date the election is received at the Home Office or on a later date, if requested.

**Payment Date.** The first payment is due as of the effective date of the plan. If applicable, proof of the date of birth, acceptable to the Company, must be furnished for each individual on whose life the payments are based.

**Minimum Payment.** The Company may limit the election of an income plan to one that results in payments of at least $50. If payments under an income plan are or become less than $50, the Company may change the frequency of payments. If the payments are being made once every 12 months and are less than $50, the Company may pay the present value or the balance of the income plan.

## 8.3 INCOME PLAN OFFERINGS

The Company will make available the following Life Income Plans:

- **Single Life Income.** The Company will make monthly payments for the selected certain period, if any, and thereafter during the remaining lifetime of the individual upon whose life income payments are based. The choices for the certain period are:

  (a) zero years;

  (b) 10 years; or

  (c) 20 years.

- **Joint And Survivor Life Income.** The Company will make monthly payments for a 10-year certain period and thereafter during the joint lifetime of the two individuals upon whose lives income payments are based and continuing during the remaining lifetime of the survivor.

**EXHIBIT 1**

EXHIBIT A

**Limitations.** A Beneficiary who is a natural person may be paid under a Life Income Plan only if the payments depend on his or her life. A Beneficiary who is a non-natural person may be paid under a Life Income Plan only if the payments depend on the life of the Insured's spouse or the Insured's dependent.

**Payment Frequency.** On request, payments will be made once every 3, 6 or 12 months instead of each month.

**Other Selections.** The Company may offer additional income plans.

### 8.4 NAMING AND CHANGING OF BENEFICIARIES UNDER INCOME PLANS

**For Income Plans Elected By Owner.** The Owner of the Policy may name the direct beneficiaries, contingent beneficiaries, and further payees of an income plan elected for the Life Insurance Benefit. If the Owner of the Policy elected an income plan, a Beneficiary may name and change any contingent beneficiaries and further payees of the Beneficiary's share of the benefits only if:

- the Beneficiary was the Owner of the Policy; or
- no contingent beneficiary or further payee of that share is living.

**For Income Plans Elected By Beneficiary.** If a Beneficiary elected the income plan, the Beneficiary may name and change any contingent beneficiaries and further payees of the Beneficiary's share of the benefits.

### 8.5 SUCCESSION IN INTEREST OF BENEFICIARIES UNDER INCOME PLANS

**Direct Beneficiary.** Amounts payable under an income plan will be payable to the direct beneficiary.

**Contingent Beneficiaries.** At the death of the direct beneficiary, amounts payable under an income plan will be payable in equal shares to the contingent beneficiaries who survive and receive payment. Unless otherwise requested by the Owner, the contingent beneficiaries can elect to:

- continue to receive the remaining period certain payments at the selected frequency;

- receive the present value of the remaining period certain payments in one sum; or
- apply the present value of the remaining period certain payments to a new Life Income Plan.

**Further Payees.** At the death of all direct and contingent beneficiaries, the present value of any unpaid payments under an income plan will be paid in one sum:

- in equal shares to the further payees who survive and receive payment; or
- if no further payees survive and receive payment, to the estate of the last to die of all the direct beneficiaries, contingent beneficiaries and further payees.

Present value will be based on the rate of interest used to determine the amount of the payments.

### 8.6 INCOME PLAN RATES

**Minimum Payment Rates.** Life Income Plan payments will be based on rates declared by the Company. These rates will provide at least as much income as would the Company's rates, on the date that the income plan takes effect, for a single premium immediate annuity contract. Payments under these rates will not be less than the Minimum Payment Rate Tables.

The Life Income Plan payment rates in those tables depend on the sex and the adjusted age of each person on whose life the payments are based. The adjusted age is:

- the age on the birthday that is nearest to the date on which the income plan takes effect; plus
- the age adjustment shown below for the number of Policy years that have elapsed from the Policy Date to the date that the income plan takes effect. A part of a Policy year is counted as a full year.

| POLICY YEARS ELAPSED | AGE ADJUST-MENT | POLICY YEARS ELAPSED | AGE ADJUST-MENT |
|---|---|---|---|
| 1 to 12 | 0 | 37 to 48 | -3 |
| 13 to 24 | -1 | 49 to 60 | -4 |
| 25 to 36 | -2 | 61 or more | -5 |

ICC12.TT.TERM.L20.(0513)    12

**EXHIBIT 1**                    **14**

EXHIBIT A

# MINIMUM PAYMENT RATE TABLES
## Minimum Monthly Income Payments per $1,000 of Proceeds

**SINGLE LIFE INCOME PLAN**

| | SINGLE LIFE MONTHLY PAYMENTS | | | | | | |
|---|---|---|---|---|---|---|---|
| MALE ADJUSTED AGE* | CHOSEN PERIOD (YEARS) | | | FEMALE ADJUSTED AGE* | CHOSEN PERIOD (YEARS) | | |
| | ZERO | 10 | 20 | | ZERO | 10 | 20 |
| 55 | | | | 55 | | | |
| 56 | | | | 56 | | | |
| 57 | | | | 57 | | | |
| 58 | | | | 58 | | | |
| 59 | | | | 59 | | | |
| 60 | | | | 60 | | | |
| 61 | | | | 61 | | | |
| 62 | | | | 62 | | | |
| 63 | | | | 63 | | | |
| 64 | | | | 64 | | | |
| 65 | | | | 65 | | | |
| 66 | | | | 66 | | | |
| 67 | | | | 67 | | | |
| 68 | | | | 68 | | | |
| 69 | | | | 69 | | | |
| 70 | | | | 70 | | | |
| 71 | | | | 71 | | | |
| 72 | | | | 72 | | | |
| 73 | | | | 73 | | | |
| 74 | | | | 74 | | | |
| 75 | | | | 75 | | | |
| 76 | | | | 76 | | | |
| 77 | | | | 77 | | | |
| 78 | | | | 78 | | | |
| 79 | | | | 79 | | | |
| 80 | | | | 80 | | | |
| 81 | | | | 81 | | | |
| 82 | | | | 82 | | | |
| 83 | | | | 83 | | | |
| 84 | | | | 84 | | | |
| 85 and over | | | | 85 and over | | | |

**JOINT AND SURVIVOR LIFE INCOME PLAN**

| MALE ADJUSTED AGE* | JOINT AND SURVIVOR MONTHLY PAYMENTS (with 10 years certain) | | | | | | |
|---|---|---|---|---|---|---|---|
| | FEMALE ADJUSTED AGE* | | | | | | |
| | 55 | 60 | 65 | 70 | 75 | 80 | 85 and over |
| 55 | | | | | | | |
| 60 | | | | | | | |
| 65 | | | | | | | |
| 70 | | | | | | | |
| 75 | | | | | | | |
| 80 | | | | | | | |
| 85 and over | | | | | | | |

*See Section 8.6

The amount of the payment for any other combination of ages will be furnished by the Company on request.

Monthly payment rates are based on 1.00% interest and the 2012 Individual Annuity Mortality Period Table with 125% of Projection Scale G2 and a 5.00% load. Mortality improvements are projected for 4 years plus the remaining life of the Annuitant.

ICC12.TT.TERM.L20.(0513)                                13

**EXHIBIT 1**                                                    **15**

343

EXHIBIT A

# WAIVER OF PREMIUM BENEFIT

## 1. THE BENEFIT

**Disability Before Age 60.** If total disability of the Insured starts on or before the policy anniversary nearest his 60th birthday, the Company will waive all premiums that come due on the policy as long as the total disability continues.

**Disability After Age 60.** If total disability of the Insured starts after the policy anniversary nearest his 60th birthday, the Company will waive those premiums that come due on the policy as long as the total disability continues, but only to the policy anniversary that is nearest his 65th birthday.

**Premium Waived On An Annual Basis.** Even if premiums have been paid more often than every 12 months, a premium waived on a policy anniversary will be an annual premium.

**Refund Of Premium.** The Company will refund that portion of a premium paid which applies to a period beyond the policy month in which the total disability began.

**Premium For Benefit.** The premium for this Benefit is shown on page 3.

## 2. TOTAL DISABILITY

**Definition Of Total Disability.** A total disability is one which prevents the Insured from engaging in an occupation. For the first 24 months of total disability, an occupation is the one that the Insured had at the time he became disabled. After 24 months, an occupation is one for which the Insured is qualified by education, training or experience. Due regard will be given to his vocation and earnings before he became disabled.

**Disabilities Covered By This Benefit.** Premiums are waived for total disability only if:

- the Insured becomes disabled while this Benefit is in force;

- the disability results from an accident or sickness; and

- the disability lasts for at least six months.

**Presumptive Total Disability.** Even if the Insured is able to work, he will be considered totally disabled if he has the total and irrecoverable loss of:

DATE FILED: December 4, 2020 6:16 AM
FILING ID: 88C9DD8C89AF4
CASE NUMBER: 2020CV34229

- use of both hands;
- use of both feet;
- use of one hand and one foot;
- speech; or
- hearing in both ears.

The loss must be the result of an accident that occurs, or from a sickness that first appears, while this Benefit is in force.

## 3. PROOF OF DISABILITY

Before any premium is waived, proof of total disability must be given to the Company within one year from the start of disability. However, the claim will not be affected if the proof is given as soon as reasonably possible.

## 4. PROOF THAT DISABILITY HAS CONTINUED

Proof that the total disability has continued may be required once a year. If the proof is not given when it is required, no more premiums will be waived. The Company will not require proof that the disability continues beyond the policy anniversary that is nearest the 65th birthday of the Insured.

## 5. PAYMENT OF PREMIUM

A premium that comes due while the Insured is disabled, but before the Company has approved the claim, is payable and should be paid. A premium that is paid and later waived will be refunded. A premium that is not paid will be waived if the total disability began before the end of the grace period.

## 6. TERMINATION OF BENEFIT

This Benefit will terminate on the policy anniversary that is nearest the 65th birthday of the Insured, unless he has been totally disabled since the policy anniversary that is nearest his 60th birthday. It will terminate earlier:

- when the policy terminates.
- when the policy becomes extended term or paid-up insurance.
- when the Owner's written request is received at the Home Office.

Raymond J. Maniste

Secretary
THE NORTHWESTERN MUTUAL LIFE
INSURANCE COMPANY

NN 1,2,4,5 WP                    **EXHIBIT 1**                    16

344

EXHIBIT A

POLICY APPLICATION SUPPLEMENT
FOR TERM LIFE INSURANCE POLICY
THE NORTHWESTERN MUTUAL LIFE INSURANCE COMPANY
720 East Wisconsin Avenue,
Milwaukee, Wisconsin 53202

INSURED:                                                    Sarah Rowell

PLAN NAME:                                            20 Year Level Term

POLICY:        Amount                                        $400,000

                   Waiver                                              Yes
                   IPB                                                  No

ANNUAL DIVIDENDS:                                    Reduce Premium

For Administrative Use Only

Age 31, Female, Premier NT
CO L20 - $400,000 Total Protection
Illustration No. CO3315-PDLPJ-111323

ICC13 90-1 Term.Supp.(0316)                    Policy Number

 NB-23-1

345

EXHIBIT A

DocuSign Envelope ID: 634B8E47-C7AE-4391-86D8-F3D362EAD9FB

**THE NORTHWESTERN MUTUAL LIFE INSURANCE COMPANY**
**720 EAST WISCONSIN AVENUE, MILWAUKEE, WI 53202**

**LIFE APPLICATION**
(Page 1 of 7)

**INDIVIDUAL LIFE INSURANCE APPLICATION**

☐ Companion Policy

Has an application or informal inquiry ever been made to Northwestern Mutual for annuity, life, long-term care or disability insurance on the life of the Insured?............ ☐ Yes ☑ No  If "Yes," the last policy number related to that application or inquiry is:

## 1. INSURED

| A. LEGAL NAME | FIRST<br>Sarah | M.I.<br>C | LAST *(include maiden name in parentheses.)*<br>Rowell | | LINEAGE *(e.g., Sr., Jr.)* | ☐ Male<br>☑ Female |
|---|---|---|---|---|---|---|

| B. BIRTHDATE *(MM/DD/YYYY)*<br>07/21/1987 | C. STATE OF BIRTH *(or Foreign Country)*<br>IL | | D. TAXPAYER ID NUMBER ▓▓▓▓ | |
|---|---|---|---|---|

| E. ADDRESS OF PRIMARY RESIDENCE<br>20588 Highway 39 | | CITY<br>Wiggins | STATE<br>CO | ZIP CODE<br>80654 |
|---|---|---|---|---|

| F. PHONE NUMBER: ☐ Home ☐ Business  Mobile? ☑ Yes ☐ No<br>(630) 346-2990 | G. E-MAIL ADDRESS<br>rowell.sarah4@gmail.com |
|---|---|

## 2. APPLICANT

Select ONLY ONE: ☑ Insured at Insured's Address  OR  ☐ Other *(Complete A-J)*

| A. LEGAL NAME | FIRST<br>Sarah | M.I.<br>C | LAST<br>Rowell | | LINEAGE *(e.g., Sr., Jr.)* | ☐ Male<br>☑ Female |
|---|---|---|---|---|---|---|

**OR** BUSINESS NAME/TRUST NAME

B. TYPE OF BUSINESS/TRUST
☐ Corporation ( If Bank FDIC # _____ ) ☐ Partnership ☐ Revocable or ☐ Irrevocable Trust  Type of Trust: ☐ Personal ☐ Business
☐ Other Type of Business

| C. TRUST DATE *(MM/DD/YYYY)* *(If applicable)* | D. NAME OF TRUSTEE(S) *(If applicable)* |
|---|---|

| E. RELATIONSHIP TO INSURED | F. BIRTHDATE *(MM/DD/YYYY)* *(If applicable)*<br>07/21/1987 | G. TAXPAYER ID NUMBER ▓▓▓▓ |
|---|---|---|

| H. MAILING ADDRESS ☑ Insured's Address<br>20588 Highway 39 | | CITY<br>Wiggins | STATE<br>CO | ZIP CODE<br>80654 |
|---|---|---|---|---|

| I. PHONE NUMBER: ☐ Home ☐ Business  Mobile? ☑ Yes ☐ No | J. E-MAIL ADDRESS<br>rowell.sarah4@gmail.com |
|---|---|
| (630) 346-2990 | |

## 3. OWNER - Note: A minor Owner cannot exercise policy rights until reaching legal age. Complete Personal or Business/Trust Information.

Select ONLY ONE: ☑ Insured *(Complete E)*  ☐ Applicant *(Complete E)*  ☐ Other *(Complete Personal or Business/Trust)*  **OR**
☐ See attached Owner form/letter

**PERSONAL**

| A. LEGAL NAME | FIRST<br>Sarah | M.I. | LAST<br>Rowell | | LINEAGE *(e.g., Sr., Jr.)* | ☐ Male<br>☑ Female |
|---|---|---|---|---|---|---|

| B. RELATIONSHIP TO INSURED | C. BIRTHDATE *(MM/DD/YYYY)*<br>07/21/1987 | D. TAXPAYER ID NUMBER ▓▓▓▓ |
|---|---|---|

| E. MAILING ADDRESS ☑ Insured's Address ☐ Applicant's Address OR<br>20588 Highway 39 | CITY<br>Wiggins | STATE<br>CO | ZIP CODE<br>80654 |
|---|---|---|---|

| F. PHONE NUMBER: ☐ Home ☐ Business  Mobile? ☑ Yes ☐ No<br>(630) 346-2990 | G. E-MAIL ADDRESS<br>rowell.sarah4@gmail.com |
|---|---|

**BUSINESS/TRUST**

H. BUSINESS NAME/TRUST NAME

I. TYPE OF BUSINESS/TRUST
☐ Corporation ( If Bank FDIC # _____ ) ☐ Partnership ☐ Revocable or ☐ Irrevocable Trust  Type of Trust: ☐ Personal ☐ Business
☐ Other Type of Business

| J. TAXPAYER ID NUMBER | K. TRUST DATE *(MM/DD/YYYY)* *(If applicable)* | L. NAME OF TRUSTEE(S) *(If applicable)* |
|---|---|---|

| M. MAILING ADDRESS | | CITY | STATE | ZIP CODE |
|---|---|---|---|---|

| N. PHONE NUMBER: ☐ Home ☐ Business  Mobile? ☐ Yes ☐ No | O. E-MAIL ADDRESS |
|---|---|

COLORADO
NAICREPL
90-0001-60 (0618) eF
NB-600-1

ICC17 90-1 LI (0119)

**EXHIBIT 1**

346

EXHIBIT A

DocuSign Envelope ID: 634B8E47-C7AE-4391-86D8-F3D362EAD9FB

**LIFE APPLICATION**
(Page 2 of 7)

**4. SUCCESSOR OWNER** - Complete this section when the Owner named above is an individual who is not the Insured. If a Successor Owner is not named in the designated section below, the Successor Owner will be the Insured. Note: A minor Owner cannot exercise policy rights until reaching legal age.

**A.** ☐ If the Owner dies before the Insured, the Successor Owner will be *(NAME)* _____,

*(RELATIONSHIP TO INSURED)* _____. If both the Owner and Successor Owner die before the Insured, the Insured will become the Owner.

**B.** ☐ The Insured will become the Owner upon attaining the age of _____ years. If the Owner dies before the Insured attains such age the Successor Owner will be *(NAME)* _____, *(RELATIONSHIP TO INSURED)* _____. Upon the Insured attaining such age or, if both the Owner and Successor Owner die before the Insured, the Insured will become the Owner.

**5. PREMIUM PAYER**

Select ONLY ONE:  ☑ Insured *(Complete F)*  ☐ Applicant *(Complete F)*  ☐ Owner *(Complete F)*  **OR**  ☐ Other *(Complete A-H)*

| **A.** LEGAL NAME | FIRST | M.I. | | LAST | LINEAGE *(e.g., Sr., Jr.)* | ☐ Male |
|---|---|---|---|---|---|---|
| Sarah | | C | Rowell | | | ☑ Female |

OR BUSINESS NAME

**B.** TYPE OF BUSINESS
☐ Corporation (If Bank FDIC # _____ )  ☐ Partnership  ☐ Other type of Business

| **C.** RELATIONSHIP TO INSURED | **D.** BIRTHDATE *(MM/DD/YYYY) (if applicable)*  07/21/1987 | **E.** TAXPAYER ID NUMBER |
|---|---|---|

| **F.** MAILING ADDRESS ☑ Insured's ☐ Applicant's ☐ Owner's **OR**  20588 Highway 39 | CITY  Wiggins | STATE  CO | ZIP CODE  80654 |
|---|---|---|---|

| **G.** PHONE NUMBER: ☐ Home ☐ Business  Mobile? ☑ Yes ☐ No  (630) 346-2990 | **H.** E-MAIL ADDRESS  rowell.sarah4@gmail.com |
|---|---|

**6. PREMIUM**

☑ Prepaid: Premium Payment - Initial Premium Paid: $  **281.00** **OR** ☐ Non Prepaid

**7. CONDITIONAL LIFE INSURANCE AGREEMENT**

Has the premium for the policy(ies) applied for been given to the agent in exchange for the Conditional Life Insurance Agreement?.................................................................................................  ☑ Yes  ☐ No

Note: A Conditional Life Insurance Agreement should not be provided when the Applicant is only exercising an Additional Purchase Benefit with no underwritten increase.

**8. POLICY INFORMATION** - Submit one Application Supplement for each policy applied for.

**A.** Number of *Application Supplements* being submitted: **1**

**B.** One option below **must** be selected: *(Not applicable for Universal Life or Term insurance.)*
☐ Do not activate the Automatic Premium Loan provision (Policy will default to paid-up insurance.)
☐ Activate the Automatic Premium Loan provision

Note: Submit a complete NAIC Basic Illustration (all pages, signed and dated) OR, if no illustration conforming to the policy applied for was shown to the Applicant, check the Illustration Certification box (page 7). *(Not applicable for Variable Life.)*

ICC17 90-1 LI (0119)

eF
NB-600-2

**EXHIBIT 1**

**19**

EXHIBIT A

DocuSign Envelope ID: 634B8E47-C7AE-4391-86D8-F3D362EAD9FB

**LIFE APPLICATION**
(Page 3 of 7)

## 9. BENEFICIARY

**TRUST AS BENEFICIARY:** If a trustee is named as a beneficiary and no qualified trustee makes claim to the proceeds, or to the present value of any unpaid payments under an income plan, within one year after payment becomes due to the trustee, or if satisfactory evidence is furnished to the Company within that year showing that no trustee can qualify to receive payment, payment will be as provided in the contract as though the trustee had not been named. The Company will be fully discharged of liability for any action taken by the trustee and for all amounts paid to, or at the direction of, the trustee and will have no obligation as to the use of the amounts. In all dealings with the trustee the Company will be fully protected against the claims of every other person. The Company will not be charged with notice of a change of trustee unless written evidence of the change is received at the Home Office.

**REQUEST TO PREPARE A SUPPLEMENT TO THE APPLICATION**

☐ **TRUST FOR MINOR BENEFICIARY(IES)** - Check this box if the Owner wishes to establish a trust for any minor beneficiaries named in Section A and/or B below. This selection requires the completion of form 90-1197-01. The Trust for Minor Beneficiary(ies) creates a legally valid trust in which one or more trustees are appointed by the Owner to act on behalf of the minor(s). The appointed trustee(s) must also sign the form in order to create a valid trust. The specific terms of the trust are found on the designation form 90-1197-01.

☐ **SEE ATTACHED BENEFICIARY FORM/LETTER** (To be used when none of the choices below are suitable for the intended designation.)

**A. DIRECT BENEFICIARY(IES)**

Check this box ☐ if the **Direct Beneficiary** should be the same as the **Owner** OR complete Personal or Business/Trust information below.

**PERSONAL**

| NAME          FIRST | M.I. | LAST | LINEAGE (e.g., Sr., Jr.) | ☑ Male ☐ Female |
|---|---|---|---|---|
| Andrew | M | Rowell | | |
| RELATIONSHIP TO INSURED | BIRTHDATE (MM/DD/YYYY) | | TAXPAYER ID NUMBER | |
| Spouse | 12/27/1980 | | ▮▮▮▮▮▮ | |

| ADDRESS or ☑ SAME ADDRESS AS INSURED | CITY | STATE | ZIP CODE |
|---|---|---|---|
| 20588 Highway 39 | Wiggins | CO | 80654 |

| PHONE NUMBER: ☐ Home ☐ Business   Mobile? ☐ Yes ☐ No | E-MAIL ADDRESS |
|---|---|
| | |

| NAME          FIRST | M.I. | LAST | LINEAGE (e.g., Sr., Jr.) | ☐ Male ☐ Female |
|---|---|---|---|---|
| | | | | |
| RELATIONSHIP TO INSURED | BIRTHDATE (MM/DD/YYYY) | | TAXPAYER ID NUMBER | |
| | | | | |

| ADDRESS or ☐ SAME ADDRESS AS INSURED | CITY | STATE | ZIP CODE |
|---|---|---|---|
| | | | |

| PHONE NUMBER: ☐ Home ☐ Business   Mobile? ☐ Yes ☐ No | E-MAIL ADDRESS |
|---|---|
| | |

*Check box to include all children of the Insured as direct beneficiaries without naming them or to add to the direct beneficiaries named above.*
☐ And all *(other)* children of the Insured. *(The word "children" includes 'any and all biological or legally adopted children'.)*

**BUSINESS/TRUST**

OR

| BUSINESS NAME | TYPE OF BUSINESS |
|---|---|
| | ☐ Corporation ☐ Partnership ☐ Other _____ |

| TRUST NAME | TYPE OF TRUST |
|---|---|
| | ☐ Revocable ☐ Irrevocable |

| TRUSTEE NAME(S) | DATE OF TRUST (MM/DD/YYYY) |
|---|---|
| | |

AND

| TAXPAYER ID NUMBER | PHONE NUMBER: ☐ Home ☐ Business   Mobile? ☐ Yes ☐ No | E-MAIL ADDRESS |
|---|---|---|
| | | |

| ADDRESS | CITY | STATE | ZIP CODE |
|---|---|---|---|
| | | | |

*(Beneficiary Section continued on next page)*

EXHIBIT A

DocuSign Envelope ID: 634B8E47-C7AE-4391-86D8-F3D362EAD9FB

LIFE APPLICATION
(Page 4 of 7)

**B. CONTINGENT BENEFICIARY(IES)**

| NAME | FIRST | M.I. | LAST | LINEAGE (e.g., Sr., Jr.) | ☐ Male ☐ Female |
|---|---|---|---|---|---|

| RELATIONSHIP TO INSURED | BIRTHDATE (MM/DD/YYYY) | TAXPAYER ID NUMBER |
|---|---|---|

| ADDRESS or ☐ SAME ADDRESS AS INSURED | CITY | STATE | ZIP CODE |
|---|---|---|---|

| PHONE NUMBER: ☐ Home ☐ Business   Mobile? ☐ Yes ☐ No | E-MAIL ADDRESS |
|---|---|

| NAME | FIRST | M.I. | LAST | LINEAGE (e.g., Sr., Jr.) | ☐ Male ☐ Female |
|---|---|---|---|---|---|

| RELATIONSHIP TO INSURED | BIRTHDATE (MM/DD/YYYY) | TAXPAYER ID NUMBER |
|---|---|---|

| ADDRESS or ☐ SAME ADDRESS AS INSURED | CITY | STATE | ZIP CODE |
|---|---|---|---|

| PHONE NUMBER: ☐ Home ☐ Business   Mobile? ☐ Yes ☐ No | E-MAIL ADDRESS |
|---|---|

**OR**

| TRUST NAME | TYPE OF TRUST |
|---|---|
| **Andrew & Sarah Rowell Children's Trust** | ☐ Revocable ☐ Irrevocable |

| TRUSTEE NAME(S) | DATE OF TRUST (MM/DD/YYYY) |
|---|---|

| TAXPAYER ID NUMBER | PHONE NUMBER: ☐ Home ☐ Business   Mobile? ☐ Yes ☐ No | E-MAIL ADDRESS |
|---|---|---|

| ADDRESS or ☐ SAME ADDRESS AS INSURED | CITY | STATE | ZIP CODE |
|---|---|---|---|

*Check box 1 to include all children of the Insured as contingent beneficiaries without naming them or to add to the contingent beneficiaries named above.*
☐ 1. And all (other) children of the Insured. *(The word "children" includes 'any and all biological or legally adopted children'.)*
*Check box 2 to include all of the brothers and sisters without naming them or to add to the contingent beneficiaries named above.*
☐ 2. And all (other) brothers and sisters of the Insured born of the marriage of or legally adopted by _____
and _____ before the Insured's death.

**10. ADDITIONAL PURCHASE BENEFIT (APB)** Complete this section if exercising an APB option. Note: Tobacco Questionnaire may be required.

**A.** List the policy number(s) and amount(s) for each option being exercised.
Policy 1: _____ ☐ Regular $ _____ ☐ Advanced $ _____
Policy 2: _____ ☐ Regular $ _____ ☐ Advanced $ _____

**B.** If Advanced Purchase, the event is:   ☐ Marriage   ☐ Birth of Child **OR** ☐ Adoption of Child
Date of marriage, birth or final decree of adoption: _____ (MM/DD/YYYY)

**C.** Is the amount applied for more than the additional purchase benefit available? ............................... ☐ Yes ☐ No
If "Yes," what is the excess amount to be underwritten $ _____

**D.** APB OPTION WITH UNDERWRITTEN INCREASE IN AMOUNT - If the increase cannot be issued in the same underwriting classifications as the original policy and the increased amount meets policy minimums, should two policies be issued with one policy exercising the APB option and a separate policy in the underwriting classification for which the Insured qualifies? If "No," the policy will be issued for the amount of the Additional Purchase Benefit option only............................... ☐ Yes ☐ No

**11. REQUESTED POLICY DATE** If more than one Application Supplement accompanies this application, all policies associated with this application will have the same policy date.

Select ONE dating option:
**Prepaid / Nonprepaid**
☐ Specified future date _____ (Short term premiums apply for prepaid applications.)
☐ Date to Save Age (Premiums due and any other applicable charges are based on policy date.)
☐ Backdate to _____ (Premiums due and any other applicable charges are based on policy date.)
**If no option is selected, no special dating will be applied.**

eF
NB-600-4

**EXHIBIT 1**

21

EXHIBIT A

DocuSign Envelope ID: 634B8E47-C7AE-4391-86D8-F3D362EAD9FB

**LIFE APPLICATION**
(Page 5 of 7)

## 12. INSURANCE HISTORY

**A.** Has the Insured ever had life, disability, health, or long-term care insurance declined, rated, modified, issued with an exclusion rider, cancelled, rescinded, or not renewed? If "Yes," explain in Remarks .................................................................. ☐ Yes  ☑ No

**B.** Does the Insured have any existing or pending life insurance (including group coverage) with companies **other than** Northwestern Mutual? If "Yes," complete the table below ................................................................. ☐ Yes  ☑ No

| INSURANCE COMPANY (EXCLUDING NORTHWESTERN MUTUAL) | AMOUNT OF INSURANCE | PENDING (P) OR IN FORCE (I) | PERSONAL (PU) BUSINESS (B) OR TRUST (T) COVERAGE |
|---|---|---|---|
| | $ | | |
| | $ | | |
| | $ | | |
| | $ | | |

**REMARKS:**

## 13. REPLACEMENT

**A.** Does the Applicant own any existing life insurance or annuity products with Northwestern Mutual or any other company?.. ☐ Yes  ☑ No

**B.** As a result of this purchase will the values or benefits of any other life insurance policy or annuity contract owned by the Applicant, on any life, be affected in any way? .................................................................................................. ☐ Yes  ☑ No

**C.** Will this insurance:

    **1.** Replace Northwestern Mutual insurance or annuity? ................................................................................ ☐ Yes  ☑ No

    **2.** Replace insurance or annuity of other companies?.............................................................................. ☐ Yes  ☑ No

    **3.** Result in a 1035 exchange? ................................................................................................... ☐ Yes  ☑ No

**For NAIC Replacement states: If Question A is answered "Yes," complete and sign the Important Notice and leave a copy with the Applicant.** If one or both of the questions on the *Important Notice* or question B above is answered "Yes," this constitutes a replacement and the agent must submit the *Important Notice* to the Home Office and provide copies of all required sales materials to both the Applicant and the Home Office.

**For NON-NAIC Replacement states: If Question B is answered "Yes,"** submit state required replacement disclosure forms signed and dated by the Applicant; and sales materials *(if required)* to both the Applicant and the Home Office.

## 14. INSURED HISTORY INFORMATION

**A.** What is your marital status?  ☐ Single, Widowed or Divorced  ☑ Married

**B.** Are you a U.S. citizen or do you have a permanent resident visa (i.e., green card)? If "No," complete 1, 2 & 3 ................ ☑ Yes  ☐ No

    **1.** What is your country of citizenship? _____

    **2.** What type of visa do you have (B-1, H-1B, J-1, etc.)? _____   Visa Number _____

    **3.** How long have you resided in the U.S.? _____

**C.** Have you traveled outside the U.S. during the past 12 months, or do you have plans to leave the U.S. for travel or residence in the next 2 years? If "Yes," provide details below................................................................... ☐ Yes  ☑ No

| CITY AND COUNTRY | DATE OF TRAVEL/RESIDENCE | DURATION OF TRAVEL/RESIDENCE | PURPOSE OF TRIP |
|---|---|---|---|
| | | | |
| | | | |

**QUESTIONS D THROUGH M ARE NOT REQUIRED IF THE INSURED IS UNDER AGE 16.**

**D.** What is your occupation? **Homemaker** _____

**E.** **1.** Who is your employer? _____    **2.** How long with this employer? _____

**F.** **1.** What is your annual earned income as most recently reported to the IRS?

    Salary (or IRS Schedule C net profit or loss, if a sole proprietor)  $ _____   Bonus $ _____

    Other $ _____   Explain: _____

    **2.** What is your net worth, if it is >$1,000,000?  $ _____

    *Financial Supplement forms, Business Life Insurance ICC17 90-8C (0119) and Personal Life Insurance ICC17 90-8D (0119) may be required based on age and amount requirements.*

       **(Insured History Information continued on next page)**

ICC17 90-1 LI (0119)

**EXHIBIT 1**

eF
NB-600-5

22

348

EXHIBIT A

DocuSign Envelope ID: 634B8E47-C7AE-4391-86D8-F3D362EAD9FB

**LIFE APPLICATION**
(Page 6 of 7)

**G.** In the past 5 years, have you filed bankruptcy? If "Yes," provide details below.................................................. ☐ Yes ☑ No

| TYPE OF BANKRUPTCY (CHAPTER) | DATE FILED | DATE DISCHARGED |
|---|---|---|
|  |  |  |

**H.** Are you a member of, or have you entered into a written agreement to become a member of any branch of the Armed Forces or reserve military unit? If "Yes," complete Military Supplement, ICC17 90-5 (0119)........................................ ☐ Yes ☑ No

**I.** Other than as a passenger on a regularly scheduled commercial flight, have you flown within the past 2 years or do you have plans to fly in the next 2 years? If "Yes," complete Aviation Supplement, ICC17 90-5 (0119)........................ ☐ Yes ☑ No

**J.** In the past 2 years, have you participated in or do you have plans to participate in the next 2 years in any of the following: motor sports or racing (automobile, motorcycle, boat, go-cart, snowmobile); scuba diving; aeronautics (skydiving, hang gliding, paragliding); bungee or BASE jumping; mountain, rock, or ice climbing; rodeos; boxing, wrestling, or mixed martial arts? If "Yes," complete Avocation Supplement, ICC17 90-6 (0119)............................................ ☐ Yes ☑ No

**K.** What is your driver's license number and state issued? Driver's License Number: **141050429**   State Issued: **CO**

**L.** In the past 5 years, have you:
   **1.** Been involved in an accident in which you are found to be at fault?.................................................... ☐ Yes ☑ No
   AND/OR
   **2.** Pled guilty, pled no contest, or been convicted of:
   ☐ Driving while impaired or intoxicated   ☐ Reckless driving   ☐ Driving with a suspended or revoked license   ☐ Speeding
   ☐ Careless, negligent, inattentive or distracted driving   ☐ Other driving violations
   ☑ No driving violations

Provide details for each driving violation:

| DATE | TYPE OF VIOLATION AND/OR DETAILS OF ACCIDENT (SPEEDING, RECKLESS DRIVING, DRIVING WHILE INTOXICATED, ETC.) |
|---|---|
|  |  |
|  |  |

**M.** Do you have any pending criminal charges or have you ever pled guilty, pled no contest, or been convicted of any criminal charges:
☐ Felony   ☐ Misdemeanor   ☑ No criminal charges

Provide details for each offense:

| DATE | CITY/COUNTY/STATE | OFFENSE (PLEASE ALSO NOTE IF FELONY OR MISDEMEANOR) | TIME SERVED | DATE OF PAROLE OR PROBATION TERMINATION |
|---|---|---|---|---|
|  |  |  |  |  |
|  |  |  |  |  |

---

### CONSENT AND DECLARATION

The Insured consents to this application, and each signer has read the application and all statements and answers that pertain to them, and declares that the statements and answers are correctly recorded, complete and true to the best of their knowledge and belief. Answers and statements brought to the attention of the agent, medical examiner, or paramedical examiner are not considered information brought to the attention of the Company unless stated in the application. Statements and answers in this application are representations and not warranties.

It is agreed that:

1. If the premium is not paid when the application is signed, no insurance will be in effect. The insurance will take effect at the time the policy is delivered and the premium is paid, if: the Insured is living at the time; and the answers and statements in the application are then true to the best of the Insured's knowledge and belief.

2. If the premium is paid when the application is taken, no insurance will be in effect except as provided in the Conditional Life Insurance Agreement or by the automatic term insurance provided when exercising the Additional Purchase Benefit.

3. If the policy is issued in an extra premium class, acceptance of the policy will amend it so that extended term insurance can be in force only if (a) the Company gives its consent or (b) the loan value is not large enough to grant a premium loan. If a premium is not paid within the grace period and, due to operation of the foregoing amendment of the policy, extended term insurance cannot be in force, paid-up insurance will be selected. *(Not applicable for Universal Life.)*

4. No agent is authorized to make or alter contracts or to waive any of the Company's rights or requirements.

ICC17 90-1 LI (0119)

EXHIBIT 1                                23

eF
NB-600-6

EXHIBIT A

DocuSign Envelope ID: 634B8E47-C7AE-4391-86D8-F3D362EAD9FB

**LIFE APPLICATION**
(Page 7 of 7)

## AUTHORIZATION

I authorize The Northwestern Mutual Life Insurance Company, its agents, employees, reinsurers, insurance support organizations and their representatives to obtain information about me to evaluate this application, to verify information in this application, and for other purposes as allowed by law. This information will include: (a) age; (b) medical history, condition and care; (c) physical and mental health; (d) occupation; (e) income and financial history; (f) foreign travel; (g) avocations; (h) driving record; (i) other personal characteristics; and (j) other insurance. This authorization extends to information on the use of alcohol, drugs and tobacco; the diagnosis or treatment of HIV (AIDS virus) infection and sexually transmitted diseases; and the diagnosis and treatment of mental illness. During the time this authorization is valid it extends to information required to determine eligibility for benefits under any policy issued as a result of this application.

I authorize any person, including any physician, health care professional, hospital, clinic, medical facility, government agency including the Veterans and Social Security Administrations, the MIB, Inc., employer, business associates, consumer reporting agency, banker, accountant, tax preparer, or other insurance company, to release information about me to The Northwestern Mutual Life Insurance Company or its representatives on receipt of this authorization. The Northwestern Mutual Life Insurance Company or its representatives may release this information about me to translators, to reinsurers, to the MIB, Inc., or to another insurance company to whom I have applied or to who a claim has been made. No other release may be made except as allowed by law or as I further authorize.

I have received a copy of the MIB, Inc. and Fair Credit Reporting Act notices. I authorize The Northwestern Mutual Life Insurance Company to obtain an investigative consumer report on me.

☐ I request to be interviewed if an investigative consumer report is done.

This authorization is valid for 24 months from the date it is signed or for the time limit, if any, permitted by applicable law in the state where the policy is delivered or issued for delivery, whichever period is shorter. A copy of this authorization is as valid as the original and will be provided on request.

## ILLUSTRATION CERTIFICATION

☑ The undersigned Applicant and Agent acknowledge that no illustration conforming to the policy applied for was available for the Applicant to review and sign. The Applicant understands that an illustration conforming to the policy exactly as issued will be provided to the Policyowner, by the Company or Agent, no later than at the time the policy is delivered.

## TAXPAYER IDENTIFICATION NUMBER (TIN) CERTIFICATION

**Under penalties of perjury, the Owner (and/or payee) certifies that:**

(1) the number shown on this form is the Owner's correct taxpayer identification number (or is waiting for a number to be issued), **and**

(2) the Owner is not subject to backup withholding because: (a) the Owner is exempt from backup withholding, or (b) the Owner has not been notified by the Internal Revenue Service (IRS) that they are subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified the Owner that they are no longer subject to backup withholding, **and**

(3) the Owner is a U.S. person, which includes: a U.S. citizen or U.S. resident alien; a partnership, corporation, company, or association created or organized in the United States or under the laws of the United States; an estate (other than a foreign estate); or a domestic trust (as defined in 26 CFR § 301.7701-7), **and**

(4) the Owner is exempt from FATCA reporting because the Owner is not a foreign entity.

☐ Check this box if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return. Item 2 does not apply if this box is checked.

## SIGNATURE(S)

The signatures below apply to the application, the Application Supplement, Consent and Declaration, Authorization, Illustration Certification (if checked), and the Taxpayer Identification Number Certification. **The Internal Revenue Service does not require your consent to any provision of this document other than the certifications required to avoid backup withholding.**

| | |
|---|---|
| *Sarah C Rowell* | 1/6/2019 | 18:40:14 CST |
| Signature of **APPLICANT**     Sarah C Rowell | DATE signed by APPLICANT *(MM/DD/YYYY)* |
| | co |
| Signature of **INSURED** (If other than Applicant.) If Insured is under age 18, a Parent or Guardian signature is required. | STATE where APPLICANT signed |
| | *signature* |
| Signature of **OWNER**     Sarah C Rowell (If other than Insured/Applicant) | Signature of **LICENSED AGENT**     Nathan Thomas Kruse |

**Any person who knowingly presents a false statement in an application for insurance may be guilty of a criminal offense and subject to penalties under state law.**

ICC17 90-1 LI (0119)

**EXHIBIT 1**

NB-600-7

24

349

EXHIBIT A

**THE NORTHWESTERN MUTUAL LIFE INSURANCE COMPANY**
**720 EAST WISCONSIN AVENUE, MILWAUKEE, WI 53202**

**MEDICAL HISTORY QUESTIONNAIRE**
(Page 1 of 9)

## MEDICAL HISTORY QUESTIONNAIRE

| INSURED NAME | FIRST | M.I. | | LAST |
|---|---|---|---|---|
| | SARAH | | | ROWELL |

**Instructions:**

- As used in this Medical History Questionnaire, the terms "you" and "your" refer to the Insured. The terms "you" and "the Insured" are used interchangeably throughout.
- Each question must be individually asked and answered. Use the DETAILS section or Additional Details page to explain all checked boxes (other than "NONE") and all "YES" responses.

To begin the Medical History Questionnaire, read the *'Declaration of Truth'* with the Insured or Parent/Guardian. They must "Agree" to proceed.

*Declaration of Truth:* *The responses provided below are complete, accurate, and truthful to the best of my knowledge and belief. I acknowledge that any inaccurate or misleading statements could result in the reformation, rescission or termination of this policy and impact the payment of future claims. Given Northwestern Mutual's status as a mutual company, inaccurate or misleading statements potentially harm other policyholders.*

■**Agree**

**HEALTHCARE PROVIDERS**

**1.** Do you have a regular physician, doctor or healthcare provider?..........................................................................■ YES ☐ NO

If "YES," complete the information below on your current physician, doctor or healthcare provider:

| NAME<br>WOMENS CLINIC | | TELEPHONE NUMBER<br>( ) |
|---|---|---|
| ADDRESS<br>UNKNOWN | | |
| CITY<br>FORT COLLINS | STATE<br>CO | ZIP |
| WHEN DID YOU LAST SEE THIS MEDICAL PROVIDER?<br>*(MM/YYYY)*<br>2018 | REASON FOR YOUR LAST VISIT?<br>**ROUTINE EXAM - PAP WNL** | |

**2.** Have you been receiving care from your regular physician, doctor or healthcare provider for less than two years?.....................................................................................................................................................☐ YES ■ NO

If "YES," complete the information below on your former physician, doctor or healthcare provider:

| NAME<br>NONE | | TELEPHONE NUMBER<br>( ) |
|---|---|---|
| ADDRESS | | |
| CITY | STATE | ZIP CODE |
| WHEN DID YOU LAST SEE THIS MEDICAL PROVIDER?<br>*(MM/YYYY)* | REASON FOR YOUR LAST VISIT? | |

EXHIBIT A

**MEDICAL HISTORY QUESTIONNAIRE**
(Page 2 of 9)

**GENERAL INFORMATION**

**3.** Is the Insured over age 5? If "YES," complete A-C below............................................................................................ ■ YES ☐ NO

   **A.** Height: __5__ ft. __05__ in.

   **B.** Weight: __120__ lbs.

   **C.** Have you lost more than 10 pounds in the last 6 months?.................................................................................... ☐ YES ■ NO

     If "YES," how many pounds have you lost? _____

     Provide details about the weight change (e.g., intentional through diet and exercise):

     _____

**4.** Are you pregnant? (Females only)............................................................................................................................... ☐ YES ■ NO

   If "YES," what is your due date? _____ *(MM/YYYY)*

**JUVENILE HEALTH**

**5.** Is insured age 5 or under? If "YES," complete A-F below........................................................................................... ☐ YES ■ NO

   **A.** Height: _____ ft. _____ in.

   **B.** Weight: _____ lbs. _____ oz.

   **C.** Was the Insured born prematurely (gestational age <37 weeks)?..................................................................... ☐ YES ☐ NO

     If "YES," what was the Insured's gestational age (in weeks) at birth _____

   **D.** Has the Insured been evaluated, tested, diagnosed with, or treated for developmental
     delay(s) by a medical provider?........................................................................................................................ ☐ YES ☐ NO

     If "YES," describe the delay(s): _____

   **E.** Has the Insured been diagnosed with any growth concerns (including length/height weight and head
     circumference) or failure to thrive (FTT) by a medical provider?.................................................................... ☐ YES ☐ NO

     If "YES," provide birth length and weight: Length _____ ft. _____ in. Weight _____ lbs. _____ oz.

     If "YES" for D and/or E, who was the medical provider seen for this condition (if different than the Insured's regular
     physician):

     Name: _____

     Address: _____

     Telephone Number: _____

     When did you last see this medical provider? _____ *(MM/YYYY)*

   **F.** Check any of the services the Insured has received or been advised to receive by a medical provider, and if applicable, provide
     the date service was last received.

     ☐ N/A ☐ Educational services _____ *(MM/YYYY)* ☐ Occupational therapy _____ *(MM/YYYY)*

     ☐ Physical therapy _____ *(MM/YYYY)* ☐ Speech/Language therapy _____ *(MM/YYYY)*

**MEDICAL HISTORY QUESTIONNAIRE**
(Page 3 of 9)

## DISEASES AND DISORDERS

For each of the categories of Diseases and Disorders throughout question 6, check each box accordingly or check "None."
Provide detail for each condition in the "Details" box provided or use the Additional Details page.

**6.** In the past 10 years, have you been told you had, been diagnosed with, or treated for **any** of the following by a medical provider:

### CARDIOVASCULAR

☐ Aneurysm
☐ Angina
☐ Cardiac bypass surgery
☐ Cardiac stent(s)
☐ Chest Pain/Tightness/Discomfort
☐ Coronary artery disease

☐ Heart attack
☐ Heart failure
☐ Heart murmur
☐ Heart valve disorder
☐ High blood pressure
☐ High cholesterol

☐ Irregular heart beat or heart rhythm disorder
☐ Stroke
☐ Transient Ischemic Attack (TIA)
☐ Any other diseases or disorders of the heart or blood vessels

■ NONE

### CANCER/GROWTHS

☐ Cancer
☐ Cysts
☐ Leukemia

☐ Lymphoma
☐ Masses
☐ Nodules

☐ Polyps
☐ Tumors

■ NONE

### RESPIRATORY

☐ Asthma
☐ Chronic cough
☐ Chronic Obstructive Pulmonary Disease (COPD)

☐ Emphysema
☐ Sinus disorder
☐ Sleep apnea
☐ Sleep disorder other than sleep apnea

☐ Throat disorder
☐ Trouble breathing
☐ Any other diseases or disorders of the lungs or respiratory system

■ NONE

### NEUROLOGY

☐ Carpal tunnel syndrome
☐ Concussion
☐ Difficulty walking
☐ Dizziness
☐ Headaches
☐ Imbalance

☐ Loss of consciousness
☐ Memory loss or memory impairment
☐ Multiple sclerosis
☐ Muscle weakness
☐ Neuropathy

☐ Paralysis
☐ Seizure/Epilepsy
☐ Tremor
☐ Vertigo
☐ Any other diseases or disorders of the brain or nervous system

■ NONE

EXHIBIT A

,

MEDICAL HISTORY QUESTIONNAIRE
(Page 4 of 9)

### PSYCHIATRIC/MENTAL HEALTH

☐ Anxiety
☐ Attention deficit/Hyperactivity Disorder (ADD or ADHD)
☐ Bipolar disorder

☐ Depression
☐ Eating disorder
☐ Post traumatic stress disorder (PTSD)

☐ Stress
☐ Any other diseases or disorders of psychiatric or mental health

■ NONE

### GASTROINTESTINAL (GI)

☐ Barrett's Esophagus
☐ Blood in the stool
☐ Crohn's disease
☐ Difficulty swallowing
☐ Hepatitis
☐ Irritable bowel syndrome (IBS)

☐ Pancreatitis
☐ Recurrent heartburn/GERD (Gastroesophageal Reflux Disease)
☐ Recurrent or persistent abdominal pain
☐ Recurrent or persistent diarrhea
☐ Recurrent or persistent vomiting

☐ Ulcerative colitis
☐ Ulcers
☐ Any other diseases or disorders of the esophagus, stomach, intestines, liver, gallbladder or pancreas

■ NONE

### ENDOCRINOLOGY/GLANDULAR

☐ Adrenal disorder
☐ Diabetes or elevated blood Glucose

☐ Pituitary disorder
☐ Thyroid disorder

☐ Any other diseases or disorders of the endocrine/glandular system

■ NONE

### HEMATOLOGY/IMMUNOLOGY

☐ Allergies
☐ Anemia
☐ Bleeding disorder

☐ Clotting disorder
☐ Enlarged lymph nodes
☐ Recurrent Infection

☐ Any other diseases or disorders of the blood, bone marrow or immune system, excluding HIV or AIDS

■ NONE

### RHEUMATOLOGY

☐ Amputation
☐ Arthritis
☐ Fibromyalgia
☐ Osteoporosis
☐ Systemic lupus

☐ Any disease or disorder of the mouth or jaw
☐ Any other disease or disorder of the muscles, bones, joints (including but not limited to the hips, knees, shoulders)

☐ Any other diseases or disorders of the spine, neck, back, or extremities

■ NONE

EXHIBIT A

**MEDICAL HISTORY QUESTIONNAIRE**
(Page 5 of 9)

### GENITOURINARY

☐ Blood in the urine
☐ Chronic kidney disease
☐ Infertility
☐ Kidney infection

☐ Kidney stones
☐ Protein in the urine
☐ Sexually transmitted diseases, e.g., chlamydia

☐ Any other diseases or disorders of the kidneys, urinary tract, bladder, prostate, reproductive organs, or breasts

■ NONE

### DERMATOLOGY

☐ Basal cell cancer
☐ Dermatitis
☐ Eczema

☐ Melanoma
☐ Psoriasis
☐ Squamous cell cancer

☐ Any other diseases or disorders of the skin

■ NONE

### OTHER DISEASES OR DISORDERS

☐ Chronic fatigue (present 3 months or longer)
☐ Chronic Lyme disease (present 3 months or longer)

☐ Chronic pain (present 3 months or longer)
☐ Ears
☐ Eyes

☐ Nose
☐ Speech

■ NONE

**7.** In the past 10 years, have you ever tested positive for human immunodeficiency virus (HIV), or been diagnosed by a medical provider as being HIV positive, or having acquired immune deficiency syndrome (AIDS)? ............................................................................................ ☐ YES ■ NO
If "YES," provide details: _____

### TOBACCO, ALCOHOL AND DRUGS

**8.** When was the last time you used tobacco or any other nicotine products?

| Check the box for any products used. | Date Last Used (MM/YYYY) | Frequency Used Per Year | Never Used |
|---|---|---|---|
| ☐ Cigarettes | | | ■ |
| ☐ Cigars | | | ■ |
| ☐ Chew or Snuff | | | ■ |
| ☐ Pipes | | | ■ |
| ☐ Vaping Products | | | ■ |
| ☐ Nicotine Patch | | | ■ |
| ☐ Nicotine Gum | | | ■ |
| ☐ Other | | | ■ |

EXHIBIT A

**MEDICAL HISTORY QUESTIONNAIRE**
(Page 6 of 9)

9. In the past 10 years, have you ever been advised by a medical provider to reduce or discontinue the use of alcohol? If "YES," complete A C below ...................................................................... ☐ YES ■ NO

   **A.** How many drinks, on average, do you consume in a given week?

     ☐ 0  ☐ 1 14  ☐ 15 21  ☐ 22 28  ☐ 29 35  ☐ 36 42  ☐ 43 49

   **B.** When did you last drink alcohol? _____ *(MM/YYYY)*

   **C.** Medical provider who advised the reduction in your alcohol use (if different from your regular physician)?

     Name: _____

     Address: _____

     Telephone Number: _____

     When did you last see (selected medical provider)? _____ *(MM/YYYY)*

     Additional comments: _____

10. In the past 10 years, have you ever received or been advised by a medical provider to seek treatment, counseling or participation in a support group for the use of alcohol or drugs? .............................. ☐ YES ■ NO

   If "YES," complete A-F below:

   **A.** Was this related to alcohol and/or drug use? ☐ Alcohol ☐ Drugs

   **B.** If drug use, list all types of drugs used: _____

   **C.** When did you last drink alcohol? _____ *(MM/YYYY)* ☐ N/A

   **D.** When did you last use drugs? _____ *(MM/YYYY)* ☐ N/A

   **E.** Indicate if you have received inpatient or outpatient treatment along with duration of care: ☐N/A

     ☐Inpatient _____ *(MM/YYYY)* to _____ *(MM/YYYY)*

     ☐Outpatient _____ *(MM/YYYY)* to _____ *(MM/YYYY)*

   **F.** Medical providers, counsellors or facilities seen related to your treatment/counselling:

     Name: _____

     Address: _____

     Telephone Number: _____

     When did you last see this medical provider? _____ *(MM/YYYY)*

     Additional comments: _____

11. In the past 5 years, have you used marijuana? If "YES," complete A G below..................................... ☐ YES ■ NO

   **A.** Indicate the frequency of your use:

     ☐Daily ☐ Weekly ☐ Monthly ☐ Annually

   **B.** How many days per: ☐ Week ☐ Month ☐ Year do you use marijuana? _____

   **C.** When did you last use marijuana? _____ *(MM/YYYY)*

   **D.** Is your marijuana use:☐ Recreational ☐ Medicinal ☐ Both

   **E.** Provide the medical reason for your medical marijuana use: _____

   **F.** Check all boxes that apply concerning the methods that you used or consumed marijuana:

     ☐ Smoking ☐ Vaporizing ☐ Edible Forms ☐ Other pharmaceutical forms (e.g., pills, oil)

   **G.** Provide name of medical provider (if different from your regular physician) who prescribed medical marijuana:

     Name: _____

     Address: _____

     Telephone Number: _____

     When did you last see this medical provider? _____ *(MM/YYYY)*

     Additional comments: _____

DATE FILED: December 14, 2020 10:16 AM
FILING ID: 98C2DD8C89AF4
CASE NUMBER: 2020CV34229

EXHIBIT A

**MEDICAL HISTORY QUESTIONNAIRE**
(Page 7 of 9)

**12.** In the past 10 years, have you used cocaine, heroin, methamphetamine, hallucinogens, or any
other illegal drugs or substance? If "YES," complete A-B below............................................................................☐ YES ■ NO
**A.** Provide details of all illegal drugs/substances used: _____
**B.** When did you last use any of the listed drugs or substances? _____ *(MM/YYYY)*

Additional comments: _____

**13.** In the past 5 years, have you used narcotics/opioids, sedatives, amphetamines, or any other
controlled substance other than as prescribed by a physician or in excess of dosages prescribed
by a physician? If "YES, complete A-C below....................................................................................................☐ YES ■ NO

**A.** Provide medications or controlled substances used: _____

**B.** When did you last use any of the listed drugs or substances? _____ *(MM/YYYY)*
**C.** Medical provider (if different from your regular physician)?
Name: _____
Address: _____
Telephone Number: _____
When did you last see (selected medical provider)? _____ *(MM/YYYY)*
Additional comments: _____

**HEALTHCARE HISTORY**

**14.** In the past 5 years, other than as previously stated on the application, have you:
If "YES," to questions A-E, provide details below:
**A.** Consulted any other medical providers (medical doctors, psychiatrists, psychologists,
counselors/therapists, chiropractors, naturopaths, occupational/physical/speech therapists
or other healthcare providers)? ......................................................................................................■ YES ☐ NO
Reason for the visit(s): **OB CARE - PRENATAL CARE**
Medical provider(s) seen for this condition (if different from your regular physician):
Name: **BIRTH CENTER OF BOULDER**
Address: **BOULDER, CO, USA**
Telephone Number: _____
When did you last see (selected medical provider)? **12/2018** *(MM/YYYY)*
Additional comments: **DELIVERY 11/15/18**

**B.** Been a patient in a hospital, clinic, rehabilitation center, or any other medical facility? ............................☐ YES ■ NO

**C.** Had any diagnostic or screening tests completed (e.g., EKGs, x rays, blood tests, CT scans, MRI
scans, heart scans, biopsies, or other tests except for Human Immunodeficiency Virus (HIV))? ...................☐ YES ■ NO

**D.** Had surgery? .........................................................................................................................................☐ YES ■ NO

**E.** Been advised by a medical provider to have any test, consultation, hospitalization, or surgery
that was not completed (except as related to the Human Immunodeficiency Virus (HIV))? .........................☐ YES ■ NO

If "YES," provide details of what was recommended and why the recommendation(s) was not completed:
_____

**MEDICAL HISTORY QUESTIONNAIRE**

(Page 8 of 9)

**15.** Other than as previously stated on this application, are you taking any medications or drugs
(legal or illegal, prescription or non prescription/over the counter or supplements) for any reason? ..................☐ YES ■ NO
If "YES," list the medication(s)/drug(s) and the reason(s) for use: _____
Additional comments: _____

**16. A.** During the past 6 months, have you worked in your regular occupation less than your usual
number of hours per week because of any sickness or injury? ...........................................................☐ YES ■ NO
If "YES," complete 1-4 below:
**1.** Describe the medical issue(s)/condition(s) that resulted in the work absence or modified work schedule:
_____
**2.** Describe the extent and duration of the modified work schedule or absence:
_____
**3.** Have you resumed working your previous schedule and duties? .............................................☐ YES ☐ NO
If "YES," provide date of return: _____ (MM/YYYY)
**4.** Medical provider seen for this issue (if other than your regular physician):
Name: _____
Address: _____
Telephone Number: _____
When did you last see this medical provider? _____ (MM/YYYY)
Additional comments: _____

**B.** In the past 5 years, have you requested or received payments, benefits, or a pension
because of any injury, accident, sickness, disability, or impairing condition? ...............................☐ YES ■ NO
If "Yes," complete 1-4 below:
**1.** Describe the medical issue(s) that resulted in the payment or request for payment:
_____
**2.** What type of payment was requested and/or received?
☐ Individual Disability ☐ Group Disability ☐ Social Security Disability ☐ Worker's Compensation
☐ Military Pension ☐ Other _____
**3.** Are you still receiving a payment? ...................................................................................☐ YES ☐ NO
If "YES," what is the duration of payment (in years)? _____
If "NO," are you still pursuing a payment? ...........................................................................☐ YES ☐ NO
**4.** Medical provider seen for this issue (if other than your regular physician):
Name: _____
Address: _____
Telephone Number: _____
When did you last see this medical provider? _____ (MM/YYYY)
Additional comments: _____

EXHIBIT A

**MEDICAL HISTORY QUESTIONNAIRE**
(Page 9 of 9)

**FAMILY HEALTH HISTORY**

**17. A.** Do you have any immediate family members (including any living or deceased parents and siblings) who were diagnosed or treated by any medical provider for heart disease, stroke, diabetes, kidney disease, cancer (e.g., melanoma, breast cancer, or other cancers), mental illness, dementia, Huntington's disease, neurofibromatosis, or aneurysm(s)? .................................................. ☐ YES ■ NO

**B.** List any tests below that you may have had to evaluate your risk based on your family history: ■ N/A

**C.** Provide the following information about your immediate family members, including any conditions from 17A.

| FAMILY MEMBER | CURRENT AGE (IF LIVING) | MEDICAL CONDITIONS | AGE AT DIAGNOSIS | AGE AT DEATH | CAUSE OF DEATH |
|---|---|---|---|---|---|
| Father | 65 | | | | |
| Mother | 64 | | | | |
| Sister(s) | | | | | |
| Brother(s) | 35 | | | | |
| Brother(s) | 33 | | | | |
| Brother(s) | 28 | | | | |

**SIGNATURE(S)**

**Any person who knowingly presents a false statement in an application for insurance may be guilty of a criminal offense and subject to penalties under state law.**

I have reviewed my answers and statements in this application and declare that they are correctly recorded, complete and true to the best of my knowledge and belief. Statements in this application are representations and not warranties.

| | | |
|---|---|---|
| Signature of INSURED (or Parent/Guardian) | 12/28/2018 DATE *(MM/DD/YYYY)* | CO STATE where INSURED (or Parent/Guardian) signed |

| | | |
|---|---|---|
| Signature of: ☐ LICENSED AGENT/FIELD STAFF – non-exam ■ PARAMEDICAL EXAMINER – paramedical exam | AGENT/FIELD STAFF # | Name of LICENSED AGENT/FIELD STAFF # (Please print) |

ICC17 90 4 (0118)
Mon 01/07/2019 08:33:04

**EXHIBIT 1**

33   NB 498 9

354

EXHIBIT A



**NMS Labs**
200 Welsh Road, Horsham, PA 19044-2208
Phone: (215) 657-4900 Fax. (215) 657-2972
e-mail: nms@nmslabs.com
Robert A. Middleberg, PhD, F-ABFT, DABCC-TC, Laboratory

**CONFIDENTIAL**

**Supplemental Report**

Report Issued     05/15/2020 15:46
Last Report Issued     05/15/2020 10:00

To:   10684
      Morgan County Coroner
      1600 Prospect Park Way
      Suite 101
      Fort Collins, CO  80525

DATE FILED: December 14, 2020 10:16 AM
Patient Name  POWELL, SARAH
Patient ID     AB19-062
Chain          NMSCP16592
Age 31 Y       DOB 07/21/1987
Gender         Female
Workorder      19123056

Page 1 of 6

**Positive Findings:**

| Compound | Result | Units | Matrix Source |
|---|---|---|---|
| Ethanol | 177 | mg/dL | 001 - Peripheral Blood |
| Blood Alcohol Concentration (BAC) | 0.177 | g/100 mL | 001 - Peripheral Blood |
| Oxycodone - Free | 11 | ng/mL | 001 - Peripheral Blood |
| Ethanol | 220 | mg/dL | 003 - Vitreous Fluid |
| Ethanol | 246 | mg/dL | 004 - Urine |
| Acetone | 49 | mg/dL | 004 - Urine |
| Delta-9 Carboxy THC - Total | 17 | ng/mL | 004 - Urine |
| Oxycodone - Free | 370 | ng/mL | 004 - Urine |
| Oxymorphone - Free | 6.1 | ng/mL | 004 - Urine |

See Detailed Findings section for additional information

**Testing Requested:**

| Analysis Code | Description |
|---|---|
| 8051U | Postmortem, Basic, Urine (Forensic) |
| 8051B | Postmortem, Basic, Blood (Forensic) |
| 8051FL | Postmortem, Basic, Fluid (Forensic) |

**Specimens Received:**

| ID | Tube/Container | Volume/ Mass | Collection Date/Time | Matrix Source | Miscellaneous Information |
|---|---|---|---|---|---|
| 001 | Gray Top Tube | 8.25 mL | 04/24/2019 14 00 | Peripheral Blood | |
| 002 | Gray Top Tube | 5.25 mL | 04/24/2019 14:00 | Peripheral Blood | |
| 003 | Red Top Tube | 3.5 mL | 04/24/2019 14:00 | Vitreous Fluid | |
| 004 | White Plastic Container | 20 mL | 04/24/2019 14:00 | Urine | |

All sample volumes/weights are approximations.
Specimens received on 04/26/2019.

NMS v.18.0
1

EXHIBIT A



CONFIDENTIAL

**Workorder** 19123056
**Chain** NMSCP16592
**Patient ID** AB19-062

**Page 2 of 6**

**Detailed Findings:**

| Analysis and Comments | Result | Units | Rpt. Limit | Specimen Source | Analysis By |
|---|---|---|---|---|---|
| Ethanol | 177 | mg/dL | 10 | 001 - Peripheral Blood | Headspace GC |
| Blood Alcohol Concentration (BAC) | 0.177 | g/100 mL | 0.010 | 001 - Peripheral Blood | Headspace GC |
| Oxycodone - Free | 11 | ng/mL | 5.0 | 001 - Peripheral Blood | LC-MS/MS |
| Ethanol | Confirmed | mg/dL | 10 | 001 - Peripheral Blood | Headspace GC |
| Ethanol | 220 | mg/dL | 10 | 003 - Vitreous Fluid | Headspace GC |
| Ethanol | Confirmed | mg/dL | 10 | 003 - Vitreous Fluid | Headspace GC |
| Ethanol | 246 | mg/dL | 10 | 004 - Urine | Headspace GC |
| Acetone | 49 | mg/dL | 5.0 | 004 - Urine | Headspace GC |
| Delta-9 Carboxy THC - Total | 17 | ng/mL | 5.0 | 004 - Urine | LC-MS/MS |
| Oxycodone - Free | 370 | ng/mL | 25 | 004 - Urine | LC-MS/MS |
| Oxymorphone - Free | 6.1 | ng/mL | 5.0 | 004 - Urine | LC-MS/MS |
| Ethanol | Confirmed | mg/dL | 10 | 004 - Urine | Headspace GC |
| Acetone | Confirmed | mg/dL | 5.0 | 004 - Urine | Headspace GC |

Other than the above findings, examination of the specimen(s) submitted did not reveal any positive findings of toxicological significance by procedures outlined in the accompanying Analysis Summary.

**Reference Comments:**

1.  Acetone - Urine:

    Acetone is a solvent used for chemicals, paints, etc. It is also a product of diabetic- and fasting-induced ketoacidosis as well as a metabolite following isopropanol ingestion. In high concentrations, acetone can have CNS-depressing effects. Symptoms include lethargy, ataxia, headache, nausea and lightheadedness. Stupor and coma appear in severe cases. Acetone produced in the body as a result of uncontrolled diabetes can also be converted to isopropanol.

2.  Delta-9 Carboxy THC - Total (Inactive Metabolite) - Urine:

    Marijuana is a DEA Schedule I hallucinogen. Collectively, the chemical compounds that comprise marijuana are known as Cannabinoids.

    Delta-9-THC is the principle psychoactive ingredient of marijuana/hashish. Delta-9-carboxy-THC (THCC) is the inactive metabolite of THC.

3.  Ethanol (Ethyl Alcohol) - Peripheral Blood:

    Ethyl alcohol (ethanol, drinking alcohol) is a central nervous system depressant and can cause effects such as impaired judgment, reduced alertness and impaired muscular coordination. The blood alcohol concentrations (BAC) can be expressed as a whole number with the units of mg/dL or as a decimal number with units of g/100 mL which is equivalent to % w/v. For example, a BAC of 85 mg/dL equals 0.085 g/100 mL or 0.085% w/v of ethanol

4.  Ethanol (Ethyl Alcohol) - Vitreous Fluid:

    Ethyl alcohol (ethanol, drinking alcohol) is a central nervous system depressant and can cause effects such as impaired judgment, reduced alertness and impaired muscular coordination. Ethanol can also be a product of decomposition or degradation of biological samples.

5.  Ethanol (Ethyl Alcohol) - Urine:

    Ethyl alcohol (ethanol, drinking alcohol) is a central nervous system depressant and can cause effects such as impaired judgment, reduced alertness and impaired muscular coordination. Ethanol can also be a product of decomposition or degradation of biological samples.

EXHIBIT 92

NMS v.18.0

2

EXHIBIT A



| | |
|---|---|
| Workorder | 19123056 |
| Chain | NMSCP16592 |
| Patient ID | AB19-062 |

Page 3 of 6

**Reference Comments:**

6.   Oxycodone - Free (OxyContin®; Roxicodone®) - Peripheral Blood:

Oxycodone is a DEA Schedule II controlled semi-synthetic narcotic analgesic  It is used to control pain associated with such ailments as bursitis, injuries, simple fractures and neuralgia. The addiction liability of oxycodone is about the same as for morphine. This compound should be administered in the smallest effective dose and as infrequently as possible. The usual adult dose of the hydrochloride salt is 5 mg every 6 hr.

Following the oral administration of oxycodone as both sustained-release (Oxycontin®) and regular formulations, peak plasma concentrations of the compound are generally less than 100 ng/mL; however, the sustained-release preparation may also result in peak concentrations of oxycodone less than 10 ng/mL serum. Oxymorphone is a pharmacologically active metabolite of oxycodone that may be seen in blood in very low concentrations

In overdose, oxycodone can produce stupor, coma, muscle flaccidity, severe respiratory depression, hypotension and cardiac arrest. In twelve oxycodone-related deaths, blood concentrations averaged 1600 ng/mL (range 240 to 8400 ng/mL). However, sustained-release preparations appear to produce adverse reactions, up to and including death, at concentrations of oxycodone well below 1000 ng/mL, especially in combination with other central nervous system depressants, depending on use pattern and route of administration.

7.   Oxycodone - Free (OxyContin®; Roxicodone®) - Urine:

Oxycodone is a DEA Schedule II controlled semi-synthetic narcotic analgesic. It is used to control pain associated with such ailments as bursitis, injuries, simple fractures and neuralgia. The addiction liability of oxycodone is about the same as for morphine. This compound should be administered in the smallest effective dose and as infrequently as possible. The usual adult dose of the hydrochloride salt is 5 mg every 6 hr

In overdose, oxycodone can produce stupor, coma, muscle flaccidity, severe respiratory depression, hypotension and cardiac arrest.

8.   Oxymorphone - Free (Numorphan®; Opana®; Oxycodone Metabolite) - Urine

Oxymorphone is a Schedule II semisynthetic opioid analgesic. It is indicated for use in the relief of moderate to severe pain and as a preanesthetic medication. The compound may be administered by injection or by mouth. Oral preparations are available as immediate-release tablets (5 or 10 mg) and as extended-release tablets (5 to 40 mg). Oxymorphone is also a pharmacologically active metabolite of oxycodone.

The mean oral bioavailability of oxymorphone is approximately 10%  The compound is extensively metabolized by reduction to 6-oxymorphol and conjugation to oxymorphone glucuronide and oxymorphone sulfate. Approximately 50% of an oral dose of oxymorphone is eliminated in the urine over 5 days primarily as conjugated oxymorphone and smaller amounts of free oxymorphone and free and conjugated 6-oxymorphol The mean elimination half-life of oxymorphone is approximately 7 5 to 9.5 hours.

Adverse effects of oxymorphone are typical of the opioid group of compounds.

**Sample Comments:**

001   Physician/Pathologist Name: M. A. Burson, MD

001   County: Morgan

001   Autopsy ID. AB19-062

Unless alternate arrangements are made by you, the remainder of the submitted specimens will be discarded one (1) year from the date of this report; and generated data will be discarded five (5) years from the date the analyses were performed.

Workorder 19123056 was electronically signed on 05/15/2020 09:26 by:

William M. Schroeder, M.S., D-ABFT-FT
Certifying Scientist

EXHIBIT A



CONFIDENTIAL

| | |
|---|---|
| Workorder | 19123056 |
| Chain | NMSCP16592 |
| Patient ID | AB19-062 |

Page 4 of 6

**Analysis Summary and Reporting Limits:**

All of the following tests were performed for this case. For each test, the compounds listed were included in the scope. The Reporting Limit listed for each compound represents the lowest concentration of the compound that will be reported as being positive. If the compound is listed as None Detected, it is not present above the Reporting Limit. Please refer to the Positive Findings section of the report for those compounds that were identified as being present

Acode 50011FL - Barbiturates Confirmation, Fluid - Vitreous Fluid

-Analysis by Gas Chromatography/Mass Spectrometry (GC/MS) for:

| Compound | Rpt. Limit | Compound | Rpt. Limit |
|---|---|---|---|
| Amobarbital | 0.40 mcg/mL | Pentobarbital | 0.40 mcg/mL |
| Butabarbital | 1 0 mcg/mL | Phenobarbital | 1.0 mcg/mL |
| Butalbital | 0 40 mcg/mL | Secobarbital | 0.40 mcg/mL |

Acode 50013U - Cannabinoids Confirmation, Urine

-Analysis by High Performance Liquid Chromatography/ Tandem Mass Spectrometry (LC-MS/MS) for:

| Compound | Rpt. Limit | Compound | Rpt. Limit |
|---|---|---|---|
| Delta-9 Carboxy THC - Total | 5.0 ng/mL | | |

Acode 50016B - Opiates - Free (Unconjugated) Confirmation, Blood - Peripheral Blood

-Analysis by High Performance Liquid Chromatography/ Tandem Mass Spectrometry (LC-MS/MS) for:

| Compound | Rpt. Limit | Compound | Rpt. Limit |
|---|---|---|---|
| 6-Monoacetylmorphine - Free | 1.0 ng/mL | Hydromorphone - Free | 1.0 ng/mL |
| Codeine - Free | 5.0 ng/mL | Morphine - Free | 5.0 ng/mL |
| Dihydrocodeine / Hydrocodol - Free | 5.0 ng/mL | Oxycodone - Free | 5.0 ng/mL |
| Hydrocodone - Free | 5.0 ng/mL | Oxymorphone - Free | 1.0 ng/mL |

Acode 50016U - Opiates - Free (Unconjugated) Confirmation, Urine

-Analysis by High Performance Liquid Chromatography/ Tandem Mass Spectrometry (LC-MS/MS) for:

| Compound | Rpt. Limit | Compound | Rpt. Limit |
|---|---|---|---|
| 6-Monoacetylmorphine - Free | 5.0 ng/mL | Hydromorphone - Free | 5 0 ng/mL |
| Codeine - Free | 25 ng/mL | Morphine - Free | 25 ng/mL |
| Dihydrocodeine / Hydrocodol - Free | 25 ng/mL | Oxycodone - Free | 25 ng/mL |
| Hydrocodone - Free | 25 ng/mL | Oxymorphone - Free | 5.0 ng/mL |

Acode 52198B - Cannabinoids Confirmation, Blood - Peripheral Blood

-Analysis by High Performance Liquid Chromatography/ Tandem Mass Spectrometry (LC-MS/MS) for

| Compound | Rpt. Limit | Compound | Rpt. Limit |
|---|---|---|---|
| 11-Hydroxy Delta-9 THC | 1.0 ng/mL | Delta-9 THC | 0.50 ng/mL |
| Delta-9 Carboxy THC | 5.0 ng/mL | | |

Acode 52250B - Alcohols and Acetone Confirmation, Blood - Peripheral Blood

-Analysis by Headspace Gas Chromatography (GC) for:

| Compound | Rpt. Limit | Compound | Rpt. Limit |
|---|---|---|---|
| Acetone | 5.0 mg/dL | Isopropanol | 5.0 mg/dL |
| Ethanol | 10 mg/dL | Methanol | 5 0 mg/dL |

Acode 52250FL - Alcohols and Acetone Confirmation, Fluid - Vitreous Fluid

-Analysis by Headspace Gas Chromatography (GC) for:

EXHIBIT 2

NMS v.18.0

4

EXHIBIT A



CONFIDENTIAL

| Workorder | 19123056 |
|---|---|
| Chain | NMSCP16592 |
| Patient ID | AB19-062 |

Page 5 of 6

**Analysis Summary and Reporting Limits:**

| Compound | Rpt. Limit | Compound | Rpt. Limit |
|---|---|---|---|
| Acetone | 5.0 mg/dL | Isopropanol | 5.0 mg/dL |
| Ethanol | 10 mg/dL | Methanol | 5.0 mg/dL |

Acode 52250U - Alcohols and Acetone Confirmation, Unne

-Analysis by Headspace Gas Chromatography (GC) for

| Compound | Rpt. Limit | Compound | Rpt. Limit |
|---|---|---|---|
| Acetone | 5.0 mg/dL | Isopropanol | 5.0 mg/dL |
| Ethanol | 10 mg/dL | Methanol | 5.0 mg/dL |

Acode 8051B - Postmortem, Basic, Blood (Forensic) - Peripheral Blood

-Analysis by Enzyme-Linked Immunosorbent Assay (ELISA) for:

| Compound | Rpt. Limit | Compound | Rpt. Limit |
|---|---|---|---|
| Amphetamines | 20 ng/mL | Fentanyl / Acetyl Fentanyl | 0.50 ng/mL |
| Barbiturates | 0.040 mcg/mL | Methadone / Metabolite | 25 ng/mL |
| Benzodiazepines | 100 ng/mL | Methamphetamine / MDMA | 20 ng/mL |
| Buprenorphine / Metabolite | 0.50 ng/mL | Opiates | 20 ng/mL |
| Cannabinoids | 10 ng/mL | Oxycodone / Oxymorphone | 10 ng/mL |
| Cocaine / Metabolites | 20 ng/mL | Phencyclidine | 10 ng/mL |

-Analysis by Headspace Gas Chromatography (GC) for.

| Compound | Rpt. Limit | Compound | Rpt. Limit |
|---|---|---|---|
| Acetone | 5.0 mg/dL | Isopropanol | 5 0 mg/dL |
| Ethanol | 10 mg/dL | Methanol | 5.0 mg/dL |

Acode 8051FL - Postmortem, Basic, Fluid (Forensic) - Vitreous Fluid

-Analysis by Enzyme-Linked Immunosorbent Assay (ELISA) for:

| Compound | Rpt. Limit | Compound | Rpt. Limit |
|---|---|---|---|
| Amphetamines | 20 ng/mL | Fentanyl / Acetyl Fentanyl | 0.50 ng/mL |
| Barbiturates | 0.040 mcg/mL | Methadone / Metabolite | 25 ng/mL |
| Benzodiazepines | 100 ng/mL | Methamphetamine / MDMA | 20 ng/mL |
| Buprenorphine / Metabolite | 0.50 ng/mL | Opiates | 20 ng/mL |
| Cannabinoids | 10 ng/mL | Oxycodone / Oxymorphone | 10 ng/mL |
| Cocaine / Metabolites | 20 ng/mL | Phencyclidine | 10 ng/mL |

-Analysis by Headspace Gas Chromatography (GC) for:

| Compound | Rpt. Limit | Compound | Rpt. Limit |
|---|---|---|---|
| Acetone | 5.0 mg/dL | Isopropanol | 5.0 mg/dL |
| Ethanol | 10 mg/dL | Methanol | 5 0 mg/dL |

Acode 8051U - Postmortem, Basic, Urine (Forensic)

-Analysis by Enzyme Immunoassay (EIA) for:

| Compound | Rpt. Limit | Compound | Rpt. Limit |
|---|---|---|---|
| Barbiturates | 0 30 mcg/mL | Cannabinoids | 50 ng/mL |
| Benzodiazepines | 50 ng/mL | Cocaine / Metabolites | 150 ng/mL |

EXHIBIT 92

NMS v.18.0

5

EXHIBIT A



**CONFIDENTIAL**

| | |
|---|---|
| **Workorder** | 19123056 |
| **Chain** | NMSCP16592 |
| **Patient ID** | AB19-062 |

**Page 6 of 6**

### Analysis Summary and Reporting Limits:

| Compound | Rpt. Limit | Compound | Rpt. Limit |
|---|---|---|---|
| Methadone / Metabolite | 300 ng/mL | Oxycodone / Oxymorphone | 100 ng/mL |
| Opiates | 300 ng/mL | Phencyclidine | 25 ng/mL |

-Analysis by Enzyme Immunoassay (EIA) for:

| Compound | Rpt. Limit | Compound | Rpt. Limit |
|---|---|---|---|
| Amphetamines | 500 ng/mL | Fentanyl / Acetyl Fentanyl | 2 0 ng/mL |
| Buprenorphine / Metabolite | 5.0 ng/mL | MDMA | 300 ng/mL |

-Analysis by Headspace Gas Chromatography (GC) for:

| Compound | Rpt. Limit | Compound | Rpt. Limit |
|---|---|---|---|
| Acetone | 5.0 mg/dL | Isopropanol | 5.0 mg/dL |
| Ethanol | 10 mg/dL | Methanol | 5.0 mg/dL |

NMS v.18.0

6

EXHIBIT A



| | PO Box 20590 | 5375 Western Ave. Ste. C |
| --- | --- | --- |
| | Boulder, CO 80308 | Boulder, CO 80301 |

DATE FILED: December 15, 2020 8:14 AM
FILING ID: 88C2DD8C89A5A
CASE NUMBER: 2020CV34229

LABORATORY, Inc.

Consulting · 45002 Bal (303) 443-0668
www.chematox.com

25 August 2020

Timothy Garvey
McDermott Law

Re: Northwestern Mutual Ins. vs Sarah Cahill Rowell, Case No. , ChemaTox No. , Review No. CR-3816

Dear Mr. Garvey,

I am an expert in Forensic Toxicology and the Chief Forensic Toxicologist for ChemaTox Consulting in Boulder, Colorado. I am a board certified Diplomate of The American Board of Forensic Toxicology (D-ABFT-FT). I have been qualified over 500 times as an expert in forensic toxicology in Colorado courts. I am qualified to testify and give opinions on the effects of drugs on the human body. I specialize in impairment relating to the ability to operate a motor vehicle. I stay up-to-date on current scientific literature and am a member of the following organizations: the American Academy of Forensic Sciences, the California Association of Toxicologists, the Society of Forensic Toxicologists, The International Association of Forensic Toxicologists, and the National Safety Council (Alcohol, Drugs and Impairment Division).

I have reviewed the police reports provided and the toxicology results relating to this case. A summary of the main facts of this case, as I understand them as established though review of the documentation provided as they relate to my opinion are as follows: Sarah Cahill Rowell had a history of alcohol abuse as a method of self-medicating to cope with depression, with periods of sobriety in between incidents of binge drinking. During some incidents, she would consume excessive amounts of alcohol to the point that she would blackout for days at a time and become confused as to the results of her actions during those blackout periods once she became sober. Occasionally, she was known to consume marijuana edibles. In April 2019, Mrs. Cahill Rowell was left home with her children while her husband was away for a planned trip. On 21 April, 2019, Mrs. Cahill Rowell attended a party and, after consuming approximately a half glass of wine, reportedly showed signs of intoxication and had to be driven home by the party's host. Later that night, a neighbor checked in on Mrs. Cahill Rowell, discovered her intoxicated and in need of assistance. On 22 April 2019, Mrs. Cahill Rowell contact her in-laws and asked if they could arrive earlier than planned to help her care for the children; they agreed and arrived later that evening. On the morning of 24 April, 2019, Mrs. Cahill Rowell contacted friends to arrange a play date for the children later in the week, showered, and took the youngest child into the bedroom to feed. Mr. Rowell's parents heard a muffled noise but did not respond to it. Later that morning, Mr. Rowell's father heard the baby crying in the bedroom for an extended period of time; he went to the room to check on Mrs. Cahill Rowell and was unable to enter the bedroom as the door had been locked and Mrs. Cahill Rowell was not responding. Mr. Rowell's father unlocked the door with a spare key, entered the room, and discovered Ms. Cahill Rowell's body, with the baby crying on the floor.

A postmortem blood sample and urine sample were collected from the decedent. The sample was tested by National Medical Services (NMS) Labs. The blood sample was tested for acetone, isopropanol, ethanol, and methanol content via automated headspace gas chromatography with flame ionization

EXHIBIT 13

1

EXHIBIT A

detection (GCFID). The result was a BAC of 0.177 g ethyl alcohol/100 mL blood. The blood sample was screened via enzyme-linked immunosorbent assay (ELISA) for amphetamines, barbiturates, benzodiazepines, buprenorphine metabolite, cannabinoids, cocaine metabolite, fentanyl, methadone, methamphetamine/MDMA, opiates, oxycodone / oxymorphone, and phencyclidine. The result of the cannabinoids and oxycodone / oxymorphone screens were positive; the results of the remaining screens were none detected. The sample was additionally tested via liquid chromatography-tandem mass spectrometry (LC-MS/MS) in order to confirm which drugs were present. Oxycodone was confirmed positive and quantitated in the sample at a level of 11 ng/mL blood.

The urine sample was tested for acetone, isopropanol, ethanol, and methanol content via automated headspace gas chromatography with flame ionization detection (GCFID). The result was a BAC of 246 mg/dL. The urine sample was screened via enzyme-linked immunosorbent assay (ELISA) for amphetamines, barbiturates, benzodiazepines, buprenorphine metabolite, cannabinoids, cocaine metabolite, fentanyl, methadone, methamphetamine/MDMA, opiates, oxycodone / oxymorphone, and phencyclidine. The result of the cannabinoids and oxycodone / oxymorphone screens were positive; the results of the remaining screens were none detected. The sample was additionally tested via liquid chromatography-tandem mass spectrometry (LC-MS/MS) in order to confirm which drugs were present. THC-COOH, oxycodone, and oxymorphone were confirmed positive and quantitated in the sample at a level of 17 ng/mL urine, 370 ng/mL urine, and 6.1 ng/mL urine, respectively.

Ethyl alcohol is the type of alcohol most commonly consumed. Alcohol acts as a central nervous system (CNS) depressant, the effects of which are proportional to the level of alcohol in the blood. Extensive studies have been performed on the physiological effects of ethyl alcohol on the human body respective to its concentration in blood. These effects have been classified into seven stages according to effect severity. A blood-alcohol concentration between 0.01-0.05 grams ethyl alcohol/100 mL blood is classified as a "Subclinical" stage of alcoholic influence; its influence is usually not obvious, and someone with a blood-alcohol concentration at this level may behave nearly normally. Slightly higher on the scale is a blood-alcohol concentration of 0.03-0.12 grams ethyl alcohol/100 mL blood. This is classified as the "Euphoria" stage and is accompanied by sociability, decreased inhibitions, diminished attention, diminished judgment, diminished control, some sensory-motor impairment, and slowed information processing. The legal blood-alcohol driving limit of 0.08 grams ethyl alcohol/100 mL blood is included in the Euphoria stage. A blood-alcohol concentration between 0.09-0.25 grams ethyl alcohol/100 mL blood is classified as the "Excitement" stage and is characterized by emotional instability, loss of critical judgment, impaired perception, impaired memory, poor comprehension, decreased sensory response, increased reaction time, sensory-motor incoordination, impaired balance, slurred speech, vomiting, and drowsiness. At blood-alcohol concentrations between 0.18-0.30 grams ethyl alcohol/100 mL blood, the "Confusion" stage is reached. Symptoms include disorientation, exaggerated emotional states, disturbances of vision, an increased pain threshold, increased muscular incoordination, staggering, and lethargy. The "Stupor" stage is from 0.25-0.40 grams ethyl alcohol/100 mL blood and can be identified by general inertia, a markedly decreased response to stimuli, marked muscular incoordination and inability to stand or walk, incontinence, approaching loss of motor functions, and impaired consciousness. From 0.35-0.50 grams ethyl alcohol/100 mL blood is the "Coma" stage, exhibiting complete unconsciousness, depressed or abolished reflexes, subnormal temperature, circulatory and respiratory impairment, and possible death. Above 0.45 grams ethyl alcohol/100 mL blood, death from respiratory arrest is basically inevitable (Dubowski, 2006). Individuals with a markedly higher alcohol tolerance may experience downgraded effects compared to those who do not drink on a regular basis.

Oxycodone is a narcotic analgesic prescription medication used therapeutically for the treatment

EXHIBIT 13                                2

EXHIBIT A

of pain. Oxycodone has a half-life of 3-6 hours and a therapeutic range of 10-140 ng/mL blood, converted from plasma. The therapeutic range of a drug is the window of effective blood-drug concentrations within which an individual will experience the desired therapeutic effects of a drug without experiencing significant toxic effects. An individual's blood-drug level within this range is determined by several factors, including the dose, dosage regimen, and the prescribing doctor's intended level of effect. Oxycodone can cause severe impairment in individuals even at therapeutic levels. This impairment is even more pronounced in individuals who do not take these medications regularly, in individuals who have just begun taking them or have recently changed their dose, or when taken in combination with other impairing substances. The effects of oxycodone can include confusion, decreased alertness, sleepiness, and impaired psychomotor skills, such as coordination and balance.

Δ9-Tetrahydrocannabinol (THC) is the psychoactive component of marijuana that is primarily responsible for its euphoric and impairing effects. Once ingested THC is first metabolized into 11-Hydroxy-THC (THC-OH), then further metabolizes into 11-nor-9-Carboxy-THC (THC-COOH). THC-OH is an active metabolite with equipotent psychoactivity to THC. THC-COOH is an inactive metabolite of THC and does not contribute to the euphoric effects of marijuana

The ability of an individual to perform actions knowingly and with total comprehension of the ramifications of these actions may be compromised in some individuals by significant levels of ethyl alcohol, drugs, or a combination of multiple drugs and/or ethyl alcohol. A sober individual of sound mind is capable of forming intent, reflecting upon potential outcomes of a decision, and passing judgment that analyzes the possible risks and/or benefits of these outcomes. The full, specific circumstances of a case, as they relate to impairment and drug use including the level of intoxication of the individual, are essential to determine an individual's ability to reflect upon and intelligently judge his or her actions. When an individual is substantially impaired, he or she may perform an action without being capable of reflecting or passing judgment upon its potential outcomes.

Slowed information processing and decreased inhibitions begin to be exhibited in users of ethyl alcohol in the Euphoria stage of alcoholic influence (BAC approximately 0.03-0.12 g ethyl alcohol/100 mL blood). Starting at a BAC of approximately 0.09 g ethyl alcohol/100 mL blood (within the Excitement stage of alcoholic influence), an individual's comprehension of the consequences and context of his or her actions may be impaired. This in turn may impair that individual's ability to reflect and pass judgment on his or her actions.

A similar case was presented to the courts in Renfandt vs. New York Life Insurance Company in 2018, in which a husband consumed diazepam, edible marijuana products, and an excessive amount of alcohol at a party and was driven home. It was later determined that at the time of his death, he had a BAC of 0.325 g ethyl alcohol/100 mL blood. Thirty minutes to an hour after he arrived home, the decedent in Renfrandt was discovered on the floor, unconscious by his wife, who moved him to the sofa. He was found on the floor unconscious a second time and was again helped to the sofa. Approximately thirty minutes later, the decedent's wife discovered he was "sleepwalking, zombie-like, with a blank, glazed-over look in his eyes." She again returned her husband to the sofa. Later, she awoke to find her husband standing in their bedroom with a loaded handgun in his hand, staring 'blankly ahead, completely unresponsive, and appearing to be in a sleepwalking state, unaware of his surroundings or his actions." Before his wife could intervene, he shot himself in the head. In Renfandt, the Court determined that "suicide" is defined as an "act of intentional self-destruction; the deliberate termination of one's existence" and concluded that, "if the insured--whether he was sane or insane--did not understand the physical nature and consequences of the act, then he did not intentionally kill himself. In that event, there is simply no 'suicide.'"

EXHIBIT 13                                    3

EXHIBIT A

When multiple drugs affecting the same system, such as the Central Nervous System, are taken at the same time, they increase the overall impairing effects on that system. It is my professional opinion to a reasonable degree of scientific certainty that, in general, I would expect the combination of ethyl alcohol and oxycodone to cause substantial impairment. This combination of drugs is likely to impair a person's ability to knowingly and intelligently perform actions with total comprehension of the ramifications of these actions including the act of self-destruction. Therefore, a person such as Ms. Cahill Rowell would be substantially impaired at the time of her death while under the influence of these drugs as described thus impairing her ability to form the intent to commit an act of self-destruction. My professional opinions are based on current scientific research generally accepted in the forensic toxicology community, on my training and experience, and on the information provided to me regarding this case. Should additional information be presented, I reserve the right to modify my opinions.

Sincerely,

Sarah Urfer, M.S., D-ABFT-FT
Chief Forensic Toxicologist

References

1. Baselt, R. 2014. Disposition of Toxic Drugs and Chemicals in Man. 10th Ed.

2. Couper, F. J., & Logan, B. K. (2004). Drugs and Human Performance Fact Sheets. Traffic Safety.

3. Desrosiers, N. A., Himes, S. K., Scheidweiler, K. B., Concheiro-Guisan, M., Gorelick, D. A., & Huestis, M. A.. (2014). Phase I and II Cannabinoid Disposition in Blood and Plasma of Occasional and Frequent Smokers Following Controlled Smoked Cannabis. Clinical Chemistry, 60(4), 1-13.

4. Dubowski, Kurt. 2006. Stages of Acute Alcoholic Influence/Intoxication.

5. Garriott, J.C. 2008. Medicolegal Aspects of Alcohol. 5th Ed.

6. Levine, B., Titus, J. M., Moore, K. A., & Fowler, D. (2005). Alcohol concentration and the ability to form intent. Science & Justice: Journal of the Forensic Science Society, 45(4), 195–7. doi:10.1016/S1355-0306(05)71666-X

7. Merikangas, J. (2004). Commentary: Alcoholic blackout--does it remove mens rea? The Journal of the American Academy of Psychiatry and the Law, 32(4), 375–7. Retrieved from http://www.ncbi.nlm.nih.gov/pubmed/15704621

8. Olesen, A. E., Upton, R., Foster, D. J. R., Staahl, C., Christrup, L. L., Arendt-Nielsen, L., & Drewes, A. M. (2010). A pharmacokinetic and pharmacodynamic study of oral oxycodone in a human experimental pain model of hyperalgesia. Clinical Pharmacokinetics, 49(12), 817–27. http://doi.org/10.2165/11536610-000000000-00000

9. Rubino, M., Summers, K. H., Puenpatom, A., Fu, C., Ohsfeldt, R. L., & Ben-Joseph, R. H. (2011). A comparison of daily average consumption (DACON) of oxycodone and oxymorphone long-acting

EXHIBIT 13                                    4

EXHIBIT A

oral tablets. Journal of Managed Care Pharmacy : JMCP, 17(5), 367–76. Retrieved from http://www.ncbi.nlm.nih.gov/pubmed/21657806

10. Watterson, R. T. (1991). Just Say No to the Charges Against You: Alcohol Intoxication, Mental Capacity, and Criminal Responsibility. Bull Am Acad Psychiatry Law, 19(3). Retrieved from http://jaapl.org/content/19/3/277

11. Winek, C. L., Wahba, W. W., Winek Jr., C. L., & Balzer, T. W. (2001). Drug and chemical blood-level data 2001. Forensic Science International, 122(2-3), 107–123. Retrieved from http://www.ncbi.nlm.nih.gov/pubmed/11672964

EXHIBIT 13                                                                  5

EXHIBIT A



**National Institute
on Alcohol Abuse
and Alcoholism**

# Understanding the Dangers of Alcohol Overdose

DATE FILED: December 14, 2020 10:16 AM
FILING ID: A4FA59B9AF4
CASE NUMBER: 2020CV34229

Celebrating at parties, cheering a favorite sports team, and enjoying get-togethers after work are common ways to relax or be with friends. For some people, these occasions may also include drinking—even binge or high-intensity drinking. And when that happens, the results can be deadly.

Drinking too much and too quickly can lead to significant impairments in motor coordination, decision-making, impulse control, and other functions, increasing the risk of harm. Continuing to drink despite clear signs of significant impairments can result in an alcohol overdose.

## What Is an Alcohol Overdose?

An alcohol overdose occurs when there is so much alcohol in the bloodstream that areas of the brain controlling basic life-support functions—such as breathing, heart rate, and temperature control—begin to shut down. Symptoms of alcohol overdose include mental confusion, difficulty remaining conscious, vomiting, seizure, trouble breathing, slow heart rate, clammy skin, dulled responses such as no gag reflex (which prevents choking), and extremely low body temperature. Alcohol overdose can lead to permanent brain damage or death.



**What Is a Standard Drink?**

12 fl oz of regular beer = 8–9 fl oz of malt liquor (shown in a 12 oz glass) = 5 fl oz of table wine = 1.5 fl oz shot of distilled spirits (gin, rum, tequila, vodka, whiskey, etc.)

about 5% alcohol / about 7% alcohol / about 12% alcohol / about 40% alcohol

Each beverage portrayed above represents one standard drink (or one alcoholic drink equivalent), defined in the United States as any beverage containing .6 fl oz or 14 grams of pure alcohol. The percentage of pure alcohol, expressed here as alcohol by volume (alc/vol), varies within and across beverage types. Although the standard drink amounts are helpful for following health guidelines, they may not reflect customary serving sizes.

### Who May Be at Risk?

Anyone who consumes too much alcohol too quickly may be in danger of an alcohol overdose. This is especially true of individuals who engage in binge drinking, defined as a pattern of drinking that brings blood alcohol concentration (BAC) to .08 percent or higher,* typically occurring after a woman consumes 4 drinks or a man consumes 5 drinks in about 2 hours;[1] as well as high-intensity drinking, defined as drinking two or more times the binge-drinking thresholds for women and men.[2] Teenagers and young adults who drink may be at particular risk for alcohol overdose. Research shows that teens and college-age young adults often engage in binge drinking and high-intensity drinking. Drinking such large quantities of alcohol can overwhelm the body's ability to break down and clear alcohol from the bloodstream. This leads to rapid increases in BAC and significantly impairs brain and other bodily functions.

*A blood alcohol concentration (BAC) of .08 percent corresponds to .08 grams per deciliter, or .08 grams per 100 milliliters.

 

National Institute
on Alcohol Abuse
and Alcoholism

*NIH . . . Turning Discovery Into Health®*
National Institute on Alcohol Abuse and Alcoholism
https://www.niaaa.nih.gov • 301.443.3860

**EXHIBIT 4**

1

EXHIBIT A

What tips the balance from drinking that produces impairment to drinking that puts one's life in jeopardy varies among individuals. Age, sensitivity to alcohol (tolerance), gender, speed of drinking, medications you are taking, and amount of food eaten can all be factors.

Alcohol use and taking opioids or sedative-hypnotics, such as sleep and anti-anxiety medications, can increase your risk of an overdose. Examples of these medications include sleep aids such as zolpidem and eszopiclone, and benzodiazepines such as diazepam and alprazolam. Even drinking alcohol while taking over-the-counter antihistamines can be dangerous. Using alcohol with opioid pain relievers such as oxycodone and morphine or illicit opioids such as heroin is also a very dangerous combination. Like alcohol, these drugs suppress areas in the brain that control vital functions such as breathing. Ingesting alcohol and other drugs together intensifies their individual effects and could produce an overdose with even moderate amounts of alcohol.

## As BAC Increases—So Do the Risks

As blood alcohol concentration (BAC) increases, so does the effect of alcohol—as well as the risk of harm. Even small increases in BAC can decrease motor coordination, make a person feel sick, and cloud judgment. This can increase an individual's risk of being injured from falls or car crashes, experiencing acts of violence, and engaging in unprotected or unintended sex. When BAC reaches high levels, amnesia (blackouts), loss of consciousness (passing out), and death can occur.

BAC can continue to rise even when a person stops drinking or is unconscious. Alcohol in the stomach and intestine continues to enter the bloodstream and circulate throughout the body.

It is dangerous to assume that an unconscious person will be fine by sleeping it off. One potential danger of alcohol overdose is choking on one's own vomit. Alcohol at very high levels can hinder signals in the brain that control automatic responses such as the gag reflex. With no gag reflex, a person who drinks to the point of passing out is in danger of choking on his or her vomit and dying from a lack of oxygen (i.e., asphyxiation). Even if the person survives, an alcohol overdose like this can lead to long-lasting brain damage.

**Critical Signs and Symptoms of an Alcohol Overdose**

- » Mental confusion, stupor
- » Difficulty remaining conscious, or inability to wake up
- » Vomiting
- » Seizures
- » Slow breathing (fewer than 8 breaths per minute)
- » Irregular breathing (10 seconds or more between breaths)
- » Slow heart rate
- » Clammy skin
- » Dulled responses, such as no gag reflex (which prevents choking)
- » Extremely low body temperature, bluish skin color, or paleness

## Know the Danger Signs and Act Quickly

Know the danger signals and, if you suspect that someone has an alcohol overdose, call 911 for help immediately. Do not wait for the person to have all the symptoms, and be aware that a person who has passed out can die. Don't play doctor—cold showers, hot coffee, and walking do not reverse the effects of alcohol overdose and could actually make things worse.




National Institute on Alcohol Abuse and Alcoholism

*NIH . . . Turning Discovery Into Health®*
National Institute on Alcohol Abuse and Alcoholism
https://www.niaaa.nih.gov • 301.443.3860

**EXHIBIT 4**

2

EXHIBIT A

While waiting for medical help to arrive:

» Be prepared to provide information to the responders, including the type and amount of alcohol the person drank; other drugs he or she took, if known; and any health information that you know about the person, such as medications currently taking, allergies to medications, and any existing health conditions.

» Do not leave an intoxicated person alone, as he or she is at risk of getting injured from falling or choking. Keep the person on the ground in a sitting or partially upright position rather than in a chair.

» Help a person who is vomiting. Have him or her lean forward to prevent choking. If a person is unconscious or lying down, roll him or her onto one side with an ear toward the ground to prevent choking.

Stay alert to keep your friends and family safe. And remember—you can avoid the risk of an alcohol overdose by drinking responsibly if you choose to drink, or by not drinking at all.



## As Blood Alcohol Concentration (BAC) Increases, So Does Impairment

**Life Threatening**
• Loss of consciousness
• Danger of life-threatening alcohol overdose
• Significant risk of death in most drinkers due to suppression of vital life functions

**Increased Impairment**
• Perceived beneficial effects of alcohol, such as relaxation, give way to increasing intoxication
• Increased risk of aggression in some people
• Speech, memory, attention, coordination, balance further impaired
• Significant impairments in all driving skills
• Increased risk of injury to self and others
• Moderate memory impairments

**Severe Impairment**
• Speech, memory, coordination, attention, reaction time, balance significantly impaired
• All driving-related skills dangerously impaired
• Judgment and decision-making dangerously impaired
• Blackouts (amnesia)
• Vomiting and other signs of alcohol overdose common
• Loss of consciousness

**Mild Impairment**
• Mild speech, memory, attention, coordination, balance impairments
• Perceived beneficial effects, such as relaxation
• Sleepiness can begin

0.31–0.45%

0.16–0.30%

Please note that the BAC ranges depicted in this graph are not absolute and vary by individual.

## For more information, please visit: https://www.niaaa.nih.gov

1 National Institute on Alcohol Abuse and Alcoholism. NIAAA Council approves definition of binge drinking. *NIAAA Newsletter*, No. 3, Winter 2004. https://pubs.niaaa.nih.gov/publications/Newsletter/winter2004/Newsletter_Number3.pdf. Accessed September 5, 2018

2 Hingson, R.W.; Zha, W.; and White, A.M. Drinking beyond the binge threshold: Predictors, consequences, and changes in the U.S. *American Journal of Preventive Medicine* 52(6):717–727, 2017. PMID 28526355




National Institute
on Alcohol Abuse
and Alcoholism

*NIH . . . Turning Discovery Into Health*®
National Institute on Alcohol Abuse and Alcoholism
https://www.niaaa.nih.gov • 301.443.3860
Updated March 2020

**EXHIBIT 4**

EXHIBIT A

**HIGHLIGHTS OF PRESCRIBING INFORMATION** These highlights do not include all the information needed to use OXYCODONE HYDROCHLORIDE ORAL SOLUTION safely and effectively. See full prescribing information for OXYCODONE HYDROCHLORIDE ORAL SOLUTION.

Oxycodone Hydrochloride oral solution CII
Initial U.S. Approval: 1950

---

**WARNING: RISK OF MEDICATION ERRORS; ADDICTION, ABUSE, AND MISUSE; RISK EVALUATION AND MITIGATION STRATEGY (REMS); LIFE-THREATENING RESPIRATORY DEPRESSION; ACCIDENTAL INGESTION; NEONATAL OPIOID WITHDRAWAL SYNDROME; CYTOCHROME P450 3A4 INTERACTION; and RISKS FROM CONCOMITANT USE WITH BENZODIAZEPINES OR OTHER CNS DEPRESSANTS**

*See full prescribing information for complete boxed warning.*

- Ensure accuracy when prescribing, dispensing, and administering Oxycodone Hydrochloride Oral Solution. Dosing errors due to confusion between mg and mL, and other Oxycodone Hydrochloride Oral Solutions of different concentrations can result in accidental overdose and death. (2.1, 5.1).

- Oxycodone Hydrochloride Oral Solution exposes users to risks of addiction, abuse, and misuse, which can lead to overdose and death. Assess patient's risk before prescribing and monitor regularly for these behaviors and conditions. (5.2)

- To ensure that the benefits of opioid analgesics outweigh the risks of addiction, abuse, and misuse, the Food and Drug Administration (FDA) has required a Risk Evaluation Mitigation Strategy (REMS) for these products. (5.3)

- Serious, life-threatening, or fatal respiratory depression may occur. Monitor closely, especially upon initiation or following a dose increase. (5.4)

- Accidental ingestion of Oxycodone Hydrochloride Oral Solution, especially by children, can result in a fatal overdose of oxycodone. (5.4)

- Prolonged use of Oxycodone Hydrochloride Oral Solution during pregnancy can result in neonatal opioid withdrawal syndrome, which may be life-threatening if not recognized and treated. If prolonged opioid use is required in a pregnant woman, advise the patient of the risk of neonatal opioid withdrawal syndrome and ensure that appropriate treatment will be available. (5.5)

- The concomitant use with CYP3A4 inhibitors (or discontinuation of CYP3A4 inducers) can result in a fatal overdose of Oxycodone Hydrochloride Oral Solution. (5.6, 7, 12.3)

- Concomitant use of opioids with benzodiazepines or other central nervous system (CNS) depressants, including alcohol, may result in profound sedation, respiratory depression, coma, and death. Reserve concomitant prescribing for use in patients for whom alternative treatment options are inadequate; limit dosages and durations to the minimum required; and follow patients for signs and symptoms of respiratory depression and sedation (5.7, 7)

---

**RECENT MAJOR CHANGES**

Boxed Warning 09/2018
Warnings and Precautions (5.3) 09/2018

---

**INDICATIONS AND USAGE**
Oxycodone Hydrochloride Oral Solution is an opioid agonist indicated for the management of pain severe enough to require an opioid analgesic and for which alternative treatments are inadequate (1)

---

Limitations of Use (1)

Because of the risks of addiction, abuse, and misuse with opioids, even at recommended doses, reserve Oxycodone Hydrochloride Oral Solution for use in patients for whom alternative treatment options [e g , non-opioid analgesics or opioid combination products]
- Have not been tolerated, or are not expected to be tolerated,
- Have not provided adequate analgesia, or are not expected to provide adequate analgesia

---

**DOSAGE AND ADMINISTRATION**
- Use the lowest effective dosage for the shortest duration consistent with individual patient treatment goals (2 1)
- Individualize dosing based on the severity of pain, patient response, prior analgesic experience, and risk factor for addiction, abuse, and misuse. (2 1)
- Initiate dosing with a range of 5 to 15 mg every 4 to 6 hours as needed for pain (2 2)
- For control of chronic pain, administer Oxycodone Hydrochloride Oral Solution on a regularly scheduled basis, at the lowest dosage level to achieve adequate analgesia (2 2)
- Individually titrate Oxycodone Hydrochloride Oral Solution to a dose that provides adequate analgesia and minimizes adverse reactions. (2 3)
- Do not stop Oxycodone Hydrochloride Oral Solution abruptly in a physically dependent patient (2 4)

---

**DOSAGE FORMS AND STRENGTHS**
Oral Solution
- 5 mg per 5 mL (1 mg/mL)
- 100 mg per 5 mL (20 mg/mL) (3)

---

**CONTRAINDICATIONS**
- Significant respiratory depression (4)
- Acute or severe bronchial asthma in an unmonitored setting in absence of resuscitative equipment (4)
- Known or suspected gastrointestinal obstruction, including paralytic ileus (4)
- Hypersensitivity to oxycodone (4)

---

**WARNINGS AND PRECAUTIONS**
- Life-Threatening Respiratory Depression in Patients with Chronic Pulmonary Disease or in Elderly, Cachectic or Debilitated Patients Monitor closely, particularly during initiation and titration (5.8)
- Adrenal Insufficiency If diagnosed, treat with physiologic replacement of corticosteroids, and wean patient off of the opioid. (5.9)
- Severe Hypotension Monitor during dosage initiation and titration. Avoid use of Oxycodone Hydrochloride Oral Solution in patients with circulatory shock (5 10)
- Risks of Use in Patients with Increased Intracranial Pressure, Brain Tumors, Head Injury or Impaired Consciousness Monitor for sedation and respiratory depression Avoid use of Oxycodone Hydrochloride Oral Solution in patients with impaired consciousness or coma (5.11)

---

**ADVERSE REACTIONS**
Most common adverse reactions are nausea, constipation, vomiting, headache, pruritus, insomnia, dizziness, asthenia, and somnolence (6)

To report SUSPECTED ADVERSE REACTIONS, contact Pharm-Olam at 1-866-511-6754 or FDA at 1-800-FDA-1088 or www.fda.gov.medwatch.

---

**DRUG INTERACTIONS**
- Serotonergic Drugs Concomitant use may result in serotonin syndrome Discontinue Oxycodone Hydrochloride Oral Solution if serotonin syndrome is suspected (7)
- Monoamine Oxidase Inhibitors (MAOIs) Can potentiate the effects of oxycodone Avoid concomitant use in patients receiving MAOIs or within 14 days of stopping treatment with an MAOI. (7)
- Mixed Agonist/Antagonist and Partial Agonist Opioid Analgesics Avoid use with Oxycodone Hydrochloride Oral Solution because they may reduce analgesic effect of Oxycodone Hydrochloride Oral Solution or precipitate withdrawal symptoms (7)

---

**USE IN SPECIFIC POPULATIONS**
- Pregnancy May cause fetal harm. (8.1)

See 17 for PATIENT COUNSELING INFORMATION and FDA approved Medication Guide

Revision: 09/2018

---

DATE Filed:December 14, 2020 10:16 AM
FILING ID: 88C2DD8C894F4
CASE NUMBER: 2020CV034904

FULL PRESCRIBING INFORMATION: CONTENTS*

**WARNING: RISK OF MEDICATION ERRORS; ADDICTION, ABUSE, AND MISUSE; RISK EVALUATION AND MITIGATION STRATEGY (REMS); LIFE-THREATENING RESPIRATORY DEPRESSION; ACCIDENTAL INGESTION; NEONATAL OPIOID WITHDRAWAL SYNDROME; CYTOCHROME P450 3A4 INTERACTION; and RISKS FROM CONCOMITANT USE WITH BENZODIAZEPINES OR OTHER CNS DEPRESSANTS**

1   **INDICATIONS AND USAGE**
2   **DOSAGE AND ADMINISTRATION**
   2 1   Important Dosage and Administration Instructions
   2 2   Initial Dosage
   2 3   Titration and Maintenance of Therapy
   2 4   Discontinuation of Oxycodone Hydrochloride Oral Solution
3   **DOSAGE FORMS AND STRENGTHS**
4   **CONTRAINDICATIONS**
5   **WARNINGS AND PRECAUTIONS**
   5 1   Risk of Accidental Overdose and Death due to Medication Errors
   5.2   Addiction, Abuse, and Misuse
   5 3   Opioid Analgesic Risk Evaluation and Mitigation Strategy (REMS)
   5 4   Life-Threatening Respiratory Depression
   5 5   Neonatal Opioid Withdrawal Syndrome
   5 6   Risks of Concomitant Use or Discontinuation of Cytochrome P450 3A4 Inhibitors and Inducers
   5 7   Risks from Concomitant Use with Benzodiazepines or Other CNS Depressants
   5 8   Life-Threatening Respiratory Depression in Patients with Chronic Pulmonary Disease or in Elderly, Cachectic, or Debilitated Patients
   5 9   Adrenal Insufficiency
   5 10   Severe Hypotension
   5 11   Risks of Use in Patients with Increased Intracranial Pressure, Brain Tumors, Head Injury, or Impaired Consciousness
   5 12   Risk of Use in Patients with Gastrointestinal Conditions
   5 13   Increased Risk of Seizures in Patients with Convulsive or Seizure Disorders
   5 14   Withdrawal
   5 15   Risks of Driving and Operating Machinery
6   **ADVERSE REACTIONS**
7   **DRUG INTERACTIONS**
8   **USE IN SPECIFIC POPULATIONS**
   8 1   Pregnancy
   8.2   Lactation
   8 3   Females and Males Reproductive Potential
   8 4   Pediatric Use
   8 5   Geriatric Use
   8 6   Hepatic Impairment
   8 7   Renal Impairment
9   **DRUG ABUSE AND DEPENDENCE**
   9 1   Controlled Substance
   9 2   Abuse
   9 3   Dependence
10   **OVERDOSAGE**
11   **DESCRIPTION**
12   **CLINICAL PHARMACOLOGY**
   12 1   Mechanism of Action
   12 2   Pharmacodynamics
   12 3   Pharmacokinetics
13   **NONCLINICAL TOXICOLOGY**
   13 1   Carcinogenesis, Mutagenesis, Impairment of Fertility
16   **HOW SUPPLIED/STORAGE AND HANDLING**
17   **PATIENT COUNSELING INFORMATION**

*Sections or subsections omitted from the full prescribing information are not listed

EXHIBIT 35

2

EXHIBIT A

## FULL PRESCRIBING INFORMATION

> ### WARNING: ADDICTION, ABUSE, AND MISUSE; RISK EVALUATION AND MITIGATION STRATEGY (REMS); LIFE-THREATENING RESPIRATORY DEPRESSION; ACCIDENTAL INGESTION; NEONATAL OPIOID WITHDRAWAL SYNDROME; CYTOCHROME P450 3A4 INTERACTION; and RISKS FROM CONCOMITANT USE WITH BENZODIAZEPINES OR OTHER CNS DEPRESSANTS
>
> #### Risk of Medication Errors
> Ensure accuracy when prescribing, dispensing, and administering Oxycodone Hydrochloride Oral Solution. Dosing errors due to confusion between mg and mL, and other oxycodone hydrochloride oral solutions of different concentrations can results in accidental overdose. *[see Dosage and Administration (2.1), Warnings and Precautions (5.1)].*
>
> #### Addiction, Abuse, and Misuse
> Oxycodone Hydrochloride Oral Solution exposes users to risks of addiction, abuse, and misuse, which can lead to overdose and death. Assess patient's risk prior to prescribing Oxycodone Hydrochloride Oral Solution, and monitor all patients regularly for the development of these behaviors and conditions. *[see Warnings and Precautions (5.2)].*
>
> #### Opioid Analgesic Risk Evaluation and Mitigation Strategy (REMS)
> To ensure that the benefits of opioid analgesics outweigh the risks of addiction, abuse, and misuse, the Food and Drug Administration (FDA) has required a REMS for these products *[see Warnings and Precautions (5.3)].*  Under the requirements of the REMS, drug companies with approved opioid analgesic products must make REMS-compliant education programs available to healthcare providers. Healthcare providers are strongly encouraged to
> - complete a REMS-compliant education program,
> - counsel patients and/or their caregivers, with every prescription, on safe use, serious risks, storage, and disposal of these products,
> - emphasize to patients and their caregivers the importance of reading the Medication Guide every time it is provided by their pharmacist, and
> - consider other tools to improve patient, household, and community safety.
>
> #### Life-Threatening Respiratory Depression
> Serious, life-threatening, or fatal respiratory depression may occur with use of Oxycodone Hydrochloride Oral Solution. Monitor for respiratory depression, especially during initiation of Oxycodone Hydrochloride Oral Solution or following a dose increase. *[see Warnings and Precautions (5.4)]*.

EXHIBIT A

<u>Accidental Ingestion</u>
**Accidental ingestion of even one dose of Oxycodone Hydrochloride Oral Solution, especially by children, can result in a fatal overdose of oxycodone. *[see Warnings and Precautions(5.4)]*.**

<u>Neonatal Opioid Withdrawal Syndrome</u>
**Prolonged use of Oxycodone Hydrochloride Oral Solution during pregnancy can result in neonatal opioid withdrawal syndrome, which may be life-threatening if not recognized and treated, and requires management according to protocols developed by neonatology experts. If opioid use is required for a prolonged period in a pregnant woman, advise the patient of the risk of neonatal opioid withdrawal syndrome and ensure that appropriate treatment will be available. *[see Warnings and Precautions (5.5)]*.**

<u>Cytochrome P450 3A4 Interaction</u>
**The concomitant of Oxycodone Hydrochloride Oral Solution with all cytochrome P450 3A4 inhibitors may result in an increase in oxycodone plasma concentrations, which could increase or prolong adverse reactions and may cause potentially fatal respiratory depression. In addition, discontinuation of a concomitantly used cytochrome P450 3A4 inducer may result in an increase in oxycodone plasma concentration. Monitor patients receiving Oxycodone Hydrochloride Oral Solution and any CYP3A4 inhibitor or inducer. *[see Warnings and Precautions (5.6), Drug Interactions (7), Clinical Pharmacology (12.3)]*.**

<u>Risks From Concomitant Use With Benzodiazepines Or Other CNS Depressants</u>
**Concomitant use of opioids with benzodiazepines or other central nervous system (CNS) depressants, including alcohol, may result in profound sedation, respiratory depression, coma, and death *[see Warnings and Precautions (5.7), Drug Interactions (7)]*.**
- **Reserve concomitant prescribing of Oxycodone Hydrochloride Oral Solution and benzodiazepines or other CNS depressants for use in patients for whom alternative treatment options are inadequate.**
- **Limit dosages and durations to the minimum required.**
- **Follow patients for signs and symptoms of respiratory depression and sedation.**

## 1 INDICATIONS AND USAGE

Oxycodone Hydrochloride Oral Solution is indicated for the management of pain severe enough to require an opioid analgesic and for which alternative treatments are inadequate.

<u>Limitations of Use</u>
Because of the risks of addiction, abuse, and misuse with opioids, even at recommended doses, *[see Warnings and Precautions (5.2)]*, reserve Oxycodone Hydrochloride Oral Solution for use in patients for whom alternative treatment options [e.g., non-opioid analgesics or opioid combination products]:

EXHIBIT 35

4

- • Have not been tolerated, or are not expected to be tolerated,
- • Have not provided adequate analgesia, or are not expected to provide adequate analgesia

## 2 DOSAGE AND ADMINISTRATION

### 2.1 Important Dosage and Administration Instructions

Ensure accuracy when prescribing, dispensing, and administering Oxycodone Hydrochloride Oral Solution to avoid dosing errors due to confusion between mg and mL, and with other oxycodone hydrochloride solutions of different concentrations, which could result in accidental overdose and death. Ensure the proper dose is communicated and dispensed. When writing prescriptions, include both the total dose in mg and the total dose in volume.

Always use the enclosed calibrated measuring cup when administering Oxycodone Hydrochloride Oral Solution 5 mg per 5 mL and always use the enclosed calibrated oral syringe when administering Oxycodone Hydrochloride Oral Solution 100 mg per 5 mL (20 mg per mL) to ensure that the dose is measured and administered accurately.

Do not use household teaspoons or tablespoons to measure Oxycodone Hydrochloride Oral Solution, as using a tablespoon instead of a teaspoon could lead to overdosage.

Use the lowest effective dosage for the shortest duration consistent with individual patient treatment goals *[see Warnings and Precautions (5)]*.

Initiate the dosing regimen for each patient individually, taking into account the patient's severity of pain, patient response, prior analgesic treatment experience, and risk factors for addiction, abuse, and misuse *[see Warnings and Precautions (5.2)]*.

Monitor patients closely for respiratory depression, especially within the first 24-72 hours of initiating therapy and following dosage increases with Oxycodone Hydrochloride Oral Solution and adjust the dosage accordingly *[see Warnings and Precautions (5.4)]*.

### 2.2 Initial Dosage

Use of Oxycodone Hydrochloride Oral Solution as the First Opioid Analgesic
Initiate treatment with Oxycodone Hydrochloride Oral Solution in a dosing range of 5 to 15 mg every 4 to 6 hours as needed for pain.

Conversion from Other Opioids to Oxycodone Hydrochloride Oral Solution
There is inter-patient variability in the potency of opioid drugs and opioid formulations. Therefore, a conservative approach is advised when determining the total daily dosage of Oxycodone Hydrochloride Oral Solution. It is safer to underestimate a patient's 24-hour Oxycodone Hydrochloride Oral Solution dosage than to overestimate the 24-hour Oxycodone Hydrochloride Oral Solution dosage and manage an adverse reaction due to overdose.

Conversion from Oxycodone Hydrochloride Oral Solution to Extended-Release Oxycodone Hydrochloride

The relative bioavailability of Oxycodone Hydrochloride Oral Solution compared to extended-release oxycodone is unknown, so conversion to extended-release tablets must

EXHIBIT 35

EXHIBIT A

be accompanied by close observation for signs of excessive sedation and respiratory depression.

### 2.3 Titration and Maintenance of Therapy

Individually titrate Oxycodone Hydrochloride Oral Solution to a dose that provides adequate analgesia and minimizes adverse reactions. Continually reevaluate patients receiving Oxycodone Hydrochloride Oral Solution to assess the maintenance of pain control and the relative incidence of adverse reactions, as well as monitoring for the development of addiction, abuse, or misuse *[see Warnings and Precautions (5.2)]*.

Frequent communication is important among the prescriber, other members of the healthcare team, the patient, and the caregiver/family during periods of changing analgesic requirements, including initial titration.

If the level of pain increases after dosage stabilization, attempt to identify the source of increased pain before increasing the Oxycodone Hydrochloride Oral Solution dosage. If unacceptable opioid-related adverse reactions are observed, consider reducing the dosage. Adjust the dosage to obtain an appropriate balance between management of pain and opioid-related adverse reactions.

### 2.4 Discontinuation of Oxycodone Hydrochloride Oral Solution

When a patient who has been taking Oxycodone Hydrochloride Oral Solution regularly and may be physically dependent no longer requires therapy with Oxycodone Hydrochloride Oral Solution, taper the dose gradually, by 25% to 50% every 2 to 4 days, while monitoring carefully for signs and symptoms of withdrawal. If the patient develops these signs or symptoms, raise the dose to the previous level and taper more slowly, either by increasing the interval between decreases, decreasing the amount of change in dose, or both. Do not abruptly discontinue Oxycodone Hydrochloride Oral Solution in a physically-dependent patient *[see Warnings and Precautions (5.14), Drug Abuse and Dependence (9.3)]*.

### 3 DOSAGE FORMS AND STRENGTHS

**Oxycodone Hydrochloride Oral Solution, USP**

5 mg per 5 mL (1 mg/mL) Strength Oral Solution: Each 5 mL of red Oxycodone Hydrochloride Oral Solution, USP contains oxycodone hydrochloride 5 mg.

100 mg per 5 mL (20 mg per mL) Strength Oral Solution: Each 5 mL of yellow Oxycodone Hydrochloride Oral Solution, USP contains oxycodone hydrochloride 100 mg.

### 4 CONTRAINDICATIONS

Oxycodone Hydrochloride Oral Solution is contraindicated in patients with:
- Significant respiratory depression *[see Warnings and Precautions (5.4)]*
- Acute or severe bronchial asthma in an unmonitored setting or in the absence of resuscitative equipment *[see Warnings and Precautions (5.8)]*
- Known or suspected gastrointestinal obstruction, including paralytic ileus *[see Warnings and Precautions (5.12)]*
- Hypersensitivity to oxycodone (e.g., angioedema) *[see Adverse Reactions (6)]*

EXHIBIT 35

6

EXHIBIT A

## 5 WARNINGS AND PRECAUTIONS

### 5.1 Risk of Accidental Overdose and Death due to Medication Errors

Dosing errors can result in accidental overdose and death. Avoid dosing errors that may result from confusion between mg and mL and confusion with oxycodone hydrochloride solutions of different concentrations, when prescribing, dispensing, and administering Oxycodone Hydrochloride Oral Solution. Ensure that the dose is communicated clearly and dispensed accurately. Always use the <u>enclosed</u> calibrated measuring cup when administering Oxycodone Hydrochloride Oral Solution 5 mg per 5 mL (1 mg/mL) and always use the <u>enclosed</u> calibrated oral syringe when administering Oxycodone Hydrochloride Oral Solution 100 mg per 5 mL (20 mg/ mL) to ensure the dose is measured and administered accurately.

Do not use a teaspoon or a tablespoon to measure a dose. A household teaspoon or tablespoon is not an adequate measuring device. Given the inexactitude of the household spoon measure and the possibility of using a tablespoon instead of a teaspoon, which could lead to overdosage, it is strongly recommended that, if the enclosed calibrated measuring cup becomes lost, caregivers obtain and use a calibrated measuring device. Health care providers should recommend a calibrated device that can measure and deliver the prescribed dose accurately, and instruct caregivers to use extreme caution in measuring the dosage.

### 5.2 Addiction, Abuse, and Misuse

Oxycodone Hydrochloride Oral Solution contains oxycodone, a Schedule II controlled substance. As an opioid, Oxycodone Hydrochloride Oral Solution exposes users to the risks of addiction, abuse, and misuse *[see Drug Abuse and Dependence (9)]*.

Although the risk of addiction in any individual is unknown, it can occur in patients appropriately prescribed Oxycodone Hydrochloride Oral Solution. Addiction can occur at recommended dosages and if the drug is misused or abused.

Assess each patient's risk for opioid addiction, abuse, or misuse prior to prescribing Oxycodone Hydrochloride Oral Solution, and monitor all patients receiving Oxycodone Hydrochloride Oral Solution for the development of these behaviors and conditions. Risks are increased in patients with a personal or family history of substance abuse (including drug or alcohol abuse or addiction) or mental illness (e.g., major depression). The potential for these risks should not, however, prevent the proper management of pain in any given patient. Patients at increased risk may be prescribed opioids such as Oxycodone Hydrochloride Oral Solution, but use in such patients necessitates intensive counseling about the risks and proper use of Oxycodone Hydrochloride Oral Solution along with intensive monitoring for signs of addiction, abuse, and misuse.

Opioids are sought by drug abusers and people with addiction disorders and are subject to criminal diversion. Consider these risks when prescribing or dispensing Oxycodone Hydrochloride Oral Solution. Strategies to reduce these risks include prescribing the drug in the smallest appropriate quantity and advising the patient on the proper disposal of unused drug [see Patient Counseling Information (17)]. Contact local state professional licensing board or state controlled substances authority for information on how to prevent and detect abuse or diversion of this product.

EXHIBIT 35

EXHIBIT A

### 5.3 Opioid Analgesic Risk Evaluation and Mitigation Strategy (REMS)

To ensure that the benefits of opioid analgesics outweigh the risks of addiction, abuse, and misuse, the Food and Drug Administration (FDA) has required a Risk Evaluation and Mitigation Strategy (REMS) for these products. Under the requirements of the REMS, drug companies with approved opioid analgesic products must make REMS-compliant education programs available to healthcare providers. Healthcare providers are strongly encouraged to do all of the following:

- Complete a <u>REMS compliant education program</u> offered by an accredited provider of continuing education (CE) or another education program that includes all the elements of the FDA Education Blueprint for Health Care Providers Involved in the Management or Support of Patients with Pain.
- Discuss the safe use, serious risks, and proper storage and disposal of opioid analgesics with patients and/or their caregivers every time these medicines are prescribed. The Patient Counseling Guide (PCG) can be obtained at this link: <u>www.fda.gov/OpioidAnalgesicREMSPCG.</u>
- Emphasize to patients and their caregivers the importance of reading the Medication Guide that they will receive from their pharmacist every time an opioid analgesic is dispensed to them.
- Consider using other tools to improve patient, household, and community safety, such as patient-prescriber agreements that reinforce patient prescriber responsibilities.

To obtain further information on the opioid analgesic REMS and for a list of accredited REMS CME/CE, call 1-800-503-0784, or log on to <u>www.opioidanalgesicrems.com.</u> The FDA Blueprint can be found at <u>www.fda/gov/OpioidAnalgesicREMSBlueprint.</u>

### 5.4 Life-Threatening Respiratory Depression

Serious, life-threatening, or fatal respiratory depression has been reported with the use of opioids, even when used as recommended. Respiratory depression, if not immediately recognized and treated, may lead to respiratory arrest and death. Management of respiratory depression may include close observation, supportive measures, and use of opioid antagonists, depending on the patient's clinical status *[see Overdosage (10)].* Carbon dioxide ($CO_2$) retention from opioid-induced respiratory depression can exacerbate the sedating effects of opioids.

While serious, life-threatening, or fatal respiratory depression can occur at any time during the use of Oxycodone Hydrochloride Oral Solution, the risk is greatest during the initiation of therapy or following a dosage increase. Monitor patients closely for respiratory depression, especially within the first 24-72 hours of initiating therapy with and following dosage increases of Oxycodone Hydrochloride Oral Solution.

To reduce the risk of respiratory depression, proper dosing and titration of Oxycodone Hydrochloride Oral Solution are essential *[see Dosage and Administration (2)].* Over estimating the Oxycodone Hydrochloride Oral Solution dosage when converting patients from another opioid product can result in a fatal overdose with the first dose. Accidental ingestion of even one dose of Oxycodone Hydrochloride Oral Solution, especially by children, can result in respiratory depression and death due to an overdose of oxycodone.

EXHIBIT A

### 5.5 Neonatal Opioid Withdrawal Syndrome

Prolonged use of Oxycodone Hydrochloride Oral Solution during pregnancy can result in withdrawal in the neonate. Neonatal opioid withdrawal syndrome, unlike opioid withdrawal syndrome in adults, may be life- threatening if not recognized and treated, and requires management according to protocols developed by neonatology experts. Observe newborns for signs of neonatal opioid withdrawal syndrome and manage accordingly. Advise pregnant women using opioids for a prolonged period of the risk of neonatal opioid withdrawal syndrome and ensure that appropriate treatment will be available *[see Use in Specific Populations (8.1), Patient Counseling Information (17)]*.

### 5.6 Risks of Concomitant Use or Discontinuation of Cytochrome P450 3A4 Inhibitors and Inducers

Concomitant use of Oxycodone Hydrochloride Oral Solution with a CYP3A4 inhibitor, such as macrolide antibiotics (e.g., erythromycin), azole-antifungal agents (e.g., ketoconazole), and protease inhibitors (e.g., ritonavir), may increase plasma concentrations of oxycodone and prolong opioid adverse reactions, which may cause potentially fatal respiratory depression *[see Warnings and Precautions (5.4)]*, particularly when an inhibitor is added after a stable dose of Oxycodone Hydrochloride Oral Solution is achieved. Similarly, discontinuation of a CYP3A4 inducer, such as rifampin, carbamazepine, and phenytoin, in Oxycodone Hydrochloride Oral Solution-treated patients may increase oxycodone plasma concentrations and prolong opioid adverse reactions. When using Oxycodone Hydrochloride Oral Solution with CYP3A4 inhibitors or discontinuing CYP3A4 inducers in Oxycodone Hydrochloride Oral Solution-treated patients, monitor patients closely at frequent intervals and consider dosage reduction of Oxycodone Hydrochloride Oral Solution until stable drug effects are achieved *[see Dosage and Administration (2.1), Drug Interactions (7)]*.

Concomitant use of Oxycodone Hydrochloride Oral Solution with CYP3A4 inducers or discontinuation of an CYP3A4 inhibitor could decrease oxycodone plasma concentrations, decrease opioid efficacy or, possibly, lead to a withdrawal syndrome in a patient who had developed physical dependence to oxycodone. When using Oxycodone Hydrochloride Oral Solution with CYP3A4 inducers or discontinuing CYP3A4 inhibitors, monitor patients closely at frequent intervals and consider increasing the opioid dosage if needed to maintain adequate analgesia or if symptoms of opioid withdrawal occur *[see Dosage and Administration (2.1), Drug Interactions (7)]*.

### 5.7 Risks from Concomitant Use with Benzodiazepines or Other CNS Depressants

Profound sedation, respiratory depression, coma, and death may result from the concomitant use of Oxycodone Hydrochloride Oral Solution with benzodiazepines or other CNS depressants (e.g., non-benzodiazepine sedatives/hypnotics, anxiolytics, tranquilizers, muscle relaxants, general anesthetics, antipsychotics, other opioids, alcohol). Because of these risks, reserve concomitant prescribing of these drugs for use in patients for whom alternative treatment options are inadequate.
Observational studies have demonstrated that concomitant use of opioid analgesics and benzodiazepines increases the risk of drug-related mortality compared to use of opioid analgesics alone. Because of similar pharmacological properties, it is reasonable to

EXHIBIT 35

EXHIBIT A

expect similar risk with the concomitant use of other CNS depressant drugs with opioid analgesics *[see Drug Interactions (7)]*.

If the decision is made to prescribe a benzodiazepine or other CNS depressant concomitantly with an opioid analgesic, prescribe the lowest effective dosages and minimum durations of concomitant use. In patients already receiving an opioid analgesic, prescribe a lower initial dose of the benzodiazepine or other CNS depressant than indicated in the absence of an opioid, and titrate based on clinical response. If an opioid analgesic is initiated in a patient already taking a benzodiazepine or other CNS depressant, prescribe a lower initial dose of the opioid analgesic, and titrate based on clinical response. Follow patients closely for signs and symptoms of respiratory depression and sedation.

Advise both patients and caregivers about the risks of respiratory depression and sedation when Oxycodone Hydrochloride Oral Solution are used with benzodiazepines or other CNS depressants (including alcohol and illicit drugs). Advise patients not to drive or operate heavy machinery until the effects of concomitant use of the benzodiazepine or other CNS depressant have been determined. Screen patients for risk of substance use disorders, including opioid abuse and misuse, and warn them of the risk for overdose and death associated with the use of additional CNS depressants including alcohol and illicit drugs *[see Drug Interactions (7) and Patient Counseling Information (17)]*.

**5.8 Life-Threatening Respiratory Depression in Patients with Chronic Pulmonary Disease or in Elderly, Cachectic, or Debilitated Patients**

The use of Oxycodone Hydrochloride Oral Solution in patients with acute or severe bronchial asthma in an unmonitored setting or in the absence of resuscitative equipment is contraindicated.

Patients with Chronic Pulmonary Disease: Oxycodone Hydrochloride Oral Solution-treated patients with significant chronic obstructive pulmonary disease or cor pulmonale, and those with a substantially decreased respiratory reserve, hypoxia, hypercapnia, or pre-existing respiratory depression are at increased risk of decreased respiratory drive including apnea, even at recommended dosages of Oxycodone Hydrochloride Oral Solution *[see Warnings and Precautions (5.4)]*.

Elderly, Cachectic, or Debilitated Patients: Life-threatening respiratory depression is more likely to occur in elderly, cachectic, or debilitated patients because they may have altered pharmacokinetics or altered clearance compared to younger, healthier patients *[see Warnings and Precautions (5.8)]*.

Monitor such patients closely, particularly when initiating and titrating Oxycodone Hydrochloride Oral Solution and when Oxycodone Hydrochloride Oral Solution is given concomitantly with other drugs that depress respiration *[see Warnings and Precautions (5.6)]*. Alternatively, consider the use of non-opioid analgesics in these patients.

**5.9 Adrenal Insufficiency**

Cases of adrenal insufficiency have been reported with opioid use, more often following greater than one month of use. Presentation of adrenal insufficiency may include non-specific symptoms and signs including nausea, vomiting, anorexia, fatigue, weakness, dizziness, and low blood pressure. If adrenal insufficiency is suspected, confirm the

EXHIBIT 35

EXHIBIT A

diagnosis with diagnostic testing as soon as possible. If adrenal insufficiency is diagnosed, treat with physiologic replacement doses of corticosteroids. Wean the patient off of the opioid to allow adrenal function to recover and continue corticosteroid treatment until adrenal function recovers.

Other opioids may be tried as some cases reported use of a different opioid without recurrence of adrenal insufficiency. The information available does not identify any particular opioids as being more likely to be associated with adrenal insufficiency.

**5.10 Severe Hypotension**

Oxycodone Hydrochloride Oral Solution may cause severe hypotension including orthostatic hypotension and syncope in ambulatory patients. There is increased risk in patients whose ability to maintain blood pressure has already been compromised by a reduced blood volume or concurrent administration of certain CNS depressant drugs e.g., phenothiazines or general anesthetics) *[see Drug Interactions (7)]*. Monitor these patients for signs of hypotension after initiating or titrating the dosage of Oxycodone Hydrochloride Oral Solution. In patients with circulatory shock, Oxycodone Hydrochloride Oral Solution may cause vasodilation that can further reduce cardiac output and blood pressure. Avoid the use of Oxycodone Hydrochloride Oral Solution in patients with circulatory shock.

**5.11 Risks of Use in Patients with Increased Intracranial Pressure, Brain Tumors, Head Injury, or Impaired Consciousness**

In patients who may be susceptible to the intracranial effects of $CO_2$ retention (e.g., those with evidence of increased intracranial pressure or brain tumors), Oxycodone Hydrochloride Oral Solution may reduce respiratory drive, and the resultant $CO_2$ retention can further increase intracranial pressure. Monitor such patients for signs of sedation and respiratory depression, particularly when initiating therapy with Oxycodone Hydrochloride Oral Solution.

Opioids may also obscure the clinical course in a patient with a head injury. Avoid the use of Oxycodone Hydrochloride Oral Solution in patients with impaired consciousness or coma.

**5.12 Risks of Use in Patients with Gastrointestinal Conditions**

Oxycodone Hydrochloride Oral Solution is contraindicated in patients with known or suspected gastrointestinal obstruction, including paralytic ileus.

The oxycodone in Oxycodone Hydrochloride Oral Solution may cause spasm of the sphincter of Oddi. Opioids may cause increases in serum amylase. Monitor patients with biliary tract disease, including acute pancreatitis for worsening symptoms.

**5.13   Increased Risk of Seizures in Patients with Seizure Disorders**

The oxycodone in Oxycodone Hydrochloride Oral Solution may increase the frequency of seizures in patients with seizure disorders, and may increase the risk of seizures occurring in other clinical settings associated with seizures. Monitor patients with a history of seizure disorders for worsened seizure control during Oxycodone Hydrochloride Oral Solution therapy.

EXHIBIT A

### 5.14   Withdrawal

Avoid the use of mixed agonist/antagonist (e.g., pentazocine, nalbuphine, and butorphanol) analgesics in patients who are receiving full opioid agonist analgesic, including Oxycodone Hydrochloride Oral Solution. In these patients, mixed agonist/antagonist and partial agonist analgesics may reduce the analgesic effect and/or precipitate withdrawal symptoms *[see Drug Interactions (7)]*.

When discontinuing Oxycodone Hydrochloride Oral Solution in a physically-dependent patient, gradually taper the dosage *[see Dosage and Administration (2.4.)]*. Do not abruptly discontinue Oxycodone Hydrochloride Oral Solution in these patients *[see Drug Abuse and Dependence (9.3)]*.

### 5.15 Risks of Driving and Operating Machinery

Oxycodone Hydrochloride Oral Solution may impair the mental or physical abilities needed to perform potentially hazardous activities such as driving a car or operating machinery. Warn patients not to drive or operate dangerous machinery unless they are tolerant to the effects of Oxycodone Hydrochloride Oral Solution and know how they will react to the medication *[see Patient Counseling Information (17)*].

## 6 ADVERSE REACTIONS

The following serious adverse reactions are described, or described in greater detail, in other sections:
*       Addiction, Abuse, and Misuse *[see Warnings and Precautions (5.2)]*
*       Life-Threatening Respiratory Depression *[see Warnings and Precautions (5.4)]*
*       Neonatal Opioid Withdrawal Syndrome *[see Warnings and Precautions (5.5)]*
*       Interactions with Benzodiazepines or Other CNS Depressants [*see Warnings and Precautions (5.7)]*
*       Adrenal Insufficiency *[see Warnings and Precautions (5.9)]*
*       Severe Hypotension [*see Warnings and Precautions (5.10)*]
*       Gastrointestinal Adverse Reactions *[see Warnings and Precautions (5.12)]*
*       Seizures *[see Warnings and Precautions (5.13)]*
*       Withdrawal *[see Warnings and Precautions (5.14)]*

The following adverse reactions associated with the use of oxycodone were identified in clinical studies or postmarketing reports. Because some of these reactions were reported voluntarily from a population of uncertain size, it is not always possible to reliably estimate their frequency or establish a causal relationship to drug exposure.

Serious adverse reactions associated with oxycodone use included: respiratory depression, respiratory arrest, circulatory depression, cardiac arrest, hypotension, and/or shock.

The common adverse reactions seen on initiation of therapy with oxycodone are dose-related and are typical opioid-related adverse reactions. The most frequent adverse events include nausea, constipation, vomiting, headache, and pruritus. The frequency of these reactions depended on several factors, including clinical setting, the patient's level of opioid tolerance, and host factors specific to the individual.

EXHIBIT 35                                                    12

EXHIBIT A

In all patients for whom dosing information was available (n=191) from the open-label and double-blind studies involving another formulation of immediate-release oxycodone, the following adverse events were recorded in oxycodone treated patients with an incidence ≥ 3%. In descending order of frequency, they were: nausea, constipation, vomiting, headache, pruritus, insomnia, dizziness, asthenia, and somnolence.

The other less frequently observed adverse reactions from opioid analgesics, including Oxycodone Hydrochloride Oral Solution included:

Body as a Whole: abdominal pain, accidental injury, allergic reaction, back pain, chills and fever, fever, flu syndrome, infection, neck pain, pain, photosensitivity reaction, and sepsis.

Cardiovascular: deep thrombophlebitis, heart failure, hemorrhage, hypotension, migraine, palpitation, and tachycardia.

Digestive: anorexia, diarrhea, dyspepsia, dysphagia, gingivitis, glossitis, and nausea and vomiting.

Hemic and Lymphatic: anemia and leukopenia.

Metabolic and Nutritional: edema, gout, hyperglycemia, iron deficiency anemia and peripheral edema.

Musculoskeletal: arthralgia, arthritis, bone pain, myalgia and pathological fracture.

Nervous: agitation, anxiety, confusion, dry mouth, hypertonia, hypesthesia, nervousness, neuralgia, personality disorder, tremor, and vasodilation.

Respiratory: bronchitis, cough increased, dyspnea, epistaxis, laryngismus, lung disorder, pharyngitis, rhinitis, and sinusitis.

Skin and Appendages: herpes simplex, rash, sweating, and urticaria.

Special Senses: amblyopia.

Urogenital: urinary tract infection

Serotonin syndrome: Cases of serotonin syndrome, a potentially life threatening condition, have been reported during concomitant use of opioids with serotonergic drugs.

Adrenal insufficiency: Cases of adrenal insufficiency have been reported with opioid use, more often following greater than one month of use.

Anaphylaxis: Anaphylaxis has been reported with ingredients contained in Oxycodone Hydrochloride Oral Solution.

Androgen deficiency: Cases of androgen deficiency have occurred with chronic use of opioids *[see Clinical Pharmacology (12.2)]*.

**7 DRUG INTERACTIONS**

Table 1 includes clinically significant drug interactions with Oxycodone Hydrochloride Oral Solution.

**Table 1: Clinically Significant Drug Interactions with Oxycodone Hydrochloride Oral Solution**

| Inhibitors of CYP3A4 and CYP2D6 | |
|---|---|
| *Clinical Impact:* | The concomitant use of Oxycodone Hydrochloride Oral Solution and CYP3A4 inhibitors can increase the plasma concentration of oxycodone, resulting in increased or prolonged opioid effects. These effects could be more pronounced with concomitant use of Oxycodone Hydrochloride Oral Solution and CYP2D6 and |

EXHIBIT 35

EXHIBIT A

|  | CYP3A4 inhibitors, particularly when an inhibitor is added after a stable dose of Oxycodone Hydrochloride Oral Solution is achieved *[see Warnings and Precautions (5.6)]*.<br>After stopping a CYP3A4 inhibitor, as the effects of the inhibitor decline, the oxycodone plasma concentration will decrease *[see Clinical Pharmacology (12.3)]*, resulting in decreased opioid efficacy or a withdrawal syndrome in patients who had developed physical dependence to oxycodone. |
|---|---|
| *Intervention:* | If concomitant use is necessary, consider dosage reduction of Oxycodone Hydrochloride Oral Solution until stable drug effects are achieved.<br>Monitor patients for respiratory depression and sedation at frequent intervals.<br>If a CYP3A4 inhibitor is discontinued, consider increasing the Oxycodone Hydrochloride Oral Solution dosage until stable drug effects are achieved. Monitor for signs of opioid withdrawal. |
| *Examples:* | Macrolide antibiotics (e.g., erythromycin, azole-antifungal agents (e.g., ketoconazole), protease inhibitors (e.g., ritonavir) |
| **CYP3A4 Inducers** | |
| *Clinical Impact:* | The concomitant use of Oxycodone Hydrochloride Oral Solution and CYP3A4 inducers can decrease the plasma concentration of oxycodone *[see Clinical Pharmacology (12.3)]*, resulting in decreased efficacy or onset of a withdrawal syndrome in patients who have developed physical dependence to oxycodone *[see Warnings and Precautions (5.6)]*.<br>After stopping a CYP3A4 inducer, as the effects of the inducer decline, the oxycodone plasma concentration will increase *[see Clinical Pharmacology (12.3)]*, which could increase or prolong both the therapeutic effects and adverse reactions, and may cause serious respiratory depression. |
| *Intervention:* | If concomitant use is necessary, consider increasing the Oxycodone Hydrochloride Oral Solution dosage until stable drug effects are achieved.<br>Monitor for signs of opioid withdrawal. If a CYP3A4 inducer is discontinued, consider Oxycodone Hydrochloride Oral Solution dosage reduction and monitor for signs of respiratory depression. |
| *Examples* | Rifampin, carbamazepine, phenytoin |
| **Benzodiazepines and other Central Nervous System (CNS) Depressants** | |
| *Clinical Impact:* | Due to additive pharmacologic effect, the concomitant use of benzodiazepines or other CNS depressants including alcohol, increases the risk of respiratory depression, profound sedation, coma, and death. |
| *Intervention:* | Reserve concomitant prescribing of these drugs for use in patients for whom alternative treatment options are inadequate. Limit dosages and durations to the minimum required. Follow patients closely for signs of respiratory depression and sedation *[see* |

EXHIBIT A

| | |
|---|---|
| | *Warnings and Precautions (5.7)].* |
| *Examples:* | Benzodiazepines and other sedatives/hypnotics, anxiolytics, tranquilizers, muscle relaxants, general anesthetics, antipsychotics, other opioids, alcohol. |
| **Serotonergic Drugs** | |
| *Clinical Impact:* | The concomitant use of opioids with other drugs that affect the serotonergic neurotransmitter system has resulted in serotonin. |
| *Intervention:* | If concomitant use is warranted, carefully observe the patient, particularly during treatment initiation and dose adjustment. Discontinue Oxycodone Hydrochloride Oral Solution if serotonin syndrome is suspected. |
| *Examples:* | Selective serotonin reuptake inhibitors (SSRIs), serotonin and norepinephrine reuptake inhibitors (SNRIs), tricyclic antidepressants (TCAs), triptans, 5-HT3 receptor antagonists, drugs that affect the serotonin neurotransmitter system (e.g., mirtazapine, trazodone, tramadol), monoamine oxidase (MAO) inhibitors (those intended to treat psychiatric disorders and also others, such as linezolid and intravenous methylene blue). |
| **Monoamine Oxidase Inhibitors (MAOIs)** | |
| *Clinical Impact:* | MAOI interactions with opioids may manifest as serotonin syndrome or opioid toxicity (e.g., respiratory depression, coma) *[see Warnings and Precautions (5.4)].* |
| *Intervention:* | The use of Oxycodone Hydrochloride Oral Solution is not recommended for patients taking MAOIs or within 14 days of stopping such treatment. If urgent use of an opioid is necessary, use test doses and frequent titration of small doses to treat pain while closely monitoring blood pressure and signs and symptoms of CNS and respiratory depression. |
| *Examples:* | phenelzine, tranylcypromine, linezolid |
| **Mixed Agonist/Antagonist and Partial Agonist Opioid Analgesics** | |
| *Clinical Impact:* | May reduce the analgesic effect of Oxycodone Hydrochloride Oral Solution and/or precipitate withdrawal symptoms. |
| *Intervention:* | Avoid concomitant use. |
| *Examples:* | butorphanol, nalbuphine, pentazocine, buprenorphine |
| **Muscle Relaxants** | |
| *Clinical Impact:* | Oxycodone may enhance the neuromuscular blocking action of skeletal muscle relaxants and produce an increased degree of respiratory depression. |
| *Intervention:* | Monitor patients for signs of respiratory depression that may be greater than otherwise expected and decrease the dosage of Oxycodone Hydrochloride Oral Solution and/or the muscle relaxant as necessary. |
| **Diuretics** | |
| *Clinical Impact:* | Opioids can reduce the efficacy of diuretics by inducing the release of antidiuretic antidiuretic hormone. |

EXHIBIT 35                15

EXHIBIT A

| Intervention: | Monitor patients for signs of diminished diuresis and/or effects on blood pressure and increase the dosage of the diuretic as needed . |
|---|---|
| **Anticholinergic Drugs** | |
| Clinical Impact: | The concomitant use of anticholinergic drugs may increase risk of urinary retention and/or severe constipation, which may lead to paralytic ileus. |
| Intervention: | Monitor patients for signs of urinary retention or reduced gastric motility when Oxycodone Hydrochloride Oral Solution is used concomitantly with anticholinergic drugs. |

## 8 USE IN SPECIFIC POPULATIONS

### 8.1 Pregnancy

<u>Risk Summary</u>

Prolonged use of opioid analgesics during pregnancy may cause neonatal opioid withdrawal syndrome *[see Warnings and Precautions (5.5)]*. Available data with Oxycodone Hydrochloride Oral Solution are insufficient to inform a drug-associated risk for major birth defects and miscarriage.

Animal reproduction studies with oral administrations of oxycodone hydrochloride in rats and rabbits during the period of organogenesis at doses 2.6 and 8.1 times, respectively, the human dose of 60 mg/day did not reveal evidence of teratogenicity or embryo-fetal toxicity. In several published studies, treatment of pregnant rats with oxycodone at clinically relevant doses and below, resulted in neurobehavioral effects in offspring [see Data]. Based on animal data, advise pregnant women of the potential risk to a fetus.

The background risk of major birth defects and miscarriage for the indicated population is unknown. All pregnancies have a background risk of birth defect, loss, or other adverse outcomes. In the U.S. general population, the estimated background risk of major birth defects and miscarriage in clinically recognized pregnancies is 2-4% and 15-20%, respectively.

<u>Clinical Considerations</u>

*Fetal/Neonatal Adverse Reactions*
Prolonged use of opioid analgesics during pregnancy for medical or nonmedical purposes can result in physical dependence in the neonate and neonatal opioid withdrawal syndrome shortly after birth.

Neonatal opioid withdrawal syndrome presents as irritability, hyperactivity and abnormal sleep pattern, high pitched cry, tremor, vomiting, diarrhea, and failure to gain weight. The onset, duration, and severity of neonatal opioid withdrawal syndrome vary based on the specific opioid used, duration of use, timing and amount of last maternal use, and rate of elimination of the drug by the newborn. Observe newborns for symptoms of neonatal opioid withdrawal syndrome and manage accordingly *[see Warnings and Precautions (5.5)]*.

EXHIBIT A

*Labor or Delivery*

Opioids cross the placenta and may produce respiratory depression and psycho-physiologic effects in neonates. An opioid antagonist, such as naloxone, must be available for reversal of opioid-induced respiratory depression in the neonate. Oxycodone Hydrochloride Oral Solution is not recommended for use in pregnant women during or immediately prior to labor, when other analgesic techniques are more appropriate. Opioid analgesics, including Oxycodone Hydrochloride Oral Solution, can prolong labor through actions which temporarily reduce the strength, duration, and frequency of uterine contractions. However, this effect is not consistent and may be offset by an increased rate of cervical dilation, which tends to shorten labor. Monitor neonates exposed to opioid analgesics during labor for signs of excess sedation and respiratory depression.

Data

*Animal Data*

In embryo-fetal development studies in rats and rabbits, pregnant animals received oral doses of oxycodone hydrochloride administered during the period of organogenesis up to 16 mg/kg/day and up 25 mg/kg/day, respectively. These studies revealed no evidence of teratogenicity or embryo-fetal toxicity due to oxycodone. The highest doses tested in rats and rabbits were equivalent to approximately 2.6 and 8.1 times an adult human dose of 60 mg/day, respectively, on a mg/m$^2$ basis. In published studies, offspring of pregnant rats administered oxycodone during gestation have been reported to exhibit neurobehavioral effects including altered stress responses, increased anxiety-like behavior (2 mg/kg/day IV from Gestation

Day 8 to 21 and Postnatal Day 1, 3, and 5; 0.3-times an adult human dose of 60 mg/day, on a mg/m2 basis) and altered learning and memory (15 mg/kg/day orally from breeding through parturition; 2.4 times an adult human dose of 60 mg/day, on a mg/m$^2$ basis).

**8.2 Lactation**

Risk Summary

Oxycodone is present in breast milk. Published lactation studies report variable concentrations of oxycodone in breast milk with administration of immediate-release oxycodone to nursing mothers in the early postpartum period. The lactation studies did not assess breastfed infants for potential adverse reactions. Lactation studies have not been conducted with Oxycodone Hydrochloride Oral Solution, and no information is available on the effects of the drug on the breastfed infant or the effects of the drug on milk production.

The developmental and health benefits of breastfeeding should be considered along with the mother's clinical need for Oxycodone Hydrochloride Oral Solution and any potential adverse effects on the breastfed infant from Oxycodone Hydrochloride Oral Solution or from the underlying maternal condition.

Clinical Considerations

Monitor infants exposed to Oxycodone Hydrochloride Oral Solution through breast milk for excess sedation and respiratory depression. Withdrawal symptoms can occur in

EXHIBIT 35

17

EXHIBIT A

breastfed infants when maternal administration of an opioid analgesic is stopped, or when breast-feeding is stopped.

**8.3 Females and Males of Reproductive Potential**

Infertility

Chronic use of opioids may cause reduced fertility in females and males of reproductive potential. It is not known whether these effects on fertility are reversible *[see Adverse Reactions (6), Clinical Pharmacology (12.2)]*.

**8.4 Pediatric Use**

The safety and effectiveness and the pharmacokinetics of Oxycodone Hydrochloride Oral Solution in pediatric patients below the age of 18 have not been established.

**8.5 Geriatric Use**

Elderly patients (aged 65 years or older) may have increased sensitivity to oxycodone. In general, use caution when selecting a dose for an elderly patient, usually starting at the low end of the dosing range, reflecting the greater frequency of decreased hepatic, renal, or cardiac function and of concomitant disease or other drug therapy.

Respiratory depression is the chief risk for elderly patients treated with opioids, and has occurred after large initial doses were administered to patients who were not opioid-tolerant or when opioids were co-administered with other agents that depress respiration. Titrate the dosage of Oxycodone Hydrochloride Oral Solution slowly in geriatric patients and monitor closely for signs of central nervous system and respiratory depression *[see Warnings and Precautions (5.8)]*.

Oxycodone is known to be substantially excreted by the kidney, and the risk of adverse reactions to this drug may be greater in patients with impaired renal function. Because elderly patients are more likely to have decreased renal function, care should be taken in dose selection, and it may be useful to monitor renal function.

**8.6 Hepatic Impairment**

Since oxycodone is extensively metabolized in the liver, its clearance may decrease in patients with hepatic impairment. Initiate therapy in these patients with a lower than usual dosage of Oxycodone Hydrochloride Oral Solution and titrate carefully. Monitor closely for adverse events such as respiratory depression, sedation, and hypotension *[see Clinical Pharmacology (12.3)]*.

**8.7 Renal Impairment**

Information from oxycodone tablets indicate that patients with renal impairment had higher plasma concentrations of oxycodone than subjects with normal renal function. Initiate therapy with a lower than usual dosage of Oxycodone Hydrochloride Oral Solution and titrate carefully. Monitor closely for adverse events such as respiratory depression, sedation, and hypotension *[see Clinical Pharmacology (12.3)]*.

## 9 DRUG ABUSE AND DEPENDENCE

### 9.1 Controlled Substance

Oxycodone Hydrochloride Oral Solution contains oxycodone, a Schedule II controlled substance.

### 9.2 Abuse

Oxycodone Hydrochloride Oral Solution contains oxycodone, a substance with a high potential for abuse similar to other opioids including fentanyl, hydrocodone, hydromorphone, methadone, morphine, oxymorphone, and tapentadol. Oxycodone Hydrochloride Oral Solution can be abused and is subject to misuse, addiction, and criminal diversion *[see Warnings and Precautions (5.2)]*.

All patients treated with opioids require careful monitoring for signs of abuse and addiction, because use of opioid analgesic products carries the risk of addiction even under appropriate medical use.

Prescription drug abuse is the intentional non-therapeutic use of a prescription drug, even once, for its rewarding psychological or physiological effects.

Drug addiction is a cluster of behavioral, cognitive, and physiological phenomena that develop after repeated substance use and includes: a strong desire to take the drug, difficulties in controlling its use, persisting in its use despite harmful consequences, a higher priority given to drug use than to other activities and obligations, increased tolerance, and sometimes a physical withdrawal.

"Drug-seeking" behavior is very common in persons with substance use disorders. Drug-seeking tactics include emergency calls or visits near the end of office hours, refusal to undergo appropriate examination, testing, or referral, repeated "loss" of prescriptions, tampering with prescriptions, and reluctance to provide prior medical records or contact information for other treating health care providers). "Doctor shopping" (visiting multiple prescribers to obtain additional prescriptions) is common among drug abusers and people suffering from untreated addiction. Preoccupation with achieving adequate pain relief can be appropriate behavior in a patient with poor pain control.

Abuse and addiction are separate and distinct from physical dependence and tolerance. Health care providers should be aware that addiction may not be accompanied by concurrent tolerance and symptoms of physical dependence in all addicts. In addition, abuse of opioids can occur in the absence of true addiction.

Oxycodone Hydrochloride Oral Solution, like other opioids, can be diverted for non-medical use into illicit channels of distribution. Careful record-keeping of prescribing information, including quantity, frequency, and renewal requests, as required by state and federal law, is strongly advised.

Proper assessment of the patient, proper prescribing practices, periodic re-evaluation of therapy, and proper dispensing and storage are appropriate measures that help to limit abuse of opioid drugs.

Risks Specific to Abuse of Oxycodone Hydrochloride Oral Solution
Oxycodone Hydrochloride Oral Solution is for oral use only. Abuse of oxycodone poses a risk of overdose and death. The risk is increased with concurrent abuse of alcohol and

EXHIBIT 35

EXHIBIT A

other central nervous system depressants. Parenteral drug abuse is commonly associated with transmission of infectious diseases such as hepatitis and HIV.

### 9.3 Dependence

Both tolerance and physical dependence can develop during chronic opioid therapy. Tolerance is the need for increasing doses of opioids to maintain a defined effect such as analgesia (in the absence of disease progression or other external factors). Tolerance may occur to both the desired and undesired effects of drugs, and may develop at different rates for different effects.

Physical dependence results in withdrawal symptoms after abrupt discontinuation or a significant dosage reduction of a drug. Withdrawal also may be precipitated through the administration of drugs with opioid antagonist activity (e.g., naloxone, nalmefene, mixed agonist/antagonist analgesics e.g., pentazocine, butorphanol, nalbuphine), or partial agonists (e.g., buprenorphine). Physical dependence may not occur to a clinically significant degree until after several days to weeks of continued opioid usage.

Oxycodone Hydrochloride Oral Solution should not be abruptly discontinued in a physically-dependent patient *[see Dosage and Administration (2.4)]*. If Oxycodone Hydrochloride Oral Solution is abruptly discontinued in a physically-dependent patient, a withdrawal syndrome may occur. Some or all of the following can characterize this syndrome: restlessness, lacrimation, rhinorrhea, yawning, perspiration, chills, myalgia, and mydriasis. Other signs and symptoms also may develop, including irritability, anxiety, backache, joint pain, weakness, abdominal cramps, insomnia, nausea, anorexia, vomiting, diarrhea, or increased blood pressure, respiratory rate, or heart rate.

Infants born to mothers physically dependent on opioids will also be physically dependent and may exhibit respiratory difficulties and withdrawal signs *[see Use in Specific Populations (8.1)]*.

### 10 OVERDOSAGE

<u>Clinical Presentation</u>

Acute overdose with Oxycodone Hydrochloride Oral Solution can be manifested by respiratory depression, somnolence progressing to stupor or coma, skeletal muscle flaccidity, cold and clammy skin, constricted pupils, and, in some cases, pulmonary edema, bradycardia, hypotension, partial or complete airway obstruction, atypical snoring, and death. Marked mydriasis rather than miosis may be seen with hypoxia in overdose situations *[see Clinical Pharmacology (12.2)]*.

<u>Treatment of Overdose</u>

In case of overdose, priorities are the reestablishment of a patent and protected airway and institution of assisted or controlled ventilation, if needed. Employ other supportive measures (including oxygen and vasopressors) in the management of circulatory shock and pulmonary edema as indicated. Cardiac arrest or arrhythmias will require advanced life-support techniques.

The opioid antagonists, naloxone or nalmefene, are specific antidotes to respiratory depression resulting from opioid overdose. For clinically significant respiratory or circulatory depression secondary to oxycodone overdose, administer an opioid

EXHIBIT 35

antagonist. Opioid antagonists should not be administered in the absence of clinically significant respiratory or circulatory depression secondary to oxycodone overdose.

Because the duration of opioid reversal is expected to be less than the duration of action of oxycodone in Oxycodone Hydrochloride Oral Solution, carefully monitor the patient until spontaneous respiration is reliably re-established. If the response to an opioid antagonist is suboptimal or only brief in nature, administer additional antagonist as directed by the product's prescribing information.

In an individual physically dependent on opioids, administration of the recommended usual dosage of the antagonist will precipitate an acute withdrawal syndrome. The severity of the withdrawal symptoms experienced will depend on the degree of physical dependence and the dose of the antagonist administered. If a decision is made to treat serious respiratory depression in the physically dependent patient, administration of the antagonist should be initiated with care and by titration with smaller than usual doses of the antagonist.

## 11. DESCRIPTION

Oxycodone Hydrochloride Oral Solution is an agonist, available as a red solution 5 mg/5 mL (1 mg/mL) and a yellow solution 100 mg/5 mL (20 mg/mL) for oral administration. The chemical name is (5R,9R,13S,14S)-4,5α-epoxy-14-hydroxy-3-methoxy-17-methylmorphinan-6-one hydrochloride. The molecular weight is 351.82.

Its molecular formula is C18H21NO4HCl, and it has the following chemical structure..



Oxycodone hydrochloride is a white, odorless crystalline powder derived from the opium alkaloid, thebaine. It is soluble in water and slightly soluble in alcohol.

The inactive ingredients in Oxycodone Hydrochloride Oral Solution, 5 mg per 5 mL (1 mg/mL) include: citric acid anhydrous, FD&C Red #40, natural/artificial berry flavor, purified water, sodium citrate dihydrate, sodium benzoate, saccharin sodium, sorbitol.

The inactive ingredients in Oxycodone Hydrochloride Oral Solution 100 mg per 5 mL (20 mg/mL) include: citric acid anhydrous, D&C Yellow #10, natural/artificial berry flavor, purified water, sodium citrate dihydrate, sodium benzoate, saccharin sodium, sorbitol.

EXHIBIT 35                     21

EXHIBIT A

## 12 CLINICAL PHARMACOLOGY

### 12.1 Mechanism of Action

Oxycodone is a full opioid agonist and is relatively selective for the mu-opioid receptor, although it can bind to other opioid receptors at higher doses. The principal therapeutic action of oxycodone is analgesia. Like all full opioid agonists, there is no ceiling effect for analgesia with oxycodone. Clinically, dosage is titrated to provide adequate analgesia and may be limited by adverse reactions, including respiratory and CNS depression.

The precise mechanism of the analgesic action is unknown. However, specific CNS opioid receptors for endogenous compounds with opioid-like activity have been identified throughout the brain and spinal cord and are thought to play a role in the analgesic effects of this drug.

### 12.2 Pharmacodynamics

Effects of the Central Nervous System (CNS)

Oxycodone produces respiratory depression by direct action on brain stem respiratory centers. The respiratory depression involves a reduction in the responsiveness of the brain stem respiratory centers to both increases in carbon dioxide tension and electrical stimulation.

Oxycodone causes miosis, even in total darkness. Pinpoint pupils are a sign of opioid overdose but are not pathognomonic (e.g., pontine lesions of hemorrhagic or ischemic origins may produce similar findings). Marked mydriasis rather than miosis may be seen due to hypoxia in overdose situations.

Effects on the Gastrointestinal Tract and Other Smooth Muscle

Oxycodone causes a reduction in motility associated with an increase in smooth muscle tone in the antrum of the stomach and duodenum. Digestion of food in the small intestine is delayed and propulsive contractions are decreased. Propulsive peristaltic waves in the colon are decreased, while tone may be increased to the point of spasm resulting in constipation. Other opioid-induced effects may include a reduction in biliary and pancreatic secretions, spasm of sphincter of Oddi, and transient elevations in serum amylase.

Effects on the Cardiovascular System

Oxycodone produces peripheral vasodilation which may result in orthostatic hypotension or syncope. Manifestations of histamine release and/or peripheral vasodilation may include pruritus, flushing, red eyes and sweating and/or orthostatic hypotension.

Effects on the Endocrine System

Opioids inhibit the secretion of adrenocorticotropic hormone (ACTH, cortisol), and luteinizing hormone (LH) in humans *[see Adverse Reactions (6)]*. They also stimulate prolactin, growth hormone (GH) secretion, and pancreatic secretion of insulin and glucagon.

Chronic use of opioids may influence the hypothalamic-pituitary-gonadal axis, leading to androgen deficiency that may manifest as low libido, impotence, erectile dysfunction,

EXHIBIT A

amenorrhea, or infertility. The causal role of opioids in the clinical syndrome of hypogonadism is unknown because the various medical, physical, lifestyle, and psychological stressors that may influence gonadal hormone levels have not been adequately controlled for in studies conducted to date *[see Adverse Reactions (6)]*.

Effects on the Immune System

Opioids have been shown to have a variety of effects on components of the immune system in in-vitro and Animal models. The clinical significance of these findings is unknown. Overall, the effects of opioids appear to be modestly immunosuppressive.

Concentration-Efficacy Relationships

The minimum effective analgesic concentration will vary widely among patients, especially among patients who have been previously treated with potent agonist opioids. The minimum effective analgesic concentration of oxycodone for any individual patient may increase over time due to an increase in pain, the development of a new pain syndrome and/or the development of analgesic tolerance *[see Dosage and Administration (2.1, 2.2)]*.

Concentration-Adverse Reaction Relationships

There is a relationship between increasing oxycodone plasma concentration and increasing frequency of dose-related opioid adverse reactions such as nausea, vomiting, CNS effects, and respiratory depression. In opioid-tolerant patients, the situation may be altered by the development of tolerance to opioid-related adverse reactions *[see Dosage and Administration (2.1, 2.2, 2.3)]*.

**12.3 Pharmacokinetics**

The activity of oxycodone hydrochloride is primarily due to the parent drug oxycodone.

Absorption

About 60 to 87% of an oral dose reaches the systemic circulation in comparison to a parenteral dose. This high oral bioavailability (compared to other opioids) is due to lower pre-systemic and/or first-pass metabolism of oxycodone.

*Food Effect*

When oxycodone capsules are administered with a high-fat meal, mean AUC values are increased by 23% and peak concentrations are decreased by 14%. Food causes a delay in Tmax (1.00 to 3 hours). Similar effects of food are expected with the oral solution.

Distribution

Following intravenous administration, the volume of distribution (Vss) for oxycodone was 2.6 L/kg. Plasma protein binding of oxycodone at 37°C and a pH of 7.4 was about 45%. Oxycodone has been found in breast milk.

Elimination

*Metabolism*

Oxycodone hydrochloride is extensively metabolized by multiple metabolic pathways to noroxycodone, oxymorphone, and noroxymorphone, which are

EXHIBIT 35

subsequently glucuronidated. CYP3A4 mediated N-demethylation to noroxycodone is the primary metabolic pathway of oxycodone with a less contribution from CYP2D6 mediated O-demethylation to oxymorphone. Therefore, the formation of these and related metabolites can, in theory, be affected by other drugs. The major circulating metabolite is noroxycodone with an AUC ratio of 0.6 relative to that of oxycodone. Noroxycodone is reported to be a considerably weaker analgesic than oxycodone. Oxymorphone, although possessing analgesic activity, is present in the plasma only in low concentrations. The correlation between oxymorphone concentrations and opioid effects was much less than that seen with oxycodone plasma concentrations. The analgesic activity profile of other metabolites is not known.

*Excretion*

Oxycodone and its metabolites are excreted primarily via the kidney. The amounts measured in the urine have been reported as follows: free oxycodone up to 19%; conjugated oxycodone up to 50%; free oxymorphone 0%; conjugated oxymorphone < 14%; both free and conjugated noroxycodone have been found in the urine but not quantified. The total plasma clearance was 0.8 L/min for adults. Apparent elimination half-life of oxycodone following the administration of oxycodone is approximately 4 hours.

Specific Populations

*Age: Geriatric Population:*

Information obtained from oxycodone tablets indicate that the plasma concentrations of oxycodone did not appear to be increased in patients over of the age of 65.

*Hepatic Impairment:*
Because oxycodone is extensively metabolized in the liver, its clearance may decrease in hepatic-impaired patients. A dose adjustment is recommended in these patients *[see Use in Specific Populations (8.6)]*.

*Renal Impairment:*

Because this drug is known to be substantially excreted by the kidney, and the risk of adverse reactions to this drug may be greater in patients with impaired renal function, a dose reduction is recommended for renal impaired patients *[see Use in Specific Populations (8.7)]*.

Drug Interaction Studies

*CYP3A4 Inhibitors*

CYP3A4 is the major enzyme involved in noroxycodone formation. A published study showed that the co-administration of voriconazole, a CYP3A4 inhibitor, increased oxycodone AUC and Cmax by 3.6 and 1.7 fold, respectively.

*CYP3A4 Inducers*

A published study showed that the co-administration of rifampin, a drug metabolizing enzyme inducer, decreased oxycodone AUC and Cmax values by 86% and 63%, respectively.

*CYP2D6 Inhibitors*

Oxycodone is metabolized in part to oxymorphone via the cytochrome P450 isoenzyme CYP2D6. While this pathway may be blocked by a variety of drugs (e.g., certain cardiovascular drugs and antidepressants), such blockade has not yet been shown to be of clinical significance with this agent.

## 13 NONCLINICAL TOXICOLOGY

### 13.1 Carcinogenesis, Mutagenesis, Impairment of Fertility

Carcinogenesis
Long-term studies in animals to evaluate the carcinogenic potential of oxycodone have not been conducted.

Mutagenesis

Oxycodone hydrochloride was genotoxic in an in-vitro mouse lymphoma assay in the presence of metabolic activation. There was no evidence of genotoxic potential in an in-vitro bacterial reverse mutation assay (Salmonella typhimurium and Escherichia coli) and in an assay for chromosomal aberrations (in-vivo mouse bone marrow micronucleus assay).

Impairment of Fertility

Studies in animals to evaluate the potential impact of oxycodone on fertility have not been conducted.

## 16 HOW SUPPLIED/STORAGE AND HANDLING

Oxycodone Hydrochloride Oral Solution 5 mg per 5 mL (1 mg/mL), is a red solution, supplied as:

NDC# 64950-354-10: Bottle of 100 mL supplied with a calibrated measuring cup
NDC# 64950-354-50: Bottle of 500 mL supplied with a calibrated measuring cup
NDC# 64950-354-05: 5 mL unit dose cup
NDC# 64950-354-45: Case contains 40 unit dose cups of 5 mL (NDC 64950-354-05), packaged in 4 trays of 10 unit dose cups each
NDC# 64950-354-55: Case contains 50 unit dose cups of 5 mL (NDC 64950-354-05), packaged in 5 trays of 10 unit dose cups each

Oxycodone Hydrochloride Oral Solution 100 mg per 5 mL (20 mg per mL), is a yellow solution, supplied as:
NDC# 64950-353-03: Bottle of 30 mL supplied with a calibrated oral syringe

Store at Controlled Room Temperature, 25°C (77°F); excursions are permitted to 15° - 30°C (59° - 86°F).
PROTECT from MOISTURE and LIGHT.

EXHIBIT 35

EXHIBIT A

## 17 PATIENT COUNSELING INFORMATION

Advise the patient to read the FDA-approved patient labeling (Medication Guide).
Medication Errors

Advise patients that Oxycodone Hydrochloride Oral Solution, is available in two
concentrations (5 mg/5 mL and 100 mg/5 mL). Inform patients about which
concentration they have been prescribed. Instruct patients how to measure and take the
correct dose of Oxycodone Hydrochloride Oral Solution and to always use the enclosed
calibrated measuring cup when administering Oxycodone Hydrochloride Oral Solution 5
mg per 5 mL (1 mg/mL) and to always use the enclosed calibrated oral syringe when
administering Oxycodone Hydrochloride Oral Solution 100 mg per 5 mL (20 mg/mL) to
ensure the dose is measured and administered accurately *[see Warnings and Precautions
(5.1)]*.

If the prescribed concentration is changed, instruct patients on how to correctly measure
the new dose to avoid errors which could result in accidental overdose and death.

Addiction, Abuse, and Misuse

Inform patients that the use of Oxycodone Hydrochloride Oral Solution, even when taken
as recommended, can result in addiction, abuse, and misuse, which can lead to overdose
and death *[see Warnings and Precautions (5.2)]*. Instruct patients not to share Oxycodone
Hydrochloride Oral Solution with others and to take steps to protect Oxycodone
Hydrochloride Oral Solution from theft or misuse.

Life-Threatening Respiratory Depression

Inform patients of the risk of life-threatening respiratory depression, including
information that the risk is greatest when starting Oxycodone Hydrochloride Oral
Solution or when the dosage is increased, and that it can occur even at recommended
dosages *[see Warnings and Precautions (5.4)]*. Advise patients how to recognize
respiratory depression and to seek medical attention if breathing difficulties develop.

Accidental Ingestion

Inform patients that accidental ingestion, especially by children, may result in respiratory
depression or death *[see Warnings and Precautions (5.4)]*. Instruct patients to take steps
to store Oxycodone Hydrochloride Oral Solution securely and to dispose of unused
Oxycodone Hydrochloride Oral Solution by flushing down the toilet.

Interactions with Benzodiazepines and Other CNS Depressants

Inform patients and caregivers that potentially fatal additive effects may occur if
Oxycodone Hydrochloride Oral Solution is used with benzodiazepines or other CNS
depressants, including alcohol, and not to use these concomitantly unless supervised by a
health care provider *[see Warnings and Precautions (5.7), Drug Interactions (7)]*.

Serotonin Syndrome

Inform patients that opioids could cause a rare but potentially life-threatening condition
resulting from concomitant administration of serotonergic drugs. Warn patients of the
symptoms of serotonin syndrome and to seek medical attention right away if symptoms

EXHIBIT A

develop. Instruct patients to inform their healthcare providers if they are taking, or plan to take serotonergic medications. *[see Drug Interactions (7)].*

<u>MAOI Interaction</u>

Inform patients to avoid taking Oxycodone Hydrochloride Oral Solution while using any drugs that inhibit monoamine oxidase. Patients should not start MAOIs while taking Oxycodone Hydrochloride Oral Solution *[see Drug Interactions (7)].*

<u>Adrenal Insufficiency</u>

Inform patients that opioids could cause adrenal insufficiency, a potentially life-threatening condition. Adrenal insufficiency may present with non-specific symptoms and signs such as nausea, vomiting, anorexia, fatigue, weakness, dizziness, and low blood pressure. Advise patients to seek medical attention if they experience a constellation of these symptoms *[see Warnings and Precautions (5.9)].*

<u>Important Administration Instructions</u>

Instruct patients how to properly take Oxycodone Hydrochloride Oral Solution. *[see Dosage and Administration (2.1), Warnings and Precautions (5.1)].*

- Advise patients to always use the enclosed calibrated oral syringe/dosing cup when administering Oxycodone Hydrochloride Oral Solution to ensure the dose is measured and administered accurately *[see Warnings and Precautions (5.1)].*
- Advise patients never to use household teaspoons or tablespoons to measure Oxycodone Hydrochloride Oral Solution.
- Advise patients not to adjust the dose of Oxycodone Hydrochloride Oral Solution without consulting with a physician or other healthcare provider.

If patients have been receiving treatment with Oxycodone Hydrochloride Oral Solution for more than a few weeks and cessation of therapy is indicated, counsel them on the importance of safely tapering the dose as abrupt discontinuation of the medication could precipitate withdrawal symptoms. Provide a dose schedule to accomplish a gradual discontinuation of the medication *[see Dosage and Administration (2.4)].*

<u>Hypotension</u>

Inform patients that Oxycodone Hydrochloride Oral Solution may cause orthostatic hypotension and syncope. Instruct patients how to recognize symptoms of low blood pressure and how to reduce the risk of serious consequences should hypotension occur (e.g., sit or lie down, carefully rise from a sitting or lying position) *[see Warnings and Precautions (5.10)].*

<u>Anaphylaxis</u>

Inform patients that anaphylaxis has been reported with ingredients contained in Oxycodone Hydrochloride Oral Solution. Advise patients how to recognize such a reaction and when to seek medical attention *[see Adverse Reactions (6)].*

EXHIBIT 5

EXHIBIT A

Pregnancy

*Neonatal Opioid Withdrawal Syndrome*

Inform female patients of reproductive potential that prolonged use of Oxycodone Hydrochloride Oral Solution during pregnancy can result in neonatal opioid withdrawal syndrome, which may be life-threatening if not recognized and treated *[see Warnings and Precautions (5.5), Use in Specific Populations (8.1)]*.

*Embryo-Fetal Toxicity*

Inform female patients of reproductive potential that Oxycodone Hydrochloride Oral Solution can cause fetal harm and to inform the healthcare provider of a known or suspected pregnancy *[see Use in Specific Populations (8.1)]*.

Lactation

Advise nursing mothers to monitor infants for increased sleepiness (more than usual), breathing difficulties, or limpness. Instruct nursing mothers to seek immediate medical care if they notice these signs *[see Use in Specific Populations (8.2)]*.

Infertility

Inform patients that chronic use of opioids may cause reduced fertility. It is not known whether these effects on fertility are reversible *[see Use in Specific Populations (8.3)]*.

Driving or Operating Heavy Machinery

Inform patients that Oxycodone Hydrochloride Oral Solution may impair the ability to perform potentially hazardous activities such as driving a car or operating heavy machinery. Advise patients not to perform such tasks until they know how they will react to the medication *[see Warnings and Precautions (5.5)]*.

Constipation

Advise patients of the potential for severe constipation, including management instructions and when to seek medical attention *[see Adverse Reactions (6), Clinical Pharmacology (12.2)]*.

Disposal of Unused Oxycodone Hydrochloride Oral Solution

Advise patients to dispose of unused Oxycodone Hydrochloride Oral Solution by flushing the solution down the toilet or disposing of in accordance with local guidelines and/or regulations.

**Manufactured by and Distributed by:**
Genus Lifesciences Inc.
514 North 12th Street,
Allentown, PA 18102

Reference ID: 4321314

EXHIBIT 5

28

EXHIBIT A

**Medication Guide**
**Oxycodone Hydrochloride (ox-ee-CO-dohn) Oral Solution, CII**

**Oxycodone Hydrochloride Oral Solution is:**
- A strong prescription pain medicine that contains an opioid (narcotic) that is used to manage pain severe enough to require an opioid pain medicine, when other pain treatments such as non-opioid pain medicines do not treat your pain well enough or you cannot tolerate them.
- An opioid pain medicine that can put you at risk for overdose and death. Even if you take your dose correctly as prescribed you are at risk for opioid addiction, abuse, and misuse that can lead to death.

**Important information about Oxycodone Hydrochloride Oral Solution:**
- **Get emergency help right away if you take too much Oxycodone Hydrochloride Oral Solution (overdose).** When you first start taking Oxycodone Hydrochloride Oral Solution, when your dose is changed, or if you take too much (overdose), serious or life-threatening breathing problems that can lead to death may occur.
- Taking Oxycodone Hydrochloride Oral Solution with other opioid medicines, benzodiazepines, alcohol, or other central nervous system depressants (including street drugs) can cause severe drowsiness, decreased awareness, breathing problems, coma, and death.
- Never give anyone else your Oxycodone Hydrochloride Oral Solution. They could die from taking it. Store Oxycodone Hydrochloride Oral Solution away from children and in a safe place to prevent stealing or abuse. Selling or giving away Oxycodone Hydrochloride Oral Solution is against the law.

**Do not take Oxycodone Hydrochloride Oral Solution if you have:**
- severe asthma, trouble breathing, or other lung problems.
- a bowel blockage or have narrowing of the stomach or intestines.
- an allergy to oxycodone or any of the ingredients in Oxycodone Hydrochloride Oral Solution.

**Before taking Oxycodone Hydrochloride Oral Solution, tell your healthcare provider if you have a history of:**
- head injury, seizures
- problems urinating
- abuse of street or prescription drugs, alcohol addiction, or mental health problems.
- liver, kidney, thyroid problems
- pancreas or gallbladder problems

**Tell your healthcare provider if you are:**
- **pregnant or planning to become pregnant.** Prolonged use of Oxycodone Hydrochloride Oral Solution during pregnancy can cause withdrawal symptoms in your newborn baby that could be life-threatening if not recognized and treated.
- **breastfeeding.** Oxycodone Hydrochloride Oral Solution passes into breast milk and may harm your baby.
- taking prescription or over-the-counter medicines, vitamins, or herbal supplements. Taking Oxycodone Hydrochloride Oral Solution with certain other medicines can cause serious side effects that could lead to death.

**When taking Oxycodone Hydrochloride Oral Solution:**
- Do not change your dose. Take Oxycodone Hydrochloride Oral Solution exactly as prescribed by your healthcare provider. Use the lowest dose possible for the shortest time needed.
- See the detailed Instructions for Use for information about how to take Oxycodone Hydrochloride Oral Solution 100 mg per 5 mL (20 mg per mL).
- Always use the enclosed calibrated measuring cup that comes with Oxycodone Hydrochloride Oral Solution 5 mg per 5 mL and the enclosed calibrated oral syringe that comes with Oxycodone Hydrochloride Oral Solution 100 mg per 5 mL (20 mg per mL) to correctly measure your dose. Never use a household teaspoon or tablespoon to measure Oxycodone Hydrochloride Oral Solution.
- Take your prescribed dose every 4 to 6 hours. Do not take more than your prescribed dose. If you miss a dose, take your next dose at your usual time.
- Call your healthcare provider if the dose you are taking does not control your pain.
- If you have been taking Oxycodone Hydrochloride Oral Solution regularly, do not stop taking Oxycodone Hydrochloride Oral Solution without talking to your healthcare provider.
- After you stop taking Oxycodone Hydrochloride Oral Solution, destroy the unused solution by flushing down the toilet.

**While taking Oxycodone Hydrochloride Oral Solution DO NOT:**
- Drive or operate heavy machinery, until you know how Oxycodone Hydrochloride Oral Solution affects you. Oxycodone Hydrochloride Oral Solution can make you sleepy, dizzy, or lightheaded.
- Drink alcohol or use prescription or over-the-counter medicines that contain alcohol. Using products containing alcohol during treatment with Oxycodone Hydrochloride Oral Solution may cause you to overdose and die.

EXHIBIT A

**The possible side effects of Oxycodone Hydrochloride Oral Solution:**
- constipation, nausea, sleepiness, vomiting, tiredness, headache, dizziness, abdominal pain. Call your healthcare provider if you have any of these symptoms and they are severe.

**Get emergency medical help if you have:**
- trouble breathing, shortness of breath, fast heartbeat, chest pain, swelling of your face, tongue, or throat, extreme drowsiness, light-headedness when changing positions, feeling faint, agitation, high body temperature, trouble walking, stiff muscles, or mental changes such as confusion.

These are not all the possible side effects of Oxycodone Hydrochloride Oral Solution. Call your doctor for medical advice about side effects. You may report side effects to FDA at 1-800-FDA-1088. **For more information go to dailymed.nlm.nih.gov**

**Manufactured by and Distributed by:**
Genus Lifesciences Inc., 514 North 12th Street, Allentown, PA 18102, www.genuslifesciences.com or call 1-866-511-6754.

This Medication Guide has been approved by the U.S. Food and Drug Administration.

Issued: 05/2017

---

**Patient Instructions for Use**
**Oxycodone Hydrochloride Oral Solution 100 mg per 5 mL (20 mg per mL) Oral Syringe**
**Important information about measuring Oxycodone Hydrochloride Oral Solution**
- **Always use the oral syringe provided with your Oxycodone Hydrochloride Oral Solution to make sure you measure the right amount.**
- **Measure the dose of medicine from the widest part of the plunger.  Do not measure from the narrow tip.  See Figure 1.**

**Step 1.**  Insert the tip of the oral syringe into the medicine bottle.

**Step 2.**  Pull back the plunger to the line that matches the dose prescribed by your healthcare provider.

**Step 3.**  Remove the oral syringe from the medicine bottle.

**Step 4.**  Take your medicine by slowly pushing the plunger until the oral syringe is empty.

**Figure 1**



EXHIBIT 35

EXHIBIT A

 Northwestern Mutual®

SHEILA HAUERWAS
Life Benefits Consultant
Life Benefits Division
Policyowner Services Department
800-636-8855, ext. 6615518

DATE FILED: December 11, 2020 9:44 AM
FILING ID: 88C2DD8C88D436
CASE NUMBER: 2020CV34229

July 23, 2019

Andrew M. Rowell
20588 Hwy 39
Wiggins, CO 80654

      **Re:**    **Sarah C. Rowell**
              **Policy 22805974**

Dear Mr. Rowell:

I want to begin by acknowledging that this must be a difficult time for you and your family. Please accept my sincere condolences in the loss of your wife, Sarah Rowell.

On January 6, 2019, Sarah applied for and was issued Northwestern Mutual Life Insurance Company Policy 22805974 (the "Policy"), a policy insuring her life, and she named you as the direct beneficiary. Unfortunately, because of the manner and timing of her death, the death benefit now due under the Policy is limited to the premiums paid on the Policy.

Section 1.5 of the Policy provides as follows:

        If the Insured dies by **suicide within one year from the Date of Issue**, the **amount payable** by the Company will be **limited to the premiums paid.** (Emphasis added)

Sarah's death certificate and the Medical Examiner's Report list the date of her death as April 24, 2019 (the "Date of Death"), and her manner of death as "Suicide." As noted above, the Policy was issued January 6, 2019 (the "Date of Issue"), less than one year prior to her Date of Death. Therefore, in light of Sarah's death by suicide occurring within one year of the Date of Issue, and the above referenced policy language, the amount payable to you as the named direct beneficiary is limited to the premiums paid on the Policy, plus interest.

Please note that because the Policy is less than 2 years old, the policy contract gives Northwestern Mutual the right to conduct a routine review to confirm the information given at the time of application was complete and accurate. We have not conducted any such review in Sarah's case due to her manner of death. Northwestern Mutual reserves the right, however, to conduct such review at a future date should we obtain additional information that would cause us to reopen the claim.

The enclosed check of $94.18 represents the premium paid of $93.64 and interest of $.54. Your depositing or cashing of this check constitutes your agreement that Policy 22805974 is rescinded and null and void.

**EXHIBIT 6**        **1**

EXHIBIT A

If you have any further questions or concerns, I can be reached at 800-635-8855, ext. 6615518.

Sincerely,

*Sheila Hauerwas*

Sheila Hauerwas


CC: Nathan Thomas Kruse: (402) 483-7871

**EXHIBIT 6**                                                                    **2**

EXHIBIT A

1    84201   84215  0      878

ANDREW M  ROWELL
20588 HWY 39
WIGGINS          CO   80654

Northwestern Mutual®                                          **WK**        **172386**

720 EAST WISCONSIN AVENUE
MILWAUKEE, WI 53202-4797

WK1 000161421              AUG 01, 2019                    $94.18

03-0200 (02/03)

THE FACE OF THIS DOCUMENT HAS A COLORED BACKGROUND ON WHITE PAPER

Northwestern Mutual®                                    **WK**       **172386**

720 EAST WISCONSIN AVENUE    US Bank, Wausau N.A.     78—1160
MILWAUKEE, WI 53202-4797     Wausau, Wisconsin        759

DATE
AUG 01, 2019

7227      462       WK 1 000161421         VOID  OVER      $94.18

PAY      Ninety—Four And 18/100 Dollars                              **$94.18**

VOID AFTER 90 DAYS

TO      ANDREW M  ROWELL
THE     20588 HWY 39
ORDER   WIGGINS          CO   80654
OF

John E. Schliple

THE BACK OF THIS DOCUMENT CONTAINS AN ARTIFICIAL WATERMARK - HOLD AT AN ANGLE TO VIEW

⑈000172386⑈ ⑆075911608⑈900001⑈728⑈                    3

EXHIBIT A



**McDermott Law, llc**

4600 S. Ulster Street, Suite 800
Denver, Colorado 80237

Timothy M. Garvey
Tel: (303) 964-1800
Fax: (303) 964-1900
www.mcdermottlaw.net
tim@mcdermottlaw.net

*Via Facsimile (414) 625-1205 and*
*Certified Mail Return Receipt 7019 1120 0000 2909 8108*

DATE FILED: December 14, 2020 10:16 AM
FILING ID: 88C2DD8C89AF4
CASE NUMBER: 2020CV34229

August 26, 2020

Sheila Hauerwas
Life Benefits Consultant
Life Benefits Division
Northwestern Mutual
720 E. Wisconsin Avenue
Milwaukee, WI  53202

<div style="margin-left:2em">

Re:    Our Client    Andrew M. Rowell
          Decedent:    Sarah C. Rowell
          Policy No.:   22 805 974

</div>

Dear Ms. Hauerwas:

This letter is in response to Northwestern Mutual's letter dated March 3, 2020.[1] Thank you for your condolences to the Rowell family, as this has been a very a difficult time for them. Unfortunately, it's been made even more difficult by having to continually relive the events over the past year while trying to get Northwestern Mutual to keep the promises it made under the Policy. Still, we appreciate your concern.

**Please immediately provide this letter to all supervisors, managers, and legal counsel assigned to Mr. Rowell's claim.** This letter presents Mr. Rowell's appeal of Northwestern's rejection of his claim on the basis that his wife (Sarah Rowell) took her own life on April 24, 2019, which was during the policy's first year.[2] While we concede that the most likely cause of Mrs. Rowell's death was a self-inflicted gunshot wound, and we acknowledge that the Medical Examiner's Report and the Death Certificate both list "suicide" as the cause of death, those facts do not allow Northwestern to deny Mr. Rowell's claim. This is so, because suicide in the context of a medical examination differs from suicide in the context of a life insurance policy exclusion.

As the Colorado Supreme Court clarified in *Renfandt*, the word "suicide" as used in a life insurance policy exclusion "is limited to acts of **intentional** self-destruction; it is the

---

[1] Letter from Sheila Hauerwas, Northwestern Mutual, to Timothy Garvey, McDermott Law, Mar. 3, 2020.
[2] *See id.*

**EXHIBIT 7**        **1**

EXHIBIT A

Sheila Hauerwas
Northwestern Mutual
August 26, 2020
Page 2 of 12

**deliberate** termination of one's existence."[3] Further, the *Renfandt* court was explicit that a suicide exclusion in a life insurance policy "excludes coverage **only if** the insured, whether sane or insane at the time, committed an act of self-destruction with the **intent** to kill himself."[4] And, to deny coverage based on such an exclusion, the insurer "**must** show that the decedent, while sane or insane, committed an act of self-destruction **with the intent to kill himself.**"[5] Thus, to uphold its claim denial, Northwestern must prove that Sarah Rowell could form—and did form—such intent on April 24, 2019. This, it cannot do.

**Principles governing insurance policy interpretation.** The *Renfandt* court presented the following principles of insurance law, which apply here:

> A life insurance policy is a contract, the interpretation of which is a matter of law that we review de novo. As with any contract, we construe its terms to promote the parties' intent. Where general language in an insurance contract is ambiguous, we construe it against the insurer. Where the language is undefined, we interpret it according to its plain meaning. When determining the plain and ordinary meaning of words, we may consider definitions in a recognized dictionary. Finally, when seeking to avoid coverage based on a policy exclusion, the insurer must establish that the exclusion applies in the case, and that the exclusion is not subject to any other reasonable interpretation.[6]

Additionally, Colorado law requires insurers to fully investigate a claim **before** denying it.[7] An insurer's investigation is crucial, because it guides the carrier's determination of whether

---

[3] *Renfandt v. N.Y. Life Ins. Co.*, 2018 CO 49 at ¶ 6 (emphasis added).

[4] *Id.* at ¶ 7 (emphasis added)

[5] *Id.* at ¶ 45 (emphasis added). This language from Colorado's highest court would seem to prevent application of a suicide exclusion even in policies where the insurer excludes both intentional and unintentional suicides. Of course, that is a moot point here, as Northwestern made no such distinction in its policy and had it intended to exclude both intentional and unintentional self-killings, it had to do so explicitly. *See, e.g., Tepe v. Rocky Mountain Hosp. and Medical Srvcs*, 893 P.2d 1323, 1327 (Colo. App. 1994).

[6] *Renfandt* at ¶ 18 (internal citations omitted).

[7] *See, e.g., Brodeur v. American Home Assur. Co.*, 169 P.3d 139, 147 n.7 (Colo. 2007) ("bad faith can occur in the unreasonable refusal to investigate a claim or to gather facts."); *see also State Farm Mut. Auto. Ins. Co. v. Brekke*, 105 P.3d 177, 189 (Colo. 2004) ("If an insurance provider does not investigate and process the insured's uninsured motorist claim in good faith, it has acted inconsistent with its relationship to the insured."); *Dunn v. American Family Ins.*, 251 P.3d 1232, 1238 (Colo. App. 2010) (holding that an insurer's duty to investigate

---

**EXHIBIT 7**                                        **2**

EXHIBIT A

benefits are owed and to what extent.[8] To perform a reasonable investigation, an insurer must endeavor to obtain all available information bearing on its coverage determination, which includes the affirmative duty to gather information potentially supporting the insured's entitlement to benefits. And, "[i]mplicit in the duty to investigate is the requirement that the investigation be adequate and fair. Adequacy and fairness means that the insurer has a duty to diligently search for evidence which supports [the] insured's claim and not merely seek evidence upholding its own interests."[9]

Conversely, a delayed or inadequate investigation frustrates the insured's right to receive prompt payment for a covered loss, and a "quick and cursory denial, without adequate investigation," supports a finding of unreasonable conduct.[10] Stated differently, "[i]f an insurer withholds payment of a claim in a first-party case based on its understanding of the facts, it had better get its facts straight first."[11]

With these bedrock principles of Colorado insurance law in mind, we now turn to discussing why Northwestern's denial of Mr. Rowell's claim for benefits must be overturned.

**Northwestern completely ignores Sarah Rowell's severe intoxication.** In denying Mr. Rowell's claim for benefits, Northwestern makes no mention of Sarah's extreme intoxication, even though the insured's intoxication was at the heart of the *Renfandt* court's

---

required that it "promptly and effectively communicate with anyone it was reasonably aware had or legitimately needed information pertaining to the handling of plaintiff's claim."); *Burgess v. Mid-Century Ins. Co.*, 841 P.2d 325, 329 (Colo. App. 1992) (evidence created jury question as to whether insurer acted unreasonably in investigating first-party claim); *Brewer v. American and Foreign Ins. Co.*, 837 P.2d 236, 238 (Colo. App. 1992) (same).

[8] Guy O. Kornblum, REACHING THE SETTLEMENT § 12:15 (2015) ("to protect the insured's peace of mind and security, an insurer cannot reasonably and in good faith deny payments to its insured without *thoroughly* investigating the foundation for its denial … ."); Jeffrey E. Thomas & Susan Randall, NEW APPLEMAN ON INSURANCE LAW LIBRARY EDITION § 55.04[1][a] (2015) ("Investigations serve multiple purposes. Of course, the primary purpose is to enable the insurer to decide what, if anything, should be paid. This requires finding facts that either support or defeat coverage.").

[9] Steven Plitt et al., 4 COUCH ON INS. § 207:25 (3d ed. 2015). An insurer's investigation requires that it ascertain **facts**, so its coverage determination does not rest on **suspicions**. COUCH ON INS. at § 207:24. "An investigation in good faith requires an honest attempt to discover the answers to questions that have been raised, in a timely manner." David Polin, 46 AM. JUR. PROOF OF FACTS 3D § 2 (1998). An insurer cannot "jump to a conclusion on the basis of particular or certain evidence and then perform a perfunctory investigation." *Id.* "When facts are in issue, it is incumbent on the insurer to interview all available witnesses and otherwise pursue 'leads' that might produce evidence favorable to the insured's case." *Id.* at § 8.

[10] Diane L. Polscer & Brett W. Sommermeyer, 1 LAW AND PRAC. OF INS. COVERAGE LITIG. § 2:10 (2015).

[11] Stephen S. Ashley, BAD FAITH ACTIONS LIABILITY & DAMAGES § 5 8 (2d ed. 2015).

**EXHIBIT 7**                                    **3**

decision.[12] Indeed, the *Renfandt* court was unequivocal that if intoxication rendered the insured unable to "understand the physical nature and consequences of the act, then he did not intentionally kill himself. In that event, there is simply no 'suicide.'"[13]

Tragically, this case involves the same situation described by the *Renfandt* court. Here, Sarah Rowell was severely intoxicated when she died in the early morning hours of April 24, 2019. A post-mortem sample of Sarah's urine revealed a BAC of 246 mg/dL, while a post-mortem sample of her blood revealed a BAC of 0.177 grams of ethyl alcohol per 100mL of blood.[14] According to the National Institutes of Health, Sarah's alcohol intoxication at these levels left her "severely impaired," to the point that her "[j]udgment and decision-making [would have been] dangerously impaired."[15]

Additionally—as was also the case in *Renfandt*—Sarah's alcohol intoxication was magnified by other intoxicants in her system.[16] In fact, post-mortem drug screens were positive for oxycodone, oxymorphone, and THC-COOH at the time of her death.[17] As such, Sarah was significantly more impaired than she would have been with only alcohol in her system. Indeed, the prescription warning label for oxycodone states, "[c]oncomitant use of opioids with benzodiazepines or other central nervous system (CNS) depressants, **including alcohol**, may result in **profound** sedation, respiratory depression, coma, and death."[18] Likewise, the Centers for Disease Control warns, "[u]sing alcohol and marijuana at the same time is likely to result

---

[12] *Renfandt v. N.Y. Life Ins. Co.*, 2018 CO 49 at ¶52 n.7 ("Here, the complaint alleges that the combination of prescription medication, alcohol, and drugs that Mark ingested rendered him so severely intoxicated that he was 'unable to act volitionally or form suicidal intent.'").

[13] *Renfandt* 2018 CO 49 at ¶ 50.

[14] *See, e.g.*, Letter from Sarah Urfer, M.S., Chief Forensic Toxicologist, Chematox, to Timothy Garvey, McDermott Law, Aug. 25, 2020 (attached as **Exhibit 1**). As stated above, it is Northwestern's job to prove Sarah could form the intent necessary to take her own life. Although Northwestern has failed to meet this burden, Mr. Rowell nevertheless has obtained additional evidence in the form of additional toxicology screens to help prove—even though it is not his burden to do so—that Sarah was too intoxicated to form the intent needed to take her own life. That Supplemental Report from NMS Labs is attached as **Exhibit 9**, and it further reveals that Sarah's post-mortem vitreous fluid contained 220 mg/dL of alcohol.

[15] National Institute on Alcohol Abuse and Alcoholism, "Understanding the Dangers of Alcohol Overdose" *available at* https://pubs.niaaa.nih.gov/publications/AlcoholOverdoseFactsheet/Overdosefact.htm (attached as **Exhibit 2**); *see also* Exhibit 1.

[16] *See, e.g.*, *Renfandt* at ¶ 13 ("Mark had clonazepam and marijuana in his system at the time of his death.").

[17] *See* Exhibits 1, 9.

[18] *See* Highlight of Prescribing Information for Oxycodone Hydrochloride Oral Solution (attached as **Exhibit 3**).

**EXHIBIT 7**                    **4**

in **greater impairment** than when using either one alone."[19] And, many sources confirm that mixing cannabis with oxycodone enhances the potency of opioids, including oxycodone.[20]

Moreover, as explained in the attached report from Sarah Urfer, Chief Forensic Toxicologist for Chematox,[21] the combination of alcohol, marijuana, and oxycodone/oxymorphone in Sarah's system made it so she **could not have formed the intent needed to commit suicide.**[22] Indeed, Ms. Urfer's report succinctly states that this combination of intoxicants were "likely to impair a person's ability to knowingly and intelligently perform actions with total comprehension of the ramifications of these actions including the act of self destruction."[23] And, more specifically, Ms. Urfer states that Sarah was "substantially impaired at the time of her death while under the influence of these drugs as described **thus impairing her ability to form the intent to commit an act of self-destruction.**"[24] That is, Sarah was too impaired to intentionally kill herself.

Accordingly—as was the case in *Renfandt*—because Colorado law holds that "an insurer **must** show that the decedent, while sane or insane, committed an act of self-destruction **with the intent to kill himself,**"[25] Northwestern must reverse its denial of benefits, because Sarah Rowell's severe intoxication at the time of her death prevents Northwestern from ever satisfying this burden.

**Northwestern's denial wrongly relies on its suspicions of what happened.** It is universally true across the country that an insurer's claim decision must rely on facts, not suspicions.[26] Unfortunately, Northwestern violated this principle by jumping to a conclusion

---

[19] Centers for Disease Control and Prevention, What are the effects of mixing marijuana with alcohol, tobacco, or prescription drugs? *available at* https://www.cdc.gov/marijuana/faqs/mixing-marijuana-with-alcohol-tobacco-drugs.html.

[20] *See, e.g.*, Ziva Cooper, et al, Impact of co-administration of oxycodone and smoke cannabis on analgesia and abuse liability, Neuropsychopharmacology. 2018 Sept. 43(1): 2046–55; Diana L. Cichewicz, Synergistic interactions between cannabinoid and opioid analgesics, Life Sci. 2004 Jan. 30; 74(11): 1317–24 ("delta 9-tetrahydrocannabinol (THC), the major psychoactive constituent of marijuana, enhances the potency of opioids").

[21] Copies of Ms. Urfer's CV and testimonial history are attached as **Exhibits 4 and 5,** respectively.

[22] *See, e.g.,* Exhibit 1.

[23] *Id.*

[24] *Id.* (emphasis added).

[25] *Renfandt* at ¶ 45 (emphasis added).

[26] COUCH ON INS. at § 207:24. "An investigation in good faith requires an honest attempt to discover the answers to questions that have been raised, in a timely manner." David Polin, 46 AM. JUR. PROOF OF FACTS 3D § 2 (1998). An insurer cannot "jump to a conclusion on the basis of particular or certain evidence and then

**EXHIBIT 7**                                        **5**

about what happened here and then performing a perfunctory investigation designed solely to confirm its pre-determined conclusion. This was improper.

In its denial letter dated March 3, 2020, Northwestern attempts to paint a picture of Sarah Rowell as a woman clearly intent on taking her own life. But, in doing so, Northwestern relies on its suspicions of what happened, rather than the facts. For instance, Northwestern claims "Mrs. Rowell calling her in-laws to her home earlier than expected and locking the door behind her after taking a loaded rifle with her demonstrate planning and an understanding of the gravity of her actions."[27] But, that isn't what happened.

Sarah Rowell texted—not called—her in-laws to come just one day earlier than previously planned, because she was (understandably) struggling to care for two young children (a two-and-a-half year old and a five-month old) in her husband's absence, and she knew her in-laws would be happy to come early and spend extra time with their grandchildren. As expected, her in-laws (who lived just a seven-hour drive away) responded to Sarah's text, stating, "yes, we can leave today," to which Sarah responded, "no rush." And, when Mr. Rowell's mother told the police she knew something was wrong, she had presumed Sarah needed help because she was overwhelmed by a combination of two young children and sleep deprivation—not that she was suicidal.

Moreover, Sarah Rowell did not "lock[] the door behind her after taking a loaded rifle" into the room. That's pure fiction. The rifle was already in the bedroom, which is where Mr. Rowell left it before he went on his weeklong rafting trip, and he did so because they had recently had issues with a mountain lion and her cubs.[28] In fact, the rifle was left within arm's reach of where Sarah was found. And, Northwestern makes too much of the door being locked, too, asserting that "[i]f she did not want to succumb to her injuries, she would not have locked her bedroom door where she committed the act, thereby delaying medical attention."[29] As the

---

perform a perfunctory investigation." *Id.* "When facts are in issue, it is incumbent on the insurer to interview all available witnesses and otherwise pursue 'leads' that might produce evidence favorable to the insured's case." *Id.* at § 8.

[27] Letter from Sheila Hauerwas, Northwestern Mutual, to Timothy Garvey, McDermott Law, Mar. 3, 2020.

[28] If Mr. Rowell had any concerns about his wife's mental health, he surely would have locked the rifle in his gun safe before he left, as Sarah had no knowledge of guns and had—to the best of Mr. Rowell's knowledge—pulled the trigger of a gun twice in her life (both times with him present). Sarah disliked guns so much that when Mr. Rowell would come home from work, he would put his gun into the gun safe (located in a separate building on the property) rather than bring it into the house.

[29] Letter from Sheila Hauerwas, Northwestern Mutual, to Timothy Garvey, McDermott Law, Mar. 3, 2020.

**EXHIBIT 7**                                                                                      **6**

EXHIBIT A

police reports state, the key to the room was "located on the top of a door frame."[30] Locking the door caused, at most, a delay of about five seconds (or however long it takes for someone to reach from the doorknob, to the door trim, and back to the knob).

Likewise, Northwestern asserts that the "Sheriff's Report details one of Mrs. Rowell's in-laws report that Mrs. Rowell went into her bedroom and locked the door before a thud was heard from the bedroom."[31] But, that's not quite right, either. Northwestern's recitation makes it appear as if these events were in close succession. They weren't. They were separate events. Sarah took a shower around 6:00 on the morning of her death.[32] Around 6:30, Sarah took her five-month old son into the bedroom to breastfeed him, and she locked the door to give her some privacy. This behavior was normal for Sarah, especially since she was still breastfeeding her youngest child—who had a dairy allergy and constantly needed to feed—and she had her in-laws staying with her. Indeed, multiple police reports confirm that Sarah locked herself in her bedroom multiple times while her in-laws were there, which was done simply to protect her privacy.[33] Notably, Northwestern ignores the importance of Sarah's child still being in the room when Sarah was found, which confirms that Sarah did not lock herself in the bedroom to avoid medical care, but to ensure she had privacy while breastfeeding.

Thus, by relying on its suspicions of what happened—rather than truly investigating to get to the truth of the matter—Northwestern impermissibly placed its own interests ahead of Mr. Rowell's to deny the claim.[34]

**Northwestern omits other critical facts from its analysis.** Insurers must endeavor to obtain all available information bearing on its coverage determination, which includes the

---

[30] *See* Police Reports (attached as **Exhibit 6**)

[31] Letter from Sheila Hauerwas, Northwestern Mutual, to Timothy Garvey, McDermott Law, Mar. 3, 2020.

[32] Exhibit 6.

[33] *Id.*

[34] We note that—although we do not have the claim file—it appears, based on the denial letter, that Northwestern made no attempts to interview a single person to confirm its understanding of the events. It certainly never attempted to confirm its understanding with Mr. Rowell.

**EXHIBIT 7**                                                      **7**

EXHIBIT A

affirmative duty to search for and consider evidence potentially supporting the insured's entitlement to benefits.[35] Here, Northwestern failed in this duty, too.[36]

Besides ignoring Sarah's severe intoxication, Northwestern's claim decision essentially ignores all other facts suggesting Sarah did not intend to kill herself and/or did not understand the consequences of her actions. For instance, although Sarah was leaving behind a loving husband, two young children, and other family members, she left no note. This is significant, because many people who die by suicide leave notes as a way of comforting those they left behind. One would expect that if Sarah truly was aware of the consequences of her actions—despite her dangerously severe intoxication—she would have left notes for her in-laws who were staying with her, her parents who were expected to visit shortly, her husband who would be left to raise their two young children, or her two children who would grow up without their mother. But there was no note, no answers, and no comfort for those left behind. It seems unlikely that a woman in full control of her faculties and with complete understanding of the consequences of her actions would do such a thing.

Likewise, Northwestern ignores the rarity of women dying by gun suicide. According to a report from the United States Senate's Joint Economic Committee, "men are about six and a half times more likely than women to die by firearm suicide" and the rate for gun suicides by women is only 1.88.[37] And yet, according to Northwestern, Sarah—who hated guns and had no experience with them—intentionally shot herself having full knowledge of her actions, despite there being a full bottle of oxycodone in the medicine cabinet.[38] That makes little sense.

---

[35] Steven Plitt et al., 4 COUCH ON INS. § 207:25 (3d ed. 2015). An insurer's investigation requires that it ascertain facts, so its coverage determination does not rest on suspicions. COUCH ON INS. at § 207:24. "An investigation in good faith requires an honest attempt to discover the answers to questions that have been raised, in a timely manner." David Polin, 46 AM. JUR. PROOF OF FACTS 3D § 2 (1998). An insurer cannot "jump to a conclusion on the basis of particular or certain evidence and then perform a perfunctory investigation." Id. "When facts are in issue, it is incumbent on the insurer to interview all available witnesses and otherwise pursue 'leads' that might produce evidence favorable to the insured's case." Id. at § 8.

[36] Again, there is no indication that Northwestern made any effort to obtain evidence supporting the claim.

[37] United States Senate, Joint Economic Committee, Guns and Suicide (2017) available at https://www.jec.senate.gov/public/_cache/files/e4c6a3e3-a170-4cee-8218-0167fe4311e9/jec2019-gunsandsuicide-final.pdf (attached as Exhibit 7). In 2017, there were around 24,000 firearm suicides in the United States. Over 86% of those were performed by males. Additionally, research demonstrates that women who die by suicide are more likely than men to avoid facial disfiguration. See, e.g., Valerie J. Callanan, et al, Gender and Suicide Method: Do Women Avoid Facial Disfiguration? Sex Roles 65 (Dec. 2011).

[38] Exhibit 6. Although women do die by firearm suicide in the United States, the vast majority choose less violent acts like poisoning and suffocation. See, e.g., Centers for Disease Control and Preventions, National Center for Injury Prevention and Control (2020) available at www.cdc.gov/injury/wisqars.

**EXHIBIT 7**                    **8**

EXHIBIT A

Similarly, Northwestern mentions that Sarah was treated for post-partum depression after delivering her first child, but it ignores that there were no indications of post-partum depression after the birth of her second child. Had there been, Mr. Rowell certainly would not have left his wife alone with their two young children to go on a weeklong rafting trip. And, there aren't really any signs that Sarah experienced a post-partum episode in her husband's absence, either. Indeed, as the police report mentions, the house was clean and Sarah had showered just a few hours before her death—both of which were rarities when Sarah was experiencing post-partum depression.

Additionally, had Northwestern fully investigated the claim, it would have learned that the morning of her passing, Sarah reached out to a friend to make plans for the day, as they had previously talked about taking their kids to the zoo.[39] Northwestern also would have learned that just days before her death, Sarah signed up her oldest child for swimming lessons that were to begin the day after her death. And, Northwestern would have learned that Sarah enrolled her son for lessons at that particular facility solely because it had a heated pool that would make the experience less traumatic for her young child.[40] That's how much Sarah loved her children, which makes it even more odd that she could even conceivably have intentionally taken her own life with her youngest child in the room with her. Further, had Northwestern fully investigated, it would have learned that Sarah received a package from StitchFix on the day of her death, which was something else she was really looking forward to.

Moreover, as the *Renfandt* court noted, the purpose of a suicide exclusion is to "protect insurers from a 'risk' that lies wholly in the control of the insured."[41] However, to apply a suicide exclusion "to an individual who lacks suicidal intent is inconsistent with the purpose of such provisions."[42] Here, permitting Northwestern to avoid its contractual promise to pay benefits upon Sarah's death would be unjust, as there exist no indications that she **intended** to defraud Northwestern by taking her own life soon after obtaining the policy. Indeed, Mr. Rowell had to convince Sarah to get a life insurance policy in the first place, and when their agent suggested a higher dollar amount, she declined. Surely, had Sarah had such a hidden intent to defraud Northwestern, she would have taken out the largest policy available to her.

Accordingly, had Northwestern fully investigated the claim—as the duty of good faith required it to—it would have learned facts that cut against its pre-determined conclusion that Sarah

---

[39] *See* text message (attached as **Exhibit 8**).

[40] The Rowells had previously tried swimming lessons for their child, but it did not go well because he was further frightened by how cold the water was.

[41] *Renfandt* at ¶ 51.

[42] *Id.*

**EXHIBIT 7**                                                                    **9**

intentionally killed herself and support the conclusion that her death was a tragic incident, committed by a person unable to form the intent necessary to commit "suicide" under the terms of the life insurance policy.

**Northwestern's decision to hide the claim file thwarts Mr. Rowell's ability to appeal.** Understandably, Mr. Rowell would prefer to avoid being forced into a lawsuit over his deceased wife's life insurance benefits.[43] However, Northwestern's refusal to provide the claim file has us worried that a lawsuit may be inevitable. To be honest, we do not understand Northwestern's refusal to provide the claim file, as insurance companies routinely provide claim files during the appeal process.[44] And, they do so for good reason. The purpose of this appeal is to ensure Northwestern has all the information it needs to make the right claim decision. But, we can't provide all the information (nor can we correct any misinformation) when Northwestern hides the claim file from us, and that means by hiding the claim file, Northwestern is preventing itself from making the right decision and ensuring that its decision rests on less than all the available information.

And, despite Northwestern's claims to the contrary, there is nothing proprietary about an insurance company's claim file. In fact, Colorado law requires every life insurer to maintain a claim file and mandates what must be in that claim file. 3 CCR 702-1 Reg. 1-1-7.[45] Therefore, what is in the claim file cannot be proprietary. Furthermore, if a lawsuit is filed, Northwestern will have no choice but to disclose the claim file. So, it makes little sense for Northwestern to hide this evidence, as doing so only makes a lawsuit more likely. As such, we once again ask that Northwestern please provide the claim file, so we may respond to any additional misinformation contained therein. And, to the extent Northwestern would continue to assert that the information in the claim file is confidential or proprietary, we would gladly agree to a reasonable protective order (pre-litigation only) to protect such information.

---

[43] We note that Northwestern forcing him to do so would violate C.R.S. § 10-3-1104(1)(h)(VII), which prohibits "[c]ompelling insureds to institute litigation to recover amounts due under an insurance policy … ."

[44] This law firm specializes in handling both ERISA and non-ERISA insurance claims. We regularly receive claim files from insurers in both kinds of cases, and we note that if this claim were governed by ERISA, Northwestern would be required to share the claim file.

[45] For life insurers, this file must contain, among many other things, "the notice of claim; claim forms; medical records; proof of loss; correspondence to and from covered individuals and claimants or their representatives regarding a claim; claim investigation documentation; claim handling logs; copies of checks or check numbers and amounts; documentation pertaining to retained asset accounts; signed releases; complaint correspondence; all applicable notices and correspondence used for determining and concluding claim payments or denials; and any other documentation maintained in a paper or electronic format necessary to support claim handling activity." 3 CCR 702-1 Reg. 1-1-7 § 4(C)(2).

**EXHIBIT 7**                    **10**

EXHIBIT A

## CONCLUSION

This is a tragic situation for everyone involved. Unfortunately for Mr. Rowell, it's been made even more tragic by Northwestern's decision to repeatedly deny his claim, which has forced him to revisit and relive this experience for over a year, simply to get Northwestern to keep its promises.

While Northwestern may believe it has grounds for avoiding its contractual obligation to Mr. Rowell, Colorado law prohibits it from doing so under the facts of this case. Indeed, as this law firm stated in its amicus brief in *Renfandt*,[46] Colorado "eliminates from consideration any defense of suicide that might otherwise have been asserted."[47] The only exception—and the only time a suicide exclusion can be enforced—is for **intentional** self-destructions that occur during the policy's first year.[48] That's it. And, as the *Renfandt* court noted, "[t]o apply the exclusion to an individual who lacks suicidal intent is inconsistent with the purpose of such provisions."[49] Thus, under Colorado law, a suicide exclusion can be enforced **only** when the insured's self-destruction was intentional, but that's not what happened here.

What happened here is, tragically, the same thing that happened in *Renfandt*. In both instances, the insured's severe intoxication from alcohol and other drugs made it so they could not understand the physical nature and consequences of their act, and because of that the law holds "there is simply no 'suicide.'"[50] And, since there was simply no suicide, Northwestern cannot rely on the policy's suicide exclusion to deny coverage. The claim must be paid.

We look forward to hearing from you within the next 45 days. If you need anything further from Mr. Rowell between now and then, please let us know. We're happy to do what we can to provide whatever additional information Northwestern believes it may need to right this wrong.

---

[46] Undersigned counsel authored and submitted an amicus brief on behalf of the Colorado Trial Lawyers Association in *Renfandt*. It is available on Westlaw. So, too, are the amicus briefs we drafted to the 10th Circuit and the Colorado Supreme Court in *Amica Life Ins. Co. v. Wertz*, as is the response brief submitted to the United States District Court in *Amvae v. Metropolitan Life Ins. Co.*, which defeated the insurer's attempt for summary judgment.

[47] *Weber v. Head* Camp, 154 P. 728, 729 (Colo. 1915).

[48] *See Ownbey v. General United Life Ins. Co.*, 524 P.2d 636, 637 (Colo. App. 1974).

[49] *Renfandt* at ¶ 51.

[50] *Id.* at ¶ 50.

**EXHIBIT 7**                              **11**

EXHIBIT A

Sheila Hauerwas
Northwestern Mutual
August 26, 2020
Page 12 of 12

Sincerely,

Timothy Garvey
Attorney

TMG:vab
Encl:   Exhibits 1–9
cc:      Andrew Rowell

**EXHIBIT 7**                                              **12**

EXHIBIT A

 **Northwestern Mutual**

SHEILA HAUERWAS
Life Benefits Consultant
Life Benefits Division

DATE FILED: December 14, 2020 11:11 AM
FILING ID: 88C2DD8C89CABB
CASE NUMBER: 2020CV34229

October 15, 2020

McDermott Law LLC
Attn: Garvey Timothy
4600 S Ulster St Ste 800
Denver, CO 80237

      Re:    **Decedent Insured: Sarah C. Rowell**
                  **Client: Andrew W Rowell**
                  **Policy 22805974**

Dear Attorney Garvey:

Thank you for your appeal letter dated August 26, 2020. We have carefully reviewed your appeal including the attached exhibits. Unfortunately, the information you provided does not warrant a change in our position. We affirm our original determination and find that the manner of Mrs. Rowell's death was suicide, and the facts surrounding her death trigger the suicide exclusion in the above-referenced policy. Please allow me to explain.

Your current appeal alleges that Northwestern Mutual erred in its initial determination by drawing conclusions unsupported by fact. We deny that allegation, and for the reasons set forth in our July 2019 letter, we maintain that the conclusions therein present a plausible narrative based on the information available to us at that time.

Your current appeal relies on additional claimed facts and circumstances which you suggest prevent Northwestern Mutual from satisfying a requisite element in invoking exclusionary suicide language in a life insurance policy: intent. We do not dispute your contention that Colorado case law requires an insurer to prove that its decedent insured acted with the intent to end his or her life. We do, however, disagree that the facts you assert in your current appeal show a lack of intent.

Some of your alleged facts are simply not persuasive in the context of our review. Specifically, Mrs. Rowell planning a trip to the zoo with friends, registering her child for swim classes, and having a clean house, taking a shower, and feeding the baby on the day of her death are arguably routine tasks in which many people engage while still having suicidal thoughts, and in the days and hours leading up to following through with an act that ends their life. Your current appeal further relies on Mrs. Rowell's history of mental health treatment as behavior contrary to that of someone who would commit suicide. This is also not persuasive as persons with suicidal ideations do seek treatment.

The Northwestern Mutual Life Insurance Company • 720 East Wisconsin Avenue, Milwaukee, Wisconsin 53202-4797 • 414 271-1444 • www.northwesternmutual.com

EXHIBIT A

On the other hand, we believe that your current appeal raises the following two important facts that, rather than raise doubt, reinforce our position that Mrs. Rowell **did** possess the requisite intent to support invoking the Policy's suicide exclusion:

## 1. Significant Alcohol Use

Your current appeal claims that Mrs. Rowell was so intoxicated at the time of her death that she could not have intended to kill herself. First, applying the findings of an academic study reviewing mind-altering blood toxicology levels to Mrs. Rowell's case requires an in-depth examination of that study's variable factors (how alcohol is metabolized in individuals based on weight, height, time, number of drinks, alcoholic content of drinks consumed, and personal tolerance based on history of drinking), and controls.

In Mrs. Rowell's case, her blood toxicology levels on the date of her death are documented in the same medical examiner's report that reflects a finding of a fatty liver.  There are two types of fatty liver disease: nonalcoholic and alcoholic.  The risk factors for *nonalcoholic* fatty liver disease include: high levels of triglycerides in the blood; metabolic syndrome; obesity, particularly when fat is concentrated in the abdomen; polycystic ovary syndrome; sleep apnea; type 2 diabetes, underactive thyroid (hypothyroidism), and underactive pituitary gland (hypopituitarism).  Mrs. Rowell did not report any such history in her application for the Policy, none of the aforementioned risk factors were cited in the medical examiner's report, and none of the law enforcement reports include any statements from your client or his parents reporting such history.

*Alcoholic* fatty liver is different, and what is notable in Mrs. Rowell's case is what her mother-in-law reported to law enforcement officers who responded to the home on the date of her death: 1) Mrs. Rowell's reported history of drinking issues in high school and college; and 2) the incident of seeing evidence of Mrs. Rowell vomiting blood on the day before she passed away. This is significant because alcoholic fatty liver is only present in individuals who have been heavy drinkers for long periods of time, and the risk increases if the longstanding heavy drinker is female. If Mrs. Rowell had in fact been drinking heavily for a long period of time, it is not certain that the alcohol consumed on the date of her death would have any measurable impact on her ability to make affirmative decisions.

If the alcohol she consumed on the date of her death had altered her state of mind to the extent suggested in your current appeal, why would her parents-in-law have left a young baby in her care?  If her mind was impacted to the point of being unable to form the idea to commit the act, why the dismissal of her locking the door to breastfeed the baby? Why not intervene instead of risking the baby ingesting the breast milk of a person who may have been drunk, or being harmed in some other way? The actions and inactions of her parents-in-law on the date of her death contradict the claim in your current appeal that she had consumed enough alcohol to render her incapable of forming intent.

Finally, it is not uncommon for persons who commit suicide to consume large quantities of alcohol or drugs in an effort to build up the courage to complete, or dull the pain of, the act.

The Northwestern Mutual Life Insurance Company • 720 East Wisconsin Avenue, Milwaukee, Wisconsin 53202-4797 • 414 271-1444 • www.northwesternmutual.com

**EXHIBIT 8**                                          **2**

EXHIBIT A

**2.  Manner of Death**

Intent is further supported by the specific act that caused Mrs. Rowell's death.  She placed a gun in her mouth and pulled the trigger.  Your current appeal does not explain any other defensible alternative outcome Mrs. Rowell could have expected by taking those affirmative steps to place a gun in her mouth and pull the trigger.  You contend that Mrs. Rowell could not have intended suicide because it is rare for women to commit suicide by use of a firearm, she had a strong dislike for guns, and, according to her husband, had only pulled the trigger of a gun twice.  None of these claims change the physical facts of how her life was ended.  Women committing suicide by use of a firearm less frequently than men does not support a conclusion that it cannot happen.  Mrs. Rowell may not have liked guns, but that did not stop her from pulling the trigger on two occasions in the presence of her husband and on the date of her death.  The physical acts she committed that day could only have resulted in the realized outcome of her death.

You ultimately argue in your current appeal that only a mind-altering combination of oxycodone, marijuana, and a significant amount of alcohol could have caused a happy, socially thriving, married young mother to put a gun in her mouth and pull the trigger.  Your argument unfortunately is simply not supported by independent medical analyses particular to Mrs. Rowell.  We again offer our condolences to your client in the loss of his wife.  We carefully reviewed the information your provided, but our position remains unchanged.

Thank you for your time and patience during our review.

Sincerely,

*Sheila Hauerwas*

Sheila  Hauerwas

The Northwestern Mutual Life Insurance Company • 720 East Wisconsin Avenue, Milwaukee, Wisconsin 53202-4797 • 414 271-1444 • www.northwesternmutual.com

**EXHIBIT 8**                     3

EXHIBIT A